**EXHIBIT 6**

Updated November __, 2003
Version 2.2

# Privacy Topics

Why A Privacy Policy?
Getting to Know our Customers
Third Party Advertising and Cookies
Information Corrections or Changes
How We Put Information to Good Use
With Whom We May Share Information
How Do I Get My Name Removed from Bulk Access
Our Accountability to You
Employee Accountability
The Accountability of Network Solutions' Agents and Business Partners
Notification of Changes

## Why A Privacy Policy?

Network Solutions respects your individual privacy. This Privacy Policy ('Policy') embodies our commitment to its protection through adherence to fair electronic information practices. This Policy puts you, the individual, in control of how your personal information is processed. You have our promise that we will not electronically process your personal information in any way that is incompatible with this Policy.

**This Privacy Policy protects your privacy by:**

**Informing you about:**

- The types of personal information Network Solutions collects about you through its Web sites;
- How it collects that information;
- The general purposes for which it collects such information;
- The types of organizations to which it discloses the information;
- The choices and means by which individuals may limit its use and disclosure.

**Empowering you to choose:**

- Whether and how certain personal information you provide is used (where such use is unrelated to the uses for which you originally disclosed it); and
- Whether and the manner in which a third party uses certain personal information you provide (where such use is unrelated to the uses for which you originally disclosed it).

**Assuring you that Network Solutions:**

- Takes reasonable precautions to protect personal information from loss, misuse, unauthorized access, disclosure, alteration or destruction;
- Implements reasonable policies and procedures to ensure that personal information is kept only for the purposes for which it has been gathered;
- Uses reasonable measures to ensure that we have accurately and completely recorded the personal information you have provided; and
- Provides you reasonable access to your personal information as well as procedures for correcting or modifying that information where appropriate.

**Ensuring accountability** to individuals who believe that Network Solutions has not complied with these privacy principles.

**Top of Page**

## Getting to Know Our Customers

Network Solutions is in the business of putting people in touch with other people. That requires more than simply offering innovative technical services. It also requires that we understand you, our customer, and your needs. Indeed, we are the Internet's leading domain name registrar because we have taken the time to get acquainted with each one of our many customers.

RFJN0273

We get to know you primarily through the information you provide to us when signing up for, or using, one or more of our services. The information you provide ranges from basic contact information, to payment information, to the technical coordinates of your host servers. The application for domain name registration services found at www.networksolutions.com is a representative illustration of the information we request of you. All of the information we request from you when purchasing our services is obligatory unless otherwise noted on the relevant form. When you purchase our services, you agree to provide and maintain accurate, complete and updated information.

After you have signed up for our services, we may be in communication with you about your account, technical questions you may have about services provided by us, or any other matter relating to those services. Those communications are essential to our relationship with you and to our ability to provide you with quality services that are responsive to your needs. At the same time, those communications give us helpful insights about you, your preferences and the ways in which we might improve our services. We therefore may maintain this information for future use.

For operational and quality assurance purposes, we take note of whether and how you use the information and services that we provide, such as by recording site traffic patterns and by maintaining log files of users' access to site files.

The information we receive from or about you is stored on systems designed to prevent the loss, misuse, unauthorized access, disclosure, alteration or destruction of that information. We also encrypt your transmission of sensitive information to us (e.g., credit card numbers, account passwords) in the interest of heightened privacy protection and information integrity. Transactions within our account manager and purchase flows use Secure Sockets Layer (SSL) encryption when transmitting data from your connection to our systems. You may click the lock icon within your web browser to verify the authenticity of any or our SSL certificates.

**Top of Page**

### Third Party Advertising and Cookies

We use third-party advertising companies to serve ads on our Web site and other Web sites. In the course of serving advertisements, these companies may place or recognize a unique 'cookie' on your hard drive, and may use information (not including your name, address, e-mail address, or telephone number) about your visits to this and other web sites in order to measure advertising effectiveness and to provide advertisements about goods and services of interest to you. For more information about this practice and to know your choices about not having your information used by these companies, please visit http://www.doubleclick.net/us/corporate/privacy.

VeriSign shares Web site usage information about visitors to our Web site with a reputable third-party advertising company for the purpose of targeting our Internet banner advertisements on this site and other sites. For this purpose, we and our third-party advertising company note some of the pages you visit on our Web site through the use of pixel tags (also called clear gifs). The information collected by our third-party advertising company through the use of these pixel tags is not personally identifiable. For more information about our third-party advertiser, please click here. To opt out of the targeting program, please click here.

**Top of Page**

### Information Corrections or Changes

You have the ability to correct or change certain information in our records, such as your address and contact information. The process for changing your information begins at https://www.networksolutions.com/en_US/manage-it/index.jhtml. You may change this information at any time and as often as necessary. If you need assistance or have questions about correcting information, you can contact us via e-mail at customerservice@networksolutions.com.

**Top of Page**

### How We Put Information to Good Use

We use information about you for purposes of monitoring and improving our internal operations, as well as to ensure we: (i) bill you properly, (ii) administer your account in accordance with your agreements with us, and (iii) properly perform the services you have requested.

We also use the information we collect to monitor and improve our internal operations, as well as to improve the experience of users in our network of sites. For example, we may correlate Web site traffic information with data about individual users. This data helps us to determine how much our customers use parts of the site, allowing us to enhance it to fit the needs of as many of our customers as possible. We may also break down overall usage statistics according to customers' domain names, browser types, and MIME types by reading this information from the browser string (information contained in every user's browser).

Another example of our use of information to enhance the experience of users in our network of sites is our reliance on cookie files. We use cookie files to make it easier for users to access our site or services. A cookie file is a small data file that certain Web sites write to your hard drive when you visit them. A cookie file can contain information such as a user ID that the site uses to track the pages you have visited. However, the only personal information a cookie can contain is information you supply yourself. A cookie cannot read data off your hard disk or read cookie files created by other sites. We use cookies to track user traffic patterns (as described above) when you register for Network Solutions services. When you register, we may use a cookie to store a unique, random user ID. We use this ID to identify you anonymously in our database and to track the pages you visit on our site.

RFJN0274

If you have set your browser to warn you before accepting cookies, you will receive the warning message with each cookie. You may refuse cookies by turning them off in your browser; however, some of our sites may require a cookie for access.

Finally, we use the information we collect to direct important notices and information affecting your account or services, as well as to provide general information that may be of interest to you, including newsletters, surveys, contest and sweepstake announcements, and information about our service or product offerings or the offerings of our business affiliates. You may opt-out of receiving information from us simply by notifying us of your desire in accordance with the opt-out instructions contained in any information message you receive from us. Note, however, that in order to fulfill our service obligations to you, we must continue sending you notices and other important information affecting your account or services.

**Top of Page**

### With Whom We May Share Information

Pursuant to arrangements with Internet Corporation for Assigned Names and Numbers ('ICANN'), we compile and maintain a publicly accessible registration database that includes basic information about each domain name registered with us, including the names, telephone numbers and e-mail addresses of individuals designated as points of contact for a given domain name. Whether or not applicable domain name registration fees have been paid is also publicly accessible. With the gradual continued privatization of the Domain Name System, and consistent with the rules or policies applicable to that system, or to comply with any changes in law or regulation, we may, if appropriate, take steps to restrict the accessibility and amount of personally identifying information available in the registration database

When you register a domain name through us, we must disclose your domain name and its associated Internet Protocol ("IP") numbers to the appropriate registry in order to make your chosen domain name a functional address on the Internet.  Certain registries also require that we disclose to them the names, postal addresses, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name. Each registry discloses certain portions (and in some cases all) of the information we are required to provide to them about your domain name registration.  For example, each registry discloses at least each registered domain name and its associated IP numbers ("TLD zone files") to TLD server administrators so that the domain name is capable of functioning as an address on the Internet. Consistent with the current rules and policies for the Domain Name System, such registries also disclose the TLD zone files to other interested persons, provided those persons agree, among other things, not to use the TLD zone files for improper purposes, including the transmission of unsolicited commercial e-mail.  Similarly, each registry may compile and maintain a publicly accessible database that includes basic information about each domain name registered with that registry, including the names, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name.

We may share certain information about you with those of our vendors who are responsible for handling your account or performing other services that you require. Although we may share sensitive financial information (i.e., credit card numbers, banking information), security information (e.g., account passwords) and personal communications (e.g., personal e-mail messages or message board postings) with such vendors where necessary and appropriate, we will not share such information with other third parties, except in response to formal requests (e.g., subpoena or court order) made in connection with litigation, arbitration, or criminal proceedings directly relating to a domain name registration or other services we provide, or as directed by you or your agent.

Additionally, we may share the information stored on the publicly accessible registration database, as well as other information that is not of a sensitive nature, with carefully selected business partners, including those who offer services that complement those provided by us or which may otherwise be of interest to you. If you do not want us to share information about you with our business partners, you may opt-out of receiving this information through our Account Manager by following the instructions below:

a.  Log into Account Manager at www.networksolutions.com;
b.  Click "Edit User Info" in the left menu;
c.  Scroll to the bottom of the page;
d.  Select "NO" for the third statement, which reads, "I would like to receive selected and relevant information from Network Solutions partners;" and
e.  Click "SAVE."

Please note, however, that consistent with the current rules and policies for the Domain Name System, information about you must remain available in the publicly accessible registration database.

**Top of Page**

### How Do I Get My Name Removed from Bulk Access

As noted above, we currently make certain information about you available to the general public via our domain name registration database look-up services. These services give users access to such data on a query-by-query basis. Pursuant to our arrangements with ICANN, qualified persons may also access such data on a bulk basis provided they agree, among other things, not to use the data to allow, enable or otherwise support the transmission by e-mail, telephone, or facsimile of mass, unsolicited, commercial advertising or solicitations to entities other than to such qualified persons' own existing customers; or (ii) sell or redistribute the data to third parties, except insofar as the data is incorporated into a value-added product or service that does not permit the extraction of a substantial portion of the data. If you do not want your personal information disclosed on a bulk basis, you may opt-out of such disclosure through our Account Manager by following the instructions below:

a.  Log into Account Manager at www.networksolutions.com;

RFJN0275

b. Click "Edit User Info" in the left menu;
c. Scroll to the bottom of the page;
d. Select "NO" for the first statement, which reads, "I choose to have my name included in the Bulk WHOIS data licensed to third parties for domains for which I am the Account Holder or Primary Contact;" and
e. Click "SAVE."

**Top of Page**

### Our Accountability to You

By purchasing our services, you obtain the protections of, and consent to the data processing practices described in, this Privacy Policy. When you purchase our services, you also represent to us that you have provided notice to, and obtained consent from, any third party individuals whose personal data you supply to us with regard to: (i) the purposes for which such third party's personal data have been collected, (ii) the intended recipients or categories of recipients of the third party's personal data, (iii) which of the third party's data are obligatory and which data, if any, are voluntary, and (iv) how the third party can access and, if necessary, rectify the data held about them.

In addition to the privacy protections that we provide, our employees, agents and business partners are independently responsible for ensuring compliance with this Privacy Policy, as described below.

**Top of Page**

### Employee Accountability

Only those Network Solutions employees that have a legitimate business purpose for accessing and handling personal information obtained by us are given authorization to do so. The unauthorized access or use of such information by a Network Solutions employee is prohibited and constitutes grounds for disciplinary action.

Additionally, our information management systems are configured in such a way as to block or inhibit employees from accessing information that they have no authority to access.

**Top of Page**

### The Accountability of Network Solutions' Agents and Business Partners

Our trusted vendors and business partners are responsible for processing or handling some of the information that we receive. These vendors and business partners are not authorized to use such information for purposes beyond those specified by us and are required to preserve the confidentiality with which we treat such information.

If you feel that Network Solutions, or any of our agents, representatives or employees, is violating this Privacy Policy, please contact us via e-mail at privacy@networksolutions.com, by telephone at (703) 668-4600, or by postal mail at:

Network Solutions Inc.
Attention: General Counsel
13200 VeriSign Way
Herndon, VA 20171
(703) 668-4600

**Top of Page**

### Notification of Changes

We will post any changes to this Privacy Policy 30 days before their effective date so you will always know what information we collect, how we use it, and under what circumstances, if any, we disclose it. You are responsible for periodically checking our web site for changes to this Privacy Policy. You may opt-out of any posted change to our collection, use or disclosure of your personal information by sending an e-mail to privacy@networksolutions.com.

**If you have any questions regarding this Privacy Policy, please contact** privacy@networksolutions.com.

**Top of Page**

**EXHIBIT 7**

Updated February __, 2004
Version 2.3

# Privacy Topics

Why A Privacy Policy?
Getting to Know our Customers
Third Party Advertising and Cookies
Information Corrections or Changes
How We Put Information to Good Use
With Whom We May Share Information
How Do I Get My Name Removed from Bulk Access
Our Accountability to You
Employee Accountability
The Accountability of Network Solutions' Agents and Business Partners
Notification of Changes

## Why A Privacy Policy?

Network Solutions respects your individual privacy. This Privacy Policy ('Policy') embodies our commitment to its protection through adherence to fair electronic information practices. This Policy puts you, the individual, in control of how your personal information is processed. You have our promise that we will not electronically process your personal information in any way that is incompatible with this Policy.

**This Privacy Policy protects your privacy by:**

**Informing you about:**

- The types of personal information Network Solutions collects about you through its Web sites;
- How it collects that information;
- The general purposes for which it collects such information;
- The types of organizations to which it discloses the information;
- The choices and means by which individuals may limit its use and disclosure.

**Empowering you to choose:**

- Whether and how certain personal information you provide is used (where such use is unrelated to the uses for which you originally disclosed it); and
- Whether and the manner in which a third party uses certain personal information you provide (where such use is unrelated to the uses for which you originally disclosed it).

**Assuring you that Network Solutions:**

- Takes reasonable precautions to protect personal information from loss, misuse, unauthorized access, disclosure, alteration or destruction;
- Implements reasonable policies and procedures to ensure that personal information is kept only for the purposes for which it has been gathered;
- Uses reasonable measures to ensure that we have accurately and completely recorded the personal information you have provided; and
- Provides you reasonable access to your personal information as well as procedures for correcting or modifying that information where appropriate.

**Ensuring accountability** to individuals who believe that Network Solutions has not complied with these privacy principles.

**Top of Page**

## Getting to Know Our Customers

Network Solutions is in the business of putting people in touch with other people. That requires more than simply offering innovative technical services. It also requires that we understand you, our customer, and your needs. Indeed, we are the Internet's leading domain name registrar because we have taken the time to get acquainted with each one of our many customers.

RFJN0277

We get to know you primarily through the information you provide to us when signing up for, or using, one or more of our services. The information you provide ranges from basic contact information, to payment information, to the technical coordinates of your host service. The application for domain name registration services found at www.networksolutions.com is a representative illustration of the information we request of you. All of the information we request from you when purchasing our services is obligatory unless otherwise noted on the relevant form. When you purchase our services, you agree to provide and maintain accurate, complete and updated information.

After you have signed up for our services, we may be in communication with you about your account, technical questions you may have about services provided by us, or any other matter relating to those services. Those communications are essential to our relationship with you and to our ability to provide you with quality services that are responsive to your needs. At the same time, those communications give us helpful insights about you, your preferences and the ways in which we might improve our services. We therefore may maintain this information for future use.

For operational and quality assurance purposes, we take note of whether and how you use the information and services that we provide, such as by recording site traffic patterns and by maintaining log files of users' access to site files.

The information we receive from or about you is stored on systems designed to prevent the loss, misuse, unauthorized access, disclosure, alteration or destruction of that information. We also encrypt your transmission of sensitive information to us (e.g., credit card numbers, account passwords) in the interest of heightened privacy protection and information integrity. Transactions within our account manager and purchase flows use Secure Sockets Layer (SSL) encryption when transmitting data from your connection to our systems. You may click the lock icon within your web browser to verify the authenticity of any or our SSL certificates.

**Top of Page**

## Third Party Advertising and Cookies

We use third-party advertising companies to serve ads on our Web site and other Web sites. In the course of serving advertisements, these companies may place or recognize a unique 'cookie' on your hard drive, and may use information (not including your name, address, e-mail address, or telephone number) about your visits to this and other web sites in order to measure advertising effectiveness and to provide advertisements about goods and services of interest to you. For more information about this practice and to know your choices about not having your information used by these companies, please visit http://www.doubleclick.net/us/corporate/privacy.

Network Solutions shares Web site usage information about visitors to our Web site with a reputable third-party advertising company for the purpose of targeting our Internet banner advertisements on this site and other sites. For this purpose, we and our third-party advertising company note some of the pages you visit on our Web site through the use of pixel tags (also called clear gifs). The information collected by our third-party advertising company through the use of these pixel tags is not personally identifiable. For more information about our third-party advertiser, please click here. To opt out of the targeting program, please click here.

**Top of Page**

## Information Corrections or Changes

You have the ability to correct or change certain information in our records, such as your address and contact information. The process for changing your information begins at https://www.networksolutions.com/en_US/manage-it/index.jhtml. You may change this information at any time and as often as necessary. If you need assistance or have questions about correcting information, you can contact us via e-mail at customerservice@networksolutions.com.

**Top of Page**

## How We Put Information to Good Use

We use information about you for purposes of monitoring and improving our internal operations, as well as to ensure we: (i) bill you properly, (ii) administer your account in accordance with your agreements with us, and (iii) properly perform the services you have requested.

We also use the information we collect to monitor and improve our internal operations, as well as to improve the experience of users in our network of sites. For example, we may correlate Web site traffic information with data about individual users. This data helps us to determine how much our customers use parts of the site, allowing us to enhance it to fit the needs of as many of our customers as possible. We may also break down overall usage statistics according to customers' domain names, browser types, and MIME types by reading this information from the browser string (information contained in every user's browser).

Another example of our use of information to enhance the experience of users in our network of sites is our reliance on cookie files. We use cookie files to make it easier for users to access our site or services. A cookie file is a small data file that certain Web sites write to your hard drive when you visit them. A cookie file can contain information such as a user ID that the site uses to track the pages you have visited. However, the only personal information a cookie can contain is information you supply yourself. A cookie cannot read data off your hard disk or read cookie files created by other sites. We use cookies to track user traffic patterns (as described above) when you register for Network Solutions services. When you register, we may use a cookie to store a unique, random user ID. We use this ID to identify you anonymously in our database and to track the pages you visit on our site.

RFJN0278

If you have set your browser to warn you before accepting cookies, you will receive the warning message with each cookie. You may refuse cookies by turning them off in your browser; however, some of our sites may require a cookie for access.

Finally, we use the information we collect to direct important notices and information affecting your account or services, as well as to provide general information that may be of interest to you, including newsletters, surveys, contest and sweepstake announcements, and information about our service or product offerings or the offerings of our business affiliates. You may opt-out of receiving information from us simply by notifying us of your desire in accordance with the opt-out instructions contained in any information message you receive from us. Note, however, that in order to fulfill our service obligations to you, we must continue sending you notices and other important information affecting your account or services.

Top of Page

## With Whom We May Share Information

Pursuant to arrangements with Internet Corporation for Assigned Names and Numbers ('ICANN'), we compile and maintain a publicly accessible registration database that includes basic information about each domain name registered with us, including the names, telephone numbers and e-mail addresses of individuals designated as points of contact for a given domain name. Whether or not applicable domain name registration fees have been paid is also publicly accessible. With the gradual continued privatization of the Domain Name System, and consistent with the rules or policies applicable to that system, or to comply with any changes in law or regulation, we may, if appropriate, take steps to restrict the accessibility and amount of personally identifying information available in the registration database.

When you register a domain name through us, we must disclose your domain name and its associated Internet Protocol ("IP") numbers to the appropriate registry in order to make your chosen domain name a functional address on the Internet. Certain registries also require that we disclose to them the names, postal addresses, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name. Each registry discloses certain portions (and in some cases all) of the information we are required to provide to them about your domain name registration. For example, each registry discloses at least each registered domain name and its associated IP numbers ("TLD zone files") to TLD server administrators so that the domain name is capable of functioning as an address on the Internet. Consistent with the current rules and policies for the Domain Name System, such registries also disclose the TLD zone files to other interested persons, provided those persons agree, among other things, not to use the TLD zone files for improper purposes, including the transmission of unsolicited commercial e-mail. Similarly, each registry may compile and maintain a publicly accessible database that includes basic information about each domain name registered with that registry, including the names, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name.

We may share certain information about you with those of our vendors who are responsible for handling your account or performing other services that you require (including vendors who may update your credit card expiration date if you choose our auto-renew feature). Although we may share sensitive financial information (i.e., credit card numbers, banking information), security information (e.g., account passwords) and personal communications (e.g., personal e-mail messages or message board postings) with such vendors where necessary and appropriate, we will not share such information with other third parties, except in response to formal requests (e.g., subpoena or court order) made in connection with litigation, arbitration, or criminal proceedings directly relating to a domain name registration or other services we provide, or as directed by you or your agent.

Additionally, we may share the information stored on the publicly accessible registration database, as well as other information that is not of a sensitive nature, with carefully selected business partners, including those who offer services that complement those provided by us or which may otherwise be of interest to you. If you do not want us to share information about you with our business partners, you may opt-out of receiving this information through our Account Manager by following the instructions below:

a. Log into Account Manager at www.networksolutions.com;
b. Click "Edit User Info" in the left menu;
c. Scroll to the bottom of the page;
d. Select "NO" for the third statement, which reads, "I would like to receive selected and relevant information from Network Solutions partners;" and
e. Click "SAVE."

Please note, however, that consistent with the current rules and policies for the Domain Name System, information about you must remain available in the publicly accessible registration database.

Top of Page

## How Do I Get My Name Removed from Bulk Access

As noted above, we currently make certain information about you available to the general public via our domain name registration database look-up services. These services give users access to such data on a query-by-query basis. Pursuant to our arrangements with ICANN, qualified persons may also access such data on a bulk basis provided they agree, among other things, not to use the data to allow; enable or otherwise support the transmission by e-mail, telephone, or facsimile of mass, unsolicited, commercial advertising or solicitations to entities other than to such qualified persons' own existing customers; or (ii) sell or redistribute the data to third parties, except insofar as the data is incorporated into a value-added product or service that does not permit the extraction of a substantial portion of the data. If you do not want your personal information disclosed on a bulk basis, you may opt-out of such disclosure through our Account Manager by following the instructions below:

a. Log into Account Manager at www.networksolutions.com;
b. Click "Edit User Info" in the left menu;
c. Scroll to the bottom of the page;
d. Select "NO" for the first statement, which reads, "I choose to have my name included in the Bulk WHOIS data licensed to third parties for domains for which I am the Account Holder or Primary Contact;" and
e. Click "SAVE."

**Top of Page**

## Our Accountability to You

By purchasing our services, you obtain the protections of, and consent to the data processing practices described in, this Privacy Policy. When you purchase our services, you also represent to us that you have provided notice to, and obtained consent from, any third party individuals whose personal data you supply to us with regard to: (i) the purposes for which such third party's personal data have been collected, (ii) the intended recipients or categories of recipients of the third party's personal data, (iii) which of the third party's data are obligatory and which data, if any, are voluntary, and (iv) how the third party can access and, if necessary, rectify the data held about them.

In addition to the privacy protections that we provide, our employees, agents and business partners are independently responsible for ensuring compliance with this Privacy Policy, as described below.

**Top of Page**

### Employee Accountability

Only those Network Solutions employees that have a legitimate business purpose for accessing and handling personal information obtained by us are given authorization to do so. The unauthorized access or use of such information by a Network Solutions employee is prohibited and constitutes grounds for disciplinary action.

Additionally, our information management systems are configured in such a way as to block or inhibit employees from accessing information that they have no authority to access.

**Top of Page**

### The Accountability of Network Solutions' Agents and Business Partners

Our trusted vendors and business partners are responsible for processing or handling some of the information that we receive. These vendors and business partners are not authorized to use such information for purposes beyond those specified by us and are required to preserve the confidentiality with which we treat such information.

If you feel that Network Solutions, or any of our agents, representatives or employees, is violating this Privacy Policy, please contact us via e-mail at privacy@networksolutions.com, by telephone at (703) 668-4600, or by postal mail at:

Network Solutions, LLC
Attention: General Counsel
13200 Woodland Park Drive
Herndon, VA 20171
(703) 668-4600

**Top of Page**

### Notification of Changes

We will post any changes to this Privacy Policy 30 days before their effective date so you will always know what information we collect, how we use it, and under what circumstances, if any, we disclose it. You are responsible for periodically checking our web site for changes to this Privacy Policy. You may opt-out of any posted change to our collection, use or disclosure of your personal information by sending an e-mail to privacy@networksolutions.com.

**If you have any questions regarding this Privacy Policy, please contact** privacy@networksolutions.com.

**Top of Page**

RFJN0280

**EXHIBIT 8**

Updated September __, 2004
Version 2.4

## Privacy Topics

Why A Privacy Policy?
Getting to Know our Customers
Third Party Advertising and Cookies
Information Corrections or Changes
How We Put Information to Good Use
With Whom We May Share Information
How Do I Get My Name Removed from Bulk Access
Our Accountability to You
Employee Accountability
The Accountability of Network Solutions' Agents and Business Partners
Notification of Changes

### Why A Privacy Policy?

Network Solutions respects your individual privacy. This Privacy Policy ('Policy') embodies our commitment to its protection through adherence to fair electronic information practices. This Policy puts you, the individual, in control of how your personal information is processed. You have our promise that we will not electronically process your personal information in any way that is incompatible with this Policy.

**This Privacy Policy protects your privacy by:**

**Informing you about:**

- The types of personal information Network Solutions collects about you through its Web sites;
- How it collects that information;
- The general purposes for which it collects such information;
- The types of organizations to which it discloses the information;
- The choices and means by which individuals may limit its use and disclosure.

**Empowering you to choose:**

- Whether and how certain personal information you provide is used (where such use is unrelated to the uses for which you originally disclosed it); and
- Whether and the manner in which a third party uses certain personal information you provide (where such use is unrelated to the uses for which you originally disclosed it).

**Assuring you that Network Solutions:**

- Takes reasonable precautions to protect personal information from loss, misuse, unauthorized access, disclosure, alteration or destruction;
- Implements reasonable policies and procedures to ensure that personal information is kept only for the purposes for which it has been gathered;
- Uses reasonable measures to ensure that we have accurately and completely recorded the personal information you have provided; and
- Provides you reasonable access to your personal information as well as procedures for correcting or modifying that information where appropriate.

**Ensuring accountability** to individuals who believe that Network Solutions has not complied with these privacy principles.

**Top of Page**

### Getting to Know Our Customers

Network Solutions is in the business of putting people in touch with other people. That requires more than simply offering innovative technical services. It also requires that we understand you, our customer, and your needs. Indeed, we are the Internet's leading domain name registrar because we have taken the time to get acquainted with each one of our many customers.

RFJN0281

We get to know you primarily through the information you provide to us when signing up for, or using, one or more of our services. The information you provide ranges from basic contact information, to payment information, to the technical coordinates of your host servers. The application for domain name registration services found at www.networksolutions.com is a representative illustration of the information we request of you. All of the information we request from you when purchasing our services is obligatory unless otherwise noted on the relevant form. When you purchase our services, you agree to provide and maintain accurate, complete and updated information.

After you have signed up for our services, we may be in communication with you about your account, technical questions you may have about services provided by us, or any other matter relating to those services. Those communications are essential to our relationship with you and to our ability to provide you with quality services that are responsive to your needs. At the same time, those communications give us helpful insights about you, your preferences and the ways in which we might improve our services. We therefore may maintain this information for future use.

For operational and quality assurance purposes, we take note of whether and how you use the information and services that we provide, such as by recording site traffic patterns and by maintaining log files of users' access to site files.

The information we receive from or about you is stored on systems designed to prevent the loss, misuse, unauthorized access, disclosure, alteration or destruction of that information. We also encrypt your transmission of sensitive information to us (e.g., credit card numbers, account passwords) in the interest of heightened privacy protection and information integrity.  Transactions within our account manager and purchase flows use Secure Sockets Layer (SSL) encryption when transmitting data from your connection to our systems.  You may click the lock icon within your web browser to verify the authenticity of any or our SSL certificates.                **Top of Page**

### Third Party Advertising and Cookies

We use third-party advertising companies to serve ads on our Web site and other Web sites. In the course of serving advertisements, these companies may place or recognize a unique 'cookie' on your hard drive, and may use information (not including your name, address, e-mail address, or telephone number) about your visits to this and other web sites in order to measure advertising effectiveness and to provide advertisements about goods and services of interest to you. For more information about this practice and to know your choices about not having your information used by these companies, please visit http://www.doubleclick.net/us/corporate/privacy.

Network Solutions shares Web site usage information about visitors to our Web site with a reputable third-party advertising company for the purpose of targeting our Internet banner advertisements on this site and other sites. For this purpose, we and our third-party advertising company note some of the pages you visit on our Web site through the use of pixel tags (also called gifs). The information collected by our third-party advertising company through the use of these pixel tags is not personally identifiable. For more information about our third-party advertiser, please click here. To opt out of the targeting program, please click here.                                    **Top of Page**

### Information Corrections or Changes

You have the ability to correct or change certain information in our records, such as your address and contact information. The process for changing your information begins at https://www.networksolutions.com/en_US/manage-it/index.jhtml. You may change this information at any time and as often as necessary. If you need assistance or have questions about correcting information, you can contact us via e-mail at customerservice@networksolutions.com.
                                                                            **Top of Page**

### How We Put Information to Good Use

We use information about you for purposes of monitoring and improving our internal operations, as well as to ensure we: (i) bill you properly, (ii) administer your account in accordance with your agreements with us, and (iii) properly perform the services you have requested.

We also use the information we collect to monitor and improve our internal operations, as well as to improve the experience of users in our network of sites. For example, we may correlate Web site traffic information with data about individual users. This data helps us to determine how much our customers use parts of the site, allowing us to enhance it to fit the needs of as many of our customers as possible. We may also break down overall usage statistics according to customers' domain names, browser types, and MIME types by reading this information from the browser string (information contained in every user's browser).

Another example of our use of information to enhance the experience of users in our network of sites is our reliance on cookie files. We use cookie files to make it easier for users to access our site or services. A cookie file is a small data file that certain Web sites write to your hard drive when you visit them. A cookie file can contain information such as a user ID that the site uses to track the pages you have visited. However, the only personal information a cookie can contain is information you supply yourself. A cookie cannot read data off your hard disk or read cookie files created by other sites. We use cookies to track user traffic patterns (as described above) when you register for Network Solutions services. When you register, we may use a cookie to store a unique, random user ID. We use this ID to identify you anonymously in our database and to track the pages you visit on our site.

RFJN0282

If you have set your browser to warn you before accepting cookies, you will receive the warning message with each cookie. You may refuse cookies by turning them off in your browser; however, some of our sites may require a cookie for access.

Finally, we use the information we collect to direct important notices and information affecting your account or services, as well as to provide general information that may be of interest to you, including newsletters, surveys, contest and sweepstake announcements, and information about our service or product offerings or the offerings of our business affiliates. You may opt-out of receiving information from us simply by notifying us of your desire in accordance with the opt-out instructions contained in any information message you receive from us. Note, however, that in order to fulfill our service obligations to you, we must continue sending you notices and other important information affecting your account or services.

**Top of Page**

## With Whom We May Share Information

Pursuant to arrangements with Internet Corporation for Assigned Names and Numbers ('ICANN'), we compile and maintain a publicly accessible registration database that includes basic information about each domain name registered with us, including the names, telephone numbers and e-mail addresses of individuals designated as points of contact for a given domain name. Whether or not applicable domain name registration fees have been paid is also publicly accessible. With the gradual continued privatization of the Domain Name System, and consistent with the rules or policies applicable to that system, or to comply with any changes in law or regulation, we may, if appropriate, take steps to restrict the accessibility and amount of personally identifying information available in the registration database

When you register a domain name through us, we must disclose your domain name and its associated Internet Protocol ("IP") numbers to the appropriate registry in order to make your chosen domain name a functional address on the Internet.  Certain registries also require that we disclose to them the names, postal addresses, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name.  Each registry discloses certain portions (and in some cases all) of the information we are required to provide to them about your domain name registration.  For example, each registry discloses at least each registered domain name and its associated IP numbers ("TLD zone files") to TLD server administrators so that the domain name is capable of functioning as an address on the Internet. Consistent with the current rules and policies for the Domain Name System, such registries also disclose the TLD zone files to other interested persons, provided those persons agree, among other things, not to use the TLD zone files for improper purposes, including the transmission of unsolicited commercial e-mail.  Similarly, each registry may compile and maintain a publicly accessible database that includes basic information about each domain name registered with that registry, including the names, telephone and fax numbers, and e-mail addresses of individuals designated as the registrant or points of contact for a given domain name.

We may share certain information about you with those of our vendors who are responsible for handling your account or performing other services that you require (including vendors who may update your credit card expiration date and credit card account number if you choose our auto-renew feature). Although we may share sensitive financial information (i.e., credit card numbers, banking information), security information (e.g., account passwords) and personal communications (e.g., personal e-mail messages or message board postings) with such vendors where necessary and appropriate, we will not share such information with other third parties, except in response to formal requests (e.g., subpoena or court order) made in connection with litigation, arbitration, or criminal proceedings directly relating to a domain name registration or other services we provide, or as directed by you or your agent.

Additionally, we may share the information stored on the publicly accessible registration database, as well as other information that is not of a sensitive nature, with carefully selected business partners, including those who offer services that complement those provided by us or which may otherwise be of interest to you. If you do not want us to share information about you with our business partners, you may opt-out of receiving this information through our Account Manager by following the instructions below:

a.  Log into Account Manager at www.networksolutions.com;
b.  Click "Edit User Info" in the left menu;
c.  Scroll to the bottom of the page;
d.  Select "NO" for the third statement, which reads, "I would like to receive selected and relevant information from Network Solutions partners;" and
e.  Click "SAVE."

Please note, however, that consistent with the current rules and policies for the Domain Name System, information about you must remain available in the publicly accessible registration database.

**Top of Page**

## How Do I Get My Name Removed from Bulk Access

As noted above, we currently make certain information about you available to the general public via our domain name registration database look-up services. These services give users access to such data on a query-by-query basis. Pursuant to our arrangements with ICANN, qualified persons may also access such data on a bulk basis provided they agree, among other things, not to use the data to allow, enable or otherwise support the transmission by e-mail, telephone, or facsimile of mass, unsolicited, commercial advertising or solicitations to entities other than to such qualified persons' own existing customers; or (ii) sell or redistribute the data to third parties, except insofar as the data is incorporated into a value-added product or service that does not permit the extraction of a substantial portion of the data. If you do not want your personal information disclosed on a bulk basis, you may opt-out of such disclosure through our Account Manager by following the instructions below:

a. Log into Account Manager at www.networksolutions.com;
b. Click "Edit User Info" in the left menu;
c. Scroll to the bottom of the page;
d. Select "NO" for the first statement, which reads, "I choose to have my name included in the Bulk WHOIS data licensed to third parties for domains for which I am the Account Holder or Primary Contact;" and
e. Click "SAVE."

Top of Page

### Our Accountability to You

By purchasing our services, you obtain the protections of, and consent to the data processing practices described in, this Privacy Policy. When you purchase our services, you also represent to us that you have provided notice to, and obtained consent from, any third party individuals whose personal data you supply to us with regard to: (i) the purposes for which such third party's personal data have been collected, (ii) the intended recipients or categories of recipients of the third party's personal data, (iii) which of the third party's data are obligatory and which data, if any, are voluntary, and (iv) how the third party can access and, if necessary, rectify the data held about them.

In addition to the privacy protections that we provide, our employees, agents and business partners are independently responsible for ensuring compliance with this Privacy Policy, as described below.

Top of Page

### Employee Accountability

Only those Network Solutions employees that have a legitimate business purpose for accessing and handling personal information obtained by us are given authorization to do so. The unauthorized access or use of such information by a Network Solutions employee is prohibited and constitutes grounds for disciplinary action.

Additionally, our information management systems are configured in such a way as to block or inhibit employees from accessing information that they have no authority to access.

Top of Page

### The Accountability of Network Solutions' Agents and Business Partners

Our trusted vendors and business partners are responsible for processing or handling some of the information that we receive. These vendors and business partners are not authorized to use such information for purposes beyond those specified by us and are required to preserve the confidentiality with which we treat such information.

If you feel that Network Solutions, or any of our agents, representatives or employees, is violating this Privacy Policy, please contact us via e-mail at privacy@networksolutions.com, by telephone at (703) 668-4600, or by postal mail at:

Network Solutions, LLC
Attention: General Counsel
13200 Woodland Park Drive
Herndon, VA 20171
(703) 668-4600

Top of Page

### Notification of Changes

We will post any changes to this Privacy Policy 30 days before their effective date so you will always know what information we collect, how we use it, and under what circumstances, if any, we disclose it. You are responsible for periodically checking our web site for changes to this Privacy Policy. You may opt-out of any posted change to our collection, use or disclosure of your personal information by sending an e-mail to privacy@networksolutions.com.

**If you have any questions regarding this Privacy Policy, please contact** privacy@networksolutions.com.

Top of Page

RFJN0284

**EXHIBIT 9**

*The*

# American
# Heritage® Dictionary

## *of the English Language*

FOURTH EDITION



 HOUGHTON MIFFLIN COMPANY
Boston   New York

RFJN0285

Words are included in this Dictionary on the basis of their usage.
Words that are known to have current trademark registrations are
shown with an initial capital and are also identified as trademarks. No
investigation has been made of common-law trademark rights in any
word, because such investigation is impracticable. The inclusion of any
word in this Dictionary is not, however, an expression of the
Publisher's opinion as to whether or not it is subject to proprietary
rights. Indeed, no definition in this Dictionary is to be regarded as
affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of
Forbes Inc. Their use is pursuant to a license agreement with
Forbes Inc.

Copyright © 2000 Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or
by any means, electronic or mechanical, including photocopying and
recording, or by any information storage or retrieval system without
the prior written permission of Houghton Mifflin Company unless
such copying is expressly permitted by federal copyright law. Address
inquiries to Reference Permissions, Houghton Mifflin Company,
222 Berkeley Street, Boston, MA 02116.

Visit our Web site: www.hmco.com/trade.

*Library of Congress Cataloging-in-Publication Data*

The American Heritage dictionary of the English language.–4th ed.
    p.    cm.
    ISBN 0-395-82517-2 (hardcover) — ISBN 0-618-08230-1
    (hardcover with CD ROM)
    1. English language–Dictionaries
PE1628 .A623 2000
423–dc21
                                    00-025369

Manufactured in the United States of America

**sear²** (sîr) *n.* The catch in a gunlock that keeps the hammer halfcocked or fully cocked. [Probably French *sear*, something that grasps, from Old French, lock, from *serrer*, to grasp, from Vulgar Latin *\*serrāre*, from Late Latin *serāre*, to bolt, from Latin *sera*, bar, bolt. See ser-² in Appendix I.]

**sear³** (sîr) *adj.* Variant of **sere¹**.

**sea raven** *n.* A large sculpin (*Hemitripterus americanus*) of the North Atlantic.

**search** (sûrch) *v.* **searched, search•ing, search•es** —*tr.* 1. To make a thorough examination of; look over carefully in order to find something; explore. 2. To make a careful examination or investigation of; probe: *search one's conscience for the right solution to the problem.* 3. *Law* To make a thorough check of (a legal document); scrutinize: *search a title.* 4a. To examine in order to find something lost or concealed: *searched my pockets for the keys.* b. To examine the person or personal effects of in order to find something lost or concealed: *arrested then searched the suspects.* 5. To come to know; learn. —*intr.* To conduct a thorough investigation; seek: *were searching for clues.* ✦ *n.* 1. An act of searching. 2. *Law* The exercise of right of search. —*idiom:* **search me** *Slang* Used by a speaker to indicate that he or she does not have an answer to a question just asked. [Middle English *serchen,* from Anglo-Norman *sercher,* variant of Old French *cerchier,* from Latin *circāre,* to go around, from Latin *circus,* circle, from Greek *krikos, kirkos.* See **sker-²** in Appendix I.] —**search'a•ble** *adj.* —**search'er** *n.*

**search engine** *n.* 1. A software program that searches a database and gathers and reports information that contains or is related to specified terms. 2. A website whose primary function is providing a search engine for gathering and reporting information available on the Internet or a portion of the Internet.

**search•ing** (sûr'chĭng) *adj.* 1. Examining closely or thoroughly; probing: *a searching investigation of their past dealings.* 2. Keenly observant: *searching insights.* —**search'ing•ly** *adv.*

**search•less** (sûrch'lĭs) *adj.* Mysterious and inscrutable: *gave me a searchless look and then passed by.*

**search•light** (sûrch'līt') *n.* 1a. An apparatus containing a light source and a reflector for projecting a high-intensity beam of approximately parallel rays of light. b. The beam of light so projected. 2. A flashlight.

**search warrant** *n.* A warrant giving legal authorization for a search.

**sea robin** *or* **sea•rob•in** (sē'rŏb'ĭn) *n.* Any of various marine fishes of the family Triglidae, having a bony head and extremely long pectoral fins with fingerlike rays that are used as feelers over the sea bottom, especially a gurnard of the genus *Prionotus* noted for its ability to produce sound from its air bladder.

**sea rocket** *n.* Any of various succulent annual seashore herbs of the genus *Cakile,* of the mustard family, having pungent foliage and white to lavender flowers.

**sea room** *n.* Unobstructed space as sea adequate for maneuvering a ship.

**sea rover** *n.* 1. One that travels extensively by sea. 2. A pirate. 3. A pirate ship.

**Sears** (sârz), **Richard Warren** 1863–1914. American merchant who founded (1886) the mail-order business that became Sears, Roebuck and Company.

**sea salt** *n.* Salt that is produced by the evaporation of sea water and that contains sodium chloride and trace elements such as sulfur, magnesium, zinc, potassium, calcium, and iron.

**sea•scape** (sē'skāp') *n.* A view or picture of the sea.

**sea scorpion** *n.* See **sculpin** (sense 2).

**sea serpent** *n.* A large snakelike marine animal often reported by mariners since antiquity but never positively identified.

**sea•shell** (sē'shĕl') *n.* The calcareous shell of a marine mollusk or similar marine organism.

**sea•shore** (sē'shôr', -shōr') *n.* 1. Land by the sea. 2. *Law* Ground lying between high-water and low-water marks; the foreshore.

**sea•sick•ness** (sē'sĭk'nĭs) *n.* Motion sickness resulting from the pitching and rolling of a ship or boat in water, especially at sea. —**sea'sick'** *adj.*

**sea•side** (sē'sīd') *n.* The seashore.

**seaside sparrow** *n.* A small sparrow (*Ammospiza maritima*) of the Atlantic coast of North America.

**sea slug** *n.* Any of various highly colorful marine gastropods of the suborder Nudibranchia, lacking a shell and gills but having fringelike projections that serve as respiratory organs. Also called *nudibranch.*

**sea snail** *n.* Any of various marine gastropods, such as a periwinkle, having a spiral shell.

**sea snake** *n.* Any of various venomous tropical snakes of the family Hydrophiidae that are adapted to living in the seas, especially in the Pacific and Indian oceans, and that bear live offspring.

**sea•son** (sē'zən) *n.* 1a. One of the four natural divisions of the year, spring, summer, fall, and winter, in the North and South Temperate zones. Each season, beginning astronomically at an equinox or solstice, is characterized by specific meteorological or climatic conditions. b. The two divisions of the year, rainy and dry, in some tropical regions. 2. A recurrent period characterized by certain occurrences, occupations, festivities, or crops: *the holiday season; tomato season.* 3. A suitable, natural, or convenient time: *a season for merriment.* 4. A period of time: *gone for a season.* ✦ *v.* **-soned, -son•ing, -sons** —*tr.* 1. To improve or enhance the flavor of (food) by adding salt, spices, herbs, or other flavorings. 2. To add zest, piquancy, or interest to: *seasoned the lecture with jokes.* 3. To treat or dry (lumber, for example) until ready for use; cure. 4. To render competent through trial and experience: *a lawyer who had been seasoned*

by years in the trial courts. 5. To accustom or inure; harden: *troops who had been seasoned in combat.* See synonyms at **harden.** 6. To moderate; temper. —*intr.* To become usable, competent, or tempered. —**idioms:** **in season** 1. Available or ready for eating or other use. 2. Legally permitted to be caught or hunted during a specified period. 3. At the right moment; opportunely. 4. In heat. Used of animals. **out of season** 1. Not available, permitted, or ready to be eaten, caught, or hunted. 2. Not at the right or proper moment inopportunely. [Middle English, from Old French *seison,* from Latin *satiō, satiōn-,* act of sowing, from *satus,* past participle of *serere,* to plant. See **sē-** in Appendix I.]

**sea•son•a•ble** (sē'zə-nə-bəl) *adj.* 1. In keeping with the time or the season. See Usage Note at **seasonal.** 2. Occurring or performed at the proper time; timely. —**sea'son•a•bly** *adv.*

**sea•son•al** (sē'zə-nəl) *adj.* Of or dependent on a particular season. —**sea'son•al'i•ty** (-zə-năl'ĭ-tē) *n.* —**sea'son•al•ly** *adv.*

**Usage Note** *Seasonal* and *seasonable,* though closely related, have different uses. *Seasonal* applies to what depends on or is controlled by the season of the year: *a seasonal rise in employment. Seasonable* applies to what is appropriate to the season (*seasonable clothing*) or timely (*seasonable intervention in the dispute*). Rains are *seasonal* if they occur at a certain time of the year; they are *seasonable* at any time if they save the crops.

**seasonal affective disorder** *n. Abbr.* **SAD** A form of depression occurring at certain seasons of the year, especially when the individual has less exposure to sunlight.

**sea•son•er** (sē'zə-nər) *n.* 1. One that uses seasonings: *The cook is a heavy seasoner.* 2. See **seasoning** (sense 1).

**sea•son•ing** (sē'zə-nĭng) *n.* 1. Something, such as a spice or herb, used to flavor food. Also called *seasoner.* 2. The act or process by which something is seasoned.

**season ticket** *n.* A ticket valid for a specified period of time, as for a series of performances or for transportation between designated points.

**sea spider** *n.* Any of various marine arthropods of the class Pycnogonida, having long legs and a relatively small body. Also called *pycnogonid.*

**sea squirt** *n.* Any of various sedentary tunicates of the class Ascidiacea, having a transparent sac-shaped body with two siphons. Also called *ascidian.* [From its habit of squirting water when disturbed.]

**sea star** *n.* See **starfish.**

**sea•strand** (sē'strănd') *n.* A seashore.

**sea swallow** *n.* Any of various terns, especially a common tern (*Sterna hirundo*) that breeds within the Arctic Circle.



**sea robin**
striped sea robin
*Prionotus evolans*

**seat** (sēt) *n.* 1. Something, such as a chair or bench, that may be sat on. 2a. A place in which one may sit. b. The right to occupy such a place or a ticket indicating this right: *got seats for the concert.* 3. The part on which one rests in sitting: *a bicycle seat.* 4a. The buttocks. b. The part of a garment that covers the buttocks. 5a. A part serving as the base of something else. b. The surface or part on which another part sits or rests. 6a. The place where something is located or based: *The heart is the seat of the emotions.* b. A center of authority; a capital: *the county seat.* See synonyms at **center.** 7. A place of abode or residence, especially a large house that is part of an estate: *the squire's country seat.* 8. Membership in an organization, such as a legislative body or stock exchange, that is obtained by appointment, election, or purchase. 9. The manner of sitting on a horse: *a fox hunter with a good seat.* ✦ *v.* **seat•ed, seat•ing, seats** —*tr.* 1a. To place in or on a seat. b. To cause or assist to sit down: *The ushers will seat the members of the bride's family.* 2. To provide with a particular seat: *The usher seated me in the back row.* 3. To have or provide seats for: *We can seat 300 in the auditorium.* 4. To install in a position of authority or eminence. 5. To fix firmly in place: *seat an ammunition clip in an automatic rifle.* —*intr.* To rest on or fit into another part: *The O-rings had not seated correctly in their grooves.* —**idiom:** **by the seat of (one's) pants** *Slang* 1. In a manner based on intuition and experience rather than method: *He ran the business by the seat of his pants.* 2. Without the use of instruments: *an inexperienced pilot who had to fly the aircraft by the seat of her pants.* [Middle English *sete,* probably from Old Norse *sæti.* See **sed-** in Appendix I.]

**sea tangle** *n.* Any of various brown algae, especially of the genus Laminaria.

**seat•back** *also* **seat back** (sēt'băk') *n.* The back of a chair or other type of seating.

**seat belt** *n.* A safety strap or harness designed to hold a person securely in a seat, as in a motor vehicle or aircraft. Also called *safety belt.*

**seat•ing** (sē'tĭng) *n.* 1a. The act of providing or furnishing with a seat or seats. b. The seats so provided or furnished: *seating for 500.* 2. The arrangement of seats in a room, auditorium, or banquet hall: *a theater that offers semicircular seating.* 3. The member or part on or within which another part is seated. 4. Material for upholstering seats.

**seat•mate** (sēt'māt') *n.* A person sitting next to another on a conveyance such as an airplane: *"His seatmate was a gray-haired woman with glasses"* (Anne Tyler).

**SEATO** (sē'tō) *abbr.* Southeast Asia Treaty Organization.

**seat-of-the-pants** (sēt'əv-thə-pănts') *adj. Slang* 1. Based on or using intuition and experience rather than a plan or method; improvised: *"Each has already moved beyond seat-of-the-pants management to more professional operating procedures"* (Business Week). 2. Performed without using instruments: *a seat-of-the-pants landing of the aircraft.*

**sea•train** (sē'trān') *n. Nautical* A seagoing vessel capable of carrying a train of railroad cars.

**sea•trout** *or* **sea trout** (sē'trout') *n.* Any of several marine fishes



RFJN0287

**EXHIBIT 10**

LEXSEE 38 S.W.3D 200

**Randall Barnett, Appellant Vs. Network Solutions, Inc., Appellee**

**No. 11-00-00079-CV**

**COURT OF APPEALS OF TEXAS, ELEVENTH DISTRICT, EASTLAND**

*38 S.W.3d 200; 2001 Tex. App. LEXIS 283*

January 11, 2001, Decided
January 11, 2001, Filed

**SUBSEQUENT HISTORY:** [**1] Petition for Review Denied April 12, 2001.

**PRIOR HISTORY:** Appeal from 42nd District Court of Taylor County.

**DISPOSITION:** Judgment of trial court affirmed.

**COUNSEL:** George Parker Young - Adam J. Williams - Friedman, Young, Suder, & Cooke - Fort Worth, TX.

David H. Harper - Debra McComas - Haynes & Boone - Attorneys at Law - Dallas, TX; Philip Sbarbaro - Network Solutions, Inc. - Herndon, VA.

**JUDGES:** Panel consists of: Jim R. Wright, Justice, and Terry McCall, Justice, and Bob Dickenson, Senior Justice. [2].

> 2  Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

**OPINION BY: JIM R. WRIGHT**

**OPINION**

[*202]  This case involves the validity of a forum selection clause in a contract between Randall Barnett and Network Solutions, Inc. (NSI). The trial court held that the forum selection clause was valid and dismissed Barnett's suit. We affirm.

The record reflects that, when the events giving rise to this lawsuit occurred, NSI was the exclusive registrar of certain internet domain names such as ".net" and ".org." See *PGMedia, Inc. v. Network Solutions, Inc., 51 F. Supp. 2d 389, 393-94 (S.D.N.Y. 1999); Beverly v. Network Solutions, Inc., 1998 U.S. Dist. LEXIS 8888,* No. C-98-0337-VRW, 1998 WL 320829 (N.D. Cal. [**2]  June 12, 1998). [1]  NSI's status as such registrar was, by virtue of a "Cooperative Agreement" between it and the United States of America, represented by the National Science Foundation.

> 1  For a general discussion of the Internet Domain Name System, see *Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 576 (2d Cir. 2000).*

As far as this case is concerned, Barnett entered into a contract with NSI desiring to register certain internet domain names. The electronic format of the contract required Barnett to electronically scroll through the contract in order to accept its provisions and obtain the registration or reject the provisions. One of those provisions was a forum selection clause requiring that any suit brought upon the contract must be brought in the State of Virginia.

Prior to the events giving rise to this lawsuit, Barnett had requested and received various domain name registrations through NSI. In the present case, Barnett claims that NSI failed to register certain domain names [**3]  for which he had contracted, and he asserts that he was damaged by that failure.

NSI moved to dismiss Barnett's suit, claiming that its contract with Barnett required that any suit on the contract be brought in Virginia. On appeal, Barnett maintains that the trial court abused its discretion when it granted the motion to dismiss. Specifically, Barnett asserts that the forum selection clause is fundamentally unfair and unenforceable for four reasons: Texas has a significant interest in [*203]  providing citizens with a forum to resolve disputes; NSI did not give adequate notice of the forum selection clause; the forum selection clause was placed in the agreement solely to discourage legitimate claims; and he was not able to reject the agreement with impunity because NSI was a monopoly.

RFJN0288

We review a trial court's decision regarding the validity and enforcement of forum selection clauses under an abuse of discretion standard. *Bowers v. Matula, 943 S.W.2d 536, 538* (Tex.App. - Houston [1st Dist.] 1997, no writ). A trial court abuses its discretion when it acts arbitrarily and unreasonably without reference to guiding rules or principles or when it misapplies the law to the facts [**4] in the case. *Baywood Country Club v. Estep, 929 S.W.2d 532, 535* (Tex.App. - Houston [1st Dist.] 1996, writ den'd).

Forum selection clauses are valid if they are contractually agreed to by the parties and if the named forum recognizes the validity of such a provision. *Southwest Intelecom, Inc. v. Hotel Networks Corp., 997 S.W.2d 322, 324* (Tex.App. - Austin 1999, pet'n den'd); *Accelerated Christian Education, Inc. v. Oracle Corporation, 925 S.W.2d 66, 70* (Tex.App. - Dallas 1996, no writ). Even though a forum selection clause in a non-negotiated form contract is valid, enforcement of the clause is subject to judicial scrutiny for fundamental fairness. *Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 594, 113 L. Ed. 2d 622, 111 S. Ct. 1522 (1991); Stobaugh v. Norwegian Cruise Line Limited, 5 S.W.3d 232, 236* (Tex.App. - Houston [14th Dist.] 1999, pet'n den'd). Since Virginia law recognizes and provides for the validity of forum selection clauses and since neither party claims on appeal that there was not a contract, we hold that the forum selection clause is valid. See *Paul Business Systems, Inc. v. Canon U.S.A., Inc., 240 Va. 337, 397 S.E.2d 804, 807 (Va. 1990).* [**5]

As previously stated, even though a forum selection clause in a written contract is valid, a court may determine that it is unreasonable to enforce the clause under the circumstances of a particular case. *Carnival Cruise Lines, Inc. v. Shute, supra; Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972); Mitsui & Co. (USA), Inc. v. Mira M/V, 111 F.3d 33, 35 (5th Cir. 1997).* In reaching this conclusion, the court will exercise judicial scrutiny to determine whether enforcement of the clause would be fundamentally unfair. *Carnival Cruise Lines, Inc. v. Shute, supra; Bremen v. Zapata Off-Shore Co., supra; Mitsui & Co. (USA), Inc. v. Mira M/V, supra.* The party challenging the forum selection clause has the "heavy burden" of making such a showing. *Mitsui & Co. (USA), Inc. v. Mira M/V, supra.*

When addressing the enforceability of forum selection clauses, the courts have utilized various factors in making a determination. For instance, a trial court is not bound by a forum selection clause if the interests of the witnesses and the public strongly favor a different forum. [**6] *Accelerated Christian Education, Inc. v. Oracle Corporation, supra at 71.* Courts may also consider whether the forum was selected to discourage legitimate claims, whether there was fraud or overreaching, whether

there was adequate notice, and whether the party retained the option of rejecting the contract with impunity following notice of the forum selection clause. *Stobaugh v. Norwegian Cruise Line Limited, supra at 234.* In addition, courts may consider whether the clause would effectively deprive a party of his day in court. *Mitsui & Co. (USA), Inc. v. Mira MN, supra.*

Although Texas does have a significant interest in providing citizens with a forum to resolve disputes, that factor is not solely determinative. Furthermore, Virginia provides an adequate forum in which to determine the case.

Barnett also claims that he did not have adequate notice of the forum [*204] selection clause because it was hidden in the registration agreement. However, the record demonstrates that the forum selection clause was stated clearly in the registration agreement. By the very nature of the electronic format of the contract, Barnett had to scroll through that portion of the contract [**7] containing the forum selection clause before he accepted its terms. Therefore, he had an adequate opportunity to read and understand the forum selection clause. Parties to a written contract have the obligation to read what they sign; and, absent actual or constructive fraud, not shown to be present here, they are not excused from the consequences attendant upon a failure to read the contract. *G-W-L, Inc. v. Robichaux, 643 S.W.2d 392 (Tex. 1982).* The same rule applies to contracts which appear in an electronic format. See *Cadapult Graphic Systems, Inc. v. Tektronix, Inc., 98 F. Supp. 2d 560 (D.N.J. 2000).* It was Barnett's responsibility to read the electronically-presented contract, and he cannot complain if he did not do so.

We also disagree with Barnett's claim that the forum selection clause was placed in the registration agreement only to discourage legitimate legal claims. Even though NSI does not have the burden on this issue, the record reveals that there were legitimate reasons for including the forum selection clause in the contract. NSI has received more than 6,000,000 registration applications from throughout the world. Without a forum selection [**8] provision, NSI could be sued in forums throughout the world. Furthermore, because NSI charged only $35 per registration, the forum selection clause was a reasonable way to keep the price of the service low and to eliminate uncertainties. See *Carnival Cruise Lines, Inc. v. Shute, supra; Bremen v. Zapata Off-Shore Co., supra.* In addition, Virginia is NSI's principal place of business. See *Carnival Cruise Lines, Inc. v. Shute, supra; Bremen v. Zapata Off-Shore Co., supra; Eisaman v. Cinema Grill Systems, Inc., 87 F. Supp. 2d 446 (D. Md. 1999).*

Furthermore, Barnett claims that he was not able to reject the agreement with impunity because NSI is a mo-

38 S.W.3d 200, *; 2001 Tex. App. LEXIS 283, **

nopoly and that, therefore, the parties were in an unequal bargaining position. It is the unfair use of, not the mere existence of, an unequal bargaining power that undermines a contract. Hodes v. S.N.C. Achille Lauro ed *Altri-Gestione, 858 F.2d 905 (3d Cir. 1988)*. Here, there has been no showing of any unfair use of a superior bargaining position by NSI. To the contrary, as stated above, the record shows that there were a number of legitimate reasons for including [**9] the forum selection clause in the contract. Assuming that NSI was a monopoly, that fact alone does not mean that the forum selection clause was not enforceable. There must be some showing of fraud, overreaching, deception, substantive unfairness, or some other unfair use of the status; and there is no such showing in this record. See Hodes v. S.N.C. Achille Lauro ed *Altri-Gestione, supra.*

Barnett claims that he is not subject to Virginia law but that NSI is subject to Texas law. We disagree. Barnett is subject to Virginia law, and whether NSI is subject to Texas law is not at issue. Enforcement of a valid forum selection clause does not offend due process. *Carnival Cruise Lines, Inc. v. Shute, supra; Abacan Technical Services Limited v. Global Marine International Services Corporation, 994 S.W.2d 839 (Tex.App. - Houston [1st Dist.] 1999, no pet'n).* When a party contractually consents to the jurisdiction of a particular state, that state has jurisdiction over the party if that state will enforce the type of forum selection clause signed by the party. *Greenwood v. Tillamook Country Smoker, Inc., 857 S.W.2d 654 (Tex.App. - Houston [**10] [1st Dist.] 1993, no writ).* Virginia does enforce forum selection

clauses. *Paul Business Systems, Inc. v. Canon U.S.A., Inc., supra.*

Finally, Barnett urges that NSI is prohibited from relying on the forum [*205] selection clause because it breached the contract by failing to provide some of the domain names which he had requested. We disagree. Barnett's claims arise from the contract and are, therefore, within the scope of the forum selection clause. *Graves v. Pikulski, 115 F. Supp. 2d 931 (S.D. Ill. 2000).* When there is a breach of contract, the parties must comply with the forum selection clause before dealing with the underlying claims. *Afram Carriers, Inc. v. Moeykens, 145 F.3d 298, 302 (5th Cir. 1998).*

The trial court did not abuse its discretion when it enforced the forum selection clause and dismissed Barnett's lawsuit. The sole issue on appeal is overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT

JUSTICE

January 11, 2001

Panel consists of: Wright, J., and

McCall, J., and Dickenson, S.J. [2]

2  Bob Dickenson, Retired Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

[**11]

RFJN0290

**EXHIBIT 11**

LEXSEE 99 F. SUPP. 2D 125

LAWRENCE J. KILGALLEN d/b/a LJK SOFTWARE, INC., Plaintiff, v. NET-
WORK SOLUTIONS, INC., Defendant.

CIVIL ACTION NO. 00-10334-PBS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHU-
SETTS

*99 F. Supp. 2d 125; 2000 U.S. Dist. LEXIS 7896*

**May 31, 2000, Decided**

**DISPOSITION:** [**1] Plaintiff's motion for sanc-
tions DENIED and defendant's motion to transfer AL-
LOWED.


**COUNSEL:** For LAWRENCE J. KILGALLEN, Plain-
tiff: Esther J. Horwich, Boston, MA.

For NETWORK SOLUTIONS, INC., Defendant: John
F. Hurley, Jr., MacCarthy, Pojani & Hurley, Worcester,
MA.

For A. DAVID MAZZONE, ADR Provider: A. David
Mazzone, United States District Court, Boston, MA.

**JUDGES:** PATTI B. SARIS, U.S. DISTRICT COURT
JUDGE.

**OPINION BY:** PATTI B. SARIS

**OPINION**

[*126] *MEMORANDUM AND ORDER*

**MAY 31, 2000**

**SARIS, U.S.D.J.**

### I. Introduction

This case involves a dispute over the re-registration
of an internet domain name, LJK.com. Plaintiff, Law-
rence J. Kilgallen d/b/a LJK Software, claims that the
defendant, Network Solutions, Inc. ("Network Solutions"
or "NSI"), committed a breach of contract when it trans-
ferred the domain name to a third person. Network Solu-
tions claims that plaintiff was the first to violate the con-
tract by failing to make the annual payment necessary to
re-register the site. As it turns out, plaintiff mailed a

check for the registration fee, but defendant mistakenly
posted the payment to another account. Despite nearly a
dozen letters from plaintiff indicating that [**2] defen-
dant had already received payment, defendant transferred
the site to someone else.

This dispute has prompted a barrage of motions.
Plaintiff originally filed the complaint in the Massachu-
setts Superior Court. Defendant removed, invoking the
Court's diversity jurisdiction. Plaintiff filed a motion for
a preliminary injunction ordering NSI to honor its con-
tract and to reinstate its LJK.com domain name. Defen-
dant filed a motion to dismiss for improper venue on the
ground that the registration agreement contains a forum
selection clause that provides for the exclusive jurisdic-
tion of contract disputes in the Eastern District of Vir-
ginia. Plaintiff filed a motion for sanctions claiming that
defendant knowingly filed false affidavits. After two
hearings, [1] multiple pleadings and a failed mediation,
plaintiff has now dropped two claims and moved to re-
mand the case to state court arguing that the amount in
controversy no longer exceeds $ 75,000.

1 The third party who registered the LJK.com
was notified of the hearings but did not seek to
intervene.

[**3] For the reasons stated herein, I *DENY* plain-
tiff's motion for sanctions and *TRANSFER* the action to
the Eastern District of Virginia. Because another court
must fully address this prickly dispute, I decline to write
a lengthy decision, but instead briefly outline my reasons
below.

### II. Factual Background

The record indicates the following facts:

The plaintiff is the owner of LJK Software, a sole
proprietorship that is located in Cambridge, Massachu-
setts. Since 1993, the defendant has been under contract

RFJN0291

99 F. Supp. 2d 125, *; 2000 U.S. Dist. LEXIS 7896, **

with the National Science Foundation to be the sole registrar of internet domain names. The defendant's principal place of business is in Herndon, Virginia.

In early 1994, plaintiff hired Robert Tinkleman, of Tinkleman Enterprises, [2] to register a domain name for use by plaintiff's software business. Tinkleman completed an electronic application with the defendant. The application required only that [*127] he provide some general contact information. It did not require him to sign a registration agreement on behalf of the plaintiff. The registration form contained no provisions prohibiting lawsuits from being brought outside Virginia. On February 24, 1994, defendant [**4] assigned plaintiff the domain name LJK.com.

2    In December, 1998, Tinkleman Enterprises was purchased by Verio, Inc.

After the initial two-year registration period, domain names must be renewed annually. On January 6, 1999, defendant e-mailed a lengthy notice to plaintiff indicating that he would soon receive an invoice for his annual registration fee. The subject line of the e-mail was "Modify Registration LJK.COM." Kilgallen recalls receiving this notice, but states that he only skimmed the portion of the message that appeared on the screen without scrolling down to view the entire message. He did not see the section headed, "DOMAIN NAME REGISTRATION AGREEMENT." Paragraph P of that agreement states:

Governing Law. Registrant agrees that this Registration Agreement shall be governed in all respects by and construed in accordance with the laws of the Commonwealth of Virginia, United States of America. By submitting this Registration Agreement, Registrant consents to the exclusive jurisdiction and venue [**5] of the United States District Court for the Eastern District of Virginia, Alexandria Division. If there is no jurisdiction in the United States District Court for the Eastern District of Virginia, Alexandria Division, then jurisdiction shall be in the Circuit Court of Fairfax County, Fairfax, Virginia.

(Dep. of Lawrence Kilgallen Exh. 4.) Plaintiff states that he was never aware of this provision.

On February 11, 1999, plaintiff received an e-mail invoice for the $ 35.00 renewal fee. Neither party retained a copy of that invoice, but defendant filed a copy of the form that its billing system used to generate plaintiff's invoice. It states, "In making payment for the invoice below, Registrant agrees to the terms and condition of the current Domain Registration Agreement." (John P. Hornak Aff. Exh. D.) It also lists payment options. For customers that decide to pay by check, the form states, "Please use the remittance stub from the hard copy invoice you should receive shortly. If you do not receive a hard copy invoice within 7 days, please call us at (703) 742-4777." (Id.) NSI's records indicate it sent plaintiff the hard copy invoice on February 1, 1999. However, plaintiff [**6] never received the hard copy and did not call NSI to report the delay. [3]

3    It is not certain why plaintiff did not receive the copy. The most likely reason is that NSI incorrectly mailed it to Tinkleman. Defendant's e-mail dated March 19, 1999 to LJK is addressed to him, and designates him incorrectly as the billing contact at a New York address. Typically, Tinkleman ignored misdirected invoices. Enclosed with every paper invoice is a form transmittal letter which contains on its reverse side the standard terms and conditions for re-registration. The paper invoice also states: "By this payment, Registrant agrees to the terms and conditions of the current Domain Name Registration Agreement." In 1998, plaintiff received the re-registration agreement which included the forum selection clause.

On February 15, 1999, plaintiff sent a check for the full amount of the renewal fee to the defendant. However, Kilgallen mistakenly sent the check to NSI's headquarters in Herndon, Virginia. (Kilgallen Dep. at 65-66.) That [**7] office had been the proper billing address for the 1998 renewal payment, but in 1998 NSI moved its billing operations to an office in Baltimore, Maryland. The Herndon office returned the check, uncashed, to plaintiff. After speaking to representatives at NSI, Kilgallen re-sent the same check to the correct address.

Unfortunately for plaintiff, his problems did not end once he discovered the proper address. Because plaintiff never received the hard copy invoice, he was not able to [*128] include the computer readable remittance stub with his check. He also did not reference the invoice number on the check. However, he did write "LJK.com thru 26-Feb-2000" on the check's memo line.

Defendant received the check on March 22, 1999, but mistakenly posted it to another account. NSI uses invoice numbers to match checks to accounts. Plaintiff's check was attached to a bank stub that indicated his checking account number, UST 88 8 1045051. An NSI billing clerk matched that number to invoice number 1045051 and posted the payment to the invoice for the renewal of the domain name SEXYMIAMI.COM.

Page 3

99 F. Supp. 2d 125, *; 2000 U.S. Dist. LEXIS 7896, **

In late March or early April, NSI sent plaintiff a de-activation notice indicating that it had not received [**8] the renewal fee and that his domain name registration would be terminated in ten days unless NSI received payment. On April 2, 1999, plaintiff replied stating that NSI had already received and cashed a check covering the full fee. He also requested written confirmation that his account was up to date. Several days later, plaintiff received another deactivation notice. Over the next six months, plaintiff sent NSI over a dozen letters, e-mails, and facsimiles indicating that NSI received his payment on March 22, 1999 and requesting confirmation. Plaintiff sent *three* copies of the cancelled check.

On November 10, 1999, NSI deactivated LJK.com, rendering it inactive on the internet. On December 12, 1999, it terminated the registration making the name available to the public. Six days later, LJK.com was registered to another subscriber, a Hagop Doumanian in Las Vegas. On January 12, 2000, defendant mailed plaintiff a $ 35.00 refund check.

**III. Discussion**

A. The Contract

The threshold issue is whether the parties entered into a contract for the registration of the LJK.com domain name. There is no dispute that defendant made an offer to provide these services or [**9] that plaintiff attempted to accept defendant's offer by mailing a check for the registration fee. However, there is a dispute whether plaintiff's acceptance was valid. Defendant contends that it was not valid because it did not comply with the manner of acceptance outlined in the "General Instructions" section of the electronic invoice, which asked customers paying by check to wait for a hard copy invoice and to mail the check along with the detachable remittance stub. [4]

4  The invoice stated:

GENERAL INSTRUCTIONS

This will be the only invoice sent via e-mail. In a few days, you should receive a hard copy invoice via postal service to the above street address. If you wish to pay by check, please wait for the hard copy invoice. It contains a scan-nable remittance stub and return envelope. To avoid delays in processing your payment DO NOT send a check to us with this e-mail invoice.

To Pay by Check:

Please use the remittance stub from the hard copy invoice you should receive shortly. If you do not receive a hard copy invoice within 7 days, please call us at (703) 742-4777.

(Hornak Aff. Exh. D.)

[**10]  Although plaintiff did not strictly comply with the terms of acceptance that were outlined in the electronic invoice, his acceptance was valid. According to the *Restatement (Second) of Contracts § 60* (1979):

If an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract. If an offer merely suggests a permitted place, time or manner of acceptance, another method of acceptance is not precluded.

*Cf. U.C.C. § 2-206(1)(a)* ("Unless otherwise unambiguously indicated . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ."). The electronic invoice's general instructions did ask registrants. [*129] paying by check to include a paper remittance stub with their check, but it did not state that a check received without an invoice stub would be rejected. I, therefore, conclude that the offer did not preclude plaintiff from accepting the offer by mailing a check with "LJK.com thru 26-Feb-2000" written on the memo line. *See McAfee v. Brewer, 214 Va. 579, 203 S.E.2d 129, 131 (Va. 1974)* (finding valid [**11] acceptance where the defendant did not sign and return a copy of the contract as plaintiff's offer requested because the contract did not state that the failure to do so would nullify the offer). Moreover, even if the acceptance terms were mandatory, plaintiff's defective acceptance constituted a counteroffer that defendant accepted by cashing the check. *See Houston Dairy, Inc. v. John Hancock Mut. Life. Ins. Co., 643 F.2d 1185, 1186 (5th Cir. 1981)* (stating that an untimely acceptance of an offer is a counteroffer that shifts the power of acceptance to the original offeror); *Restatement (Second) of Contracts § 70* (1979) ("A . . . defective acceptance may be effective as an offer to the original offeror . . . ."); 2 Williston on Contracts § 6:55, at 668 (4th ed. 1991) (same).

Unfortunately for plaintiff, establishing the existence of a contract is a Pyrrhic victory because the contract provides that it is to be governed by Virginia state law and that all disputes with federal subject matter jurisdic-

99 F. Supp. 2d 125, *; 2000 U.S. Dist. LEXIS 7896, **

tion must be litigated in the Eastern District of Virginia. [5] Courts have long enforced forum selection clauses under federal common law and Virginia state law unless [**12] an opposing party demonstrates that enforcement is unreasonable. *See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10, 32 L. Ed. 2d 513, 92 S. Ct. 1907* ("[Forum selection clauses] are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances."); *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 397 S.E.2d 804, 807-08 (Va. 1990) (enforcing a forum selection clause naming New York as the sole forum).

<blockquote>5   If there is no federal subject matter jurisdiction, the dispute must be brought in Virginia state court.</blockquote>

Plaintiff attacks the validity of the clause on three fronts. First, he argues that defendant waived the right to object to venue by not raising the objection in the removal notice. Second, plaintiff contends that enforcement of the clause would be unreasonable because he is a sole proprietor and his business would be adversely affected by his prolonged absence if he must litigate the claim [**13] in Virginia. Third, he argues that he was never aware of the clause and did not agree to be bound by it.

None of these arguments is persuasive. A removal notice requires only "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon [the] defendant." *28 U.S.C. § 1446(a)*. Defendant was under no obligation to raise the forum selection clause in that notice. With respect to the effect of plaintiff's absence on his business, plaintiff has failed to carry his burden of showing that enforcement would be unreasonable.

Finally, plaintiff's pleas that he was not aware of the clause and that he never agreed to be bound by it also miss the mark. Absent fraud, a party to a contract is bound by the terms of the contract whether or not he read them. *See State Farm Mut. Ins. Co. v. Miller, 194 Va. 589, 74 S.E.2d 145, 149 (Va. 1953); Johnson v. Shaffer,* No. 93-22, 1994 WL 1031192, at *6-7 (Va. Cir. Ct. May 19, 1994). Plaintiff acknowledges receiving an electronic renewal notice that contained a copy of the registration agreement. (Kilgallen Dep. at 68-73.) But, he argues [**14] that he never saw the agreement because he did not scroll beyond the information initially shown on his screen. Plaintiff also received, and responded to, an electronic [*130] invoice that clearly contained the caveat, "In making payment for the invoice below, Registrant agrees to the terms and conditions of the current Domain Registration Agreement." (Hornak Aff. Exh. D.) These facts do not demonstrate fraud by the defendant, but rather, they show plaintiff's decision to accept defendant's offer without taking the minimal steps necessary to ascertain the terms and conditions of the offer.

For the preceding reasons, I *TRANSFER* this dispute to the United States District Court for the Eastern District of Virginia. Although I have concluded that there is a likelihood of success on the merits in demonstrating that defendant committed a breach of contract, I will leave plaintiff's motion for a preliminary injunction for that court to address.

**B. Sanctions**

I also *DENY* plaintiff's motion for sanctions. Plaintiff claims that defendant knowingly submitted false affidavits. The most striking example of possible misconduct is exhibit C to the affidavit of John Hornak, [**15] which defendant claimed was an example of the hard copy invoice sent to plaintiff. However, it refers to a service agreement that was not effective until well after the invoice was sent to plaintiff. Defendant submitted a supplemental affidavit acknowledging the error and with an example of the correct form. Defendant explained that the error was made by the vendor who generates NSI's invoices. The vendor mistakenly used the current form to print the example instead of the form used in February, 1999. (David Graves Aff. at PP 9-13.) Although the exhibit is inaccurate, I do not find that it was filed with an intent to mislead.

**C. Remand**

Plaintiff has also moved to remand the case to state court by dropping the demand for $ 75,000 in compensatory damages. Regardless of whether the action is in state or federal court, the parties agreed to Virginia as the forum. The United States District Court for the Eastern District of Virginia must decide whether to retain jurisdiction or remand to the Circuit Court of Fairfax County pursuant to *28 U.S.C. § 1367*.

**IV. Order**

For the reasons herein, plaintiff's motion for sanctions is *DENIED* (Docket [**16] # 23) and defendant's motion to transfer venue is *ALLOWED* (Docket # 6). Although the Court declines to rule on the motion for preliminary injunction to preserve the status quo, the Court orders defendant not to re-register the domain name LJK.com pending resolution of this law suit in Virginia. The Court further orders that a copy of this opinion be sent to Hagop Doumanian, at P.O. Box 80540, Las Vegas, NV 89180-0540.

PATTI B. SARIS

U.S. DISTRICT COURT JUDGE

RFJN0294

**EXHIBIT 12**

LEXSEE 115 F. SUPP. 2D 931

**ROB GRAVES, individually, d/b/a Beingees Internet Negril, NEGRIL CHAMBER OF COMMERCE, RAY ARTHURS d/b/a Golden Sunset, Plaintiffs, vs. LEN PI-KULSKI, individually, d/b/a Negril Today d/b/a Golden Sunset d/b/a Nothin' /but Net Net LLC and MARK PINKSTONE, d/b/a Negril Today, LONNIE GOTTLIEB, d/b/a Negril Guide Nirvana d/b/a Negril Today, and STANLEY GOTTLIEB, d/b/a Negril Guide Nirvana, and PHILLIP ROCK, individually and as Agent of Nothin' But Net, LLC, and NETWORK SOLUTIONS INC., Defendants.**

Civil No. 99cv-04296-JLF

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IL-LINOIS, BENTON DIVISION**

*115 F. Supp. 2d 931; 2000 U.S. Dist. LEXIS 14406*

**August 29, 2000, Decided
August 30, 2000, Filed**

**DISPOSITION:** [**1] Network Solutions, Inc.'s motion to dismiss for improper venue (Doc. 24) GRANTED IN PART and DENIED IN PART. Action TRANS-FERRED.

**COUNSEL:** For ROB GRAVES, NEGRIL CHAMBER OF COMMERCE, RAY ARTHURS, PLAINTIFFS: Jack L. Quarant, Jack L. Quarant & Associates, Eliza-bethtown, IL.

For LEN PIKULSKI, MARK PINKSTONE, LONNIE GOTTLIEB, STANLEY GOTTLIEB, PHILLIP ROCk, DEFENDANTS: John S. Rendleman, Feirich, Mager, Carbondale, IL.

For NETWORK SOLUTIONS INC., DEFENDANT: Mary Ann Hatch, Herzog, Crebs, St. Louis, MO.

For NETWORK SOLUTIONS INC., DEFENDANT: Beth A. Fulkerson, Pattishall, McAuliffe, Chicago, IL.

**JUDGES:** James L. Foreman, DISTRICT JUDGE.

**OPINION BY:** James L. Foreman

**OPINION**

[*932] **MEMORANDUM AND ORDER**

**FOREMAN, District Judge:**

Before the Court is a motion to dismiss filed by Network Solutions, Inc. on the ground that venue is im-proper (Doc. 24). Plaintiffs have filed a response, (Doc. 33), and Network Solutions, Inc. has filed a reply (Doc. 40).

Also before the Court are motions to dismiss for lack of personal jurisdiction filed by defendants Stanley Gottlieb, Lonnie Gottlieb, and Phillip Rock (Doc. 10), and by defendant Len Pikulski (Doc. 42).

**I. Background.**

Plaintiff [**2] Rob Graves operates a business known as "Biengees Internet Negril" (BIN), a limited partnership located in Negril, Jamaica. BIN and co-plaintiff, Negril Chamber of Commerce, a not-for-profit Jamaican association, are in the business of promoting tourism in Jamaica. They do so through a website associ-ated with the Domain Name, "negril.com." Plaintiff Ray Arthurs owns and operates a resort in Negril, Jamaica called "Golden Sunset."

Plaintiffs have brought a twenty-seven page com-plaint, in five counts, against six defendants. Defendant Len Pikulski owns and operates a company called "Nothin But Net LLC" which provides and maintains web sites. Defendant Mark Pinkstone is an employee of Nothin But Net. Defendants Stanley and Lonnie Gottlieb operate a resort in Negril, Jamaica. Defendant Phillip Rock is allegedly an agent of defendant Len Pikulski and of Nothin But Net. Defendant Network Solutions, Inc. (NSI) is the registrar of the domain name "negril.com."

RFJN0295

Page 2

115 F. Supp. 2d 931, *; 2000 U.S. Dist. LEXIS 14406, **

Plaintiffs allege that they entered into a contract with Nothin But Net to become the internet service provider for the world wide web site registered domain name "negril.com." Plaintiffs allege that defendants competed with plaintiffs' [**3] web sites and actually converted plaintiffs' web sites for their own use, profit, and promotion. (Count I). Specifically, plaintiffs allege that Len Pikulski attempted to gain illegal control of the registration of the domain name and of the associated website, claiming that he "covertly influenced an employee of NSI to enter false computer data in the computer data base of NSI to change the actual domain name." (Doc.4, p.10). Plaintiffs accuse the Gottliebs of infringing [*933] on their copyrights by publishing a web site that advertises their resort in Negril, Jamaica, on a web server located in New Jersey. (Doc. 4, Counts II and IV). Plaintiffs further allege that defendant Lonnie Gottlieb posted statements that were derogatory to plaintiffs on the web server in New Jersey. (Doc. 4, Count III). Plaintiffs allege that Network Solutions, Inc. (NSI) breached the registration agreement by modifying and changing the registration and ownership of "negril.com" from plaintiffs to the co-defendants (Count V). Plaintiffs claim that they have suffered a loss of revenue and a loss of goodwill, all in Jamaica.

Defendant Len Pikulski is a resident of, and does business in, New Jersey (Doc. 4, p.4). [**4] Defendant Mark Pinkstone has the same business address as defendant Pikulski (Doc. 4, p.5). Defendants Stanley and Lonnie Gottlieb state that they operate a resort in Negril, Jamaica, and have residences in Mayville, New York, and Negril, Jamaica (Doc 11, p.2). Defendant Phillip Rock states that he is a resident of Dartmouth, Nova Scotia (Doc 11, p.2). Defendant NSI is a Delaware Corporation that has its business offices in Herndon, Virginia (Doc. 25, p.1).

Plaintiffs registered the domain name "negril.com" with NSI on January 16, 1996 (Doc.33, Exh. B, Doc. 40, Exh. 3). Plaintiffs continued to renew the registration of the domain name, and specifically, on February 10, 1999, plaintiff Graves' mother made a payment to renew the registration effective March, 1999. On March 16, 1999, plaintiffs received from NSI, via email, a domain modification form so that they could add a certain individual, Roy Rodden, as a technical contact. The top portion of the form contained the March, 1999 version of the registration agreement. The email began by stating: "This is the domain name registration agreement you recently created. In order to complete a modification you must email this form to hostmaster [**5] @ internic.net." Plaintiffs then sent in an email requesting the addition of Roy Rodden as the technical contact. (Doc. 33, Exh. 2).

This case was filed in December, 1999. Thus, the March, 1999 version of the registration agreement was the most recent version that was available when the case was filed. The first paragraph reads as follows:

> The domain name registration agreement ("Registration Agreement") is submitted to Network Solutions, Inc. ("NSI") for the purpose of applying for and registering a domain name on the Internet. If this Registration Agreement is accepted by NSI, and a domain name is registered in NSI's domain name database and assigned to the Registrant, Registrant ("Registrant") agrees to be bound by the terms of this Registration Agreement and the terms of NSI's Domain Name Dispute Policy ("Dispute Policy") which is incorporated herein by reference and made a part of this Registration Agreement. This Registration Agreement shall be accepted at the offices of NSI.

*(Doc.33, Exh. 1, p.1) (emphasis added).*

The registration agreement also contains a forum selection clause which states:

> Governing Law. Registrant agrees that this Registration [**6] Agreement shall be governed in all respects by and construed in accordance with the laws of the Commonwealth of Virginia, United States of America. By submitting this Registration Agreement, Registrant consents to the *exclusive jurisdiction and venue* of the United States District Court for the Eastern District of Virginia, Alexandria Division. If there is no jurisdiction in the United States District Court for the Eastern District of Virginia, Alexandria Division, then jurisdiction shall be in the Circuit Court of Fairfax County, Fairfax, Virginia.

*(Doc.33, Exh. B, pp.1-2) (emphasis added).*

**II. Discussion.**

As noted, defendant Network Solutions, Inc. has moved to dismiss on the ground that venue is improper in this Court.

[*934] **A. Motion to Dismiss Standard.**

Plaintiff bears the burden of establishing that venue is proper. *Emjayco v. Morgan Stanley & Co., Inc., 901 F. Supp. 1397, 1400 (C.D.Ill.1995)*; Charles Alan Wright

RFJN0296

& Arthur R. Miller, Federal Practice & Procedure §§ 1352 at 263-65 (2d ed.1990). To determine whether venue is proper, a court may examine facts outside the complaint. *Karlberg European Tanspa, Inc. v. JK-Josef Kratz Vertriebsgesellschaft MbH, 699 F. Supp. 669, 670 (N.D.Ill.1988).* [**7] In resolving a motion to dismiss for improper venue, the court must resolve any factual conflicts in the parties' submissions in favor of the plaintiff, and draw any reasonable inferences from those facts in the plaintiff's favor. *See, e.g., Nagel v. ADM Investor Servs., Inc., 995 F. Supp. 837, 843 (N.D.Ill.1998).*

**B. Analysis.**

*Section 1406(a) of Title 28 of the United States Code* provides that:

### § 1406 Cure or Waiver of defects

(a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

*28 U.S.C. § 1406(a).*

This case is brought under federal question jurisdiction. Whether venue is proper in a federal question case is governed by Title 28, *Section 1391(b)* which states:

### § 1391 Venue generally

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants [**8] reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a).*

Venue is not proper in the Southern District of Illinois. Plaintiffs cannot establish venue under *§ 1391(1)* because none of the defendants reside in Illinois, and

even if they did, not all of the defendants reside in the same state. Defendants Stanley and Lonnie Gottlieb have residences in Mayville, New York, and Negril, Jamaica, where they operate their resort. Defendant Phillip Rock is a resident of Dartmouth, Nova Scotia. Len Pikulski allegedly resides in New Jersey and Mark Pinkstone's business address is in New Jersey. NSI is a Delaware Corporation that has its business offices in Herndon, Virginia. Accordingly, plaintiffs cannot establish venue in Illinois under *§ 1391(1).*

Plaintiff cannot rely on *§ 1391(2)* to establish venue because none of the events or omissions appear [**9] to have occurred in Illinois. In fact, the complaint is completely devoid of allegations that anything occurred in Illinois. Instead, many of the events giving rise to some of these claims occurred in Virginia. The registration agreement was entered into and was performed at NSI's business offices in Virginia. The alleged breach and some of the alleged acts comprising some of the alleged tort claims also occurred in Virginia. Thus, venue is not proper in Illinois under *§ 1391(2).*

Finally, plaintiffs cannot establish venue under *§ 1391(3).* Under *§ 1391(3),* venue is proper in any judicial district in which any defendant may be found, but only if there is no other district in which the action may be brought. As noted, under *§ 1391(2),* venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." Here, many of the events giving rise to plaintiffs' claims occurred in Virginia. In addition, plaintiffs' registration agreement [*935] with NSI has a forum selection clause which states that the exclusive jurisdiction and venue over the agreement [**10] shall be in the Eastern District of Virginia. Consequently, there is another district in which this action may be brought, the Eastern District of Virginia, and venue is therefore not proper in Illinois under *§ 1391(3).*

Plaintiffs argue that the forum selection clause is not enforceable. Specifically, plaintiffs argue that they did not read the Agreement before they renewed it in February 1999. It is well-settled, however, that "a contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Hill v. Gateway 2000, 105 F.3d 1147, 1148 (7th Cir. 1997)* (citations omitted).

Plaintiffs, relying on *Hammes v. Aamco Transmissions, 33 F.3d 774 (7th Cir. 1994),* argue that a forum selection clause limiting venue should not be enforced if there is some "conspiracy" aimed at the plaintiff. Plaintiffs' reading of *Hammes* is inaccurate. *Hammes* is distinguishable in that the *Hammes* court concluded that the clause at issue "did not purport to confine the franchi-

RFJN0297

Page 4

115 F. Supp. 2d 931, *; 2000 U.S. Dist. LEXIS 14406, **

see's suits to Pennsylvania and should not be interpreted to do so." *Hammes, 33 F.3d at 783 (citing Paper Express, Ltd., v. Pfankuch Maschinen, GmbH, 972 F.2d 753 (7th Cir. 1992))*. [**11] Here, however, the forum selection clause clearly does restrict suits under the registration agreement to Virginia. Accordingly, plaintiffs' reliance on *Hammes* is ineffective.

Plaintiffs also rely on *McGee v. International Life Insurance Co., 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223*, where the United States Supreme Court upheld jurisdiction of a California court over a Texas insurance company that received a premium from California. It is somewhat unclear why plaintiffs have cited this case, but in any event, *McGee* is clearly inapplicable. For over forty years, (i.e., since 1959), this case has been limited to the insurance industry. It is simply not applicable. *Trippe Mfg. Co v. Spencer Gifts, Inc., 270 F.2d 821, 822 (7th Cir. 1959)*.

Plaintiffs also argue that the registration agreement that they entered into in 1995 did not contain a forum selection clause, and that when they completed modification forms for their renewal in March of 1999, they were merely "negotiating" for their "domain return." The Court need not pass on whether the March 1999 registration agreement had actually been renewed or was still under negotiation. Even if the contract were still under negotiation, [**12] it is clear that a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in Virginia. Accordingly, under § 1391(b)(2) this action could have been brought in Virginia.

Finally, plaintiffs argue that the forum selection clause does not apply because defendants' alleged wrongful acts were outside the contract. Plaintiffs' claims, however, arise from their contractual relationship with NSI, and are therefore within the scope of the forum selection clause. Consequently, the forum selection clause

applies. See *Hugel v. Corporation of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993)* (plaintiffs' claims arise from a contractual relationship and are therefore within the scope of the forum selection clause).

### C. Dismiss or Transfer.

The Court is now faced with the decision of whether to dismiss or transfer this case. *Section 1406(a)* provides that: "the district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *28 U.S.C. § 1406(a)* [**13] . Under this section, the district court has broad discretion on whether to dismiss or transfer the case. *Cote v. Wadel, 796 F.2d 981, 985 (7th Cir. 1986) (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219 - 221 (7th Cir.1986))*.

This Court finds that it is in the interest of justice to transfer this case to a district [*936] where it could have been brought. Accordingly, this matter is transferred to the Eastern District of Virginia, Alexandria Division.

### III. Summary.

For the foregoing reasons, Network Solutions, Inc.'s motion to dismiss for improper venue (Doc. 24) is **GRANTED IN PART and DENIED IN PART.** This action is **TRANSFERRED** to the United States District Court for the Eastern District of Virginia, Alexandria Division, for such further proceedings as that Court may deem appropriate.

**IT IS SO ORDERED.**

   **DATED:** 8/29/00

   James L. Foreman

   **DISTRICT JUDGE**

**EXHIBIT 13**

LEXSEE 2005 U.S. DIST. LEXIS 26952

STEPHEN A. WEINGRAD and WEINGRAD & WEINGRAD, P.C. d/b/a WEIN-GRAD & WEINGRAD, Plaintiff, -against- TELEPATHY, INC., NETWORK SO-LUTIONS, INC., and NAMEBAY S.A.M., Defendant.

05 Civ. 2024 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2005 U.S. Dist. LEXIS 26952*

November 3, 2005, Decided
November 7, 2005, Filed

**DISPOSITION:**  [*1] Defendants' motion granted and complaint dismissed.

**COUNSEL:** STEPHEN A. WEINGRAD, ESQ., Attorney for Plaintiff, Weingrad & Weingrad, New York, New York.

MICHAEL A. FREEMAN, ESQ., Attorney for Defendant Telepathy, Inc., Law Office of Michael A. Freeman, New York, New York.

JOHN B. BERRYHILL, ESQ., Attorney for Defendant Telepathy, Inc., Dan Dorfman Harell Skillman, Philadelphia, PA.

HAROLD S. SHAFTEL, ESQ., Attorney for Defendant Snapnames.com, Inc., Proskauer Rose, New York, New York.

SHARI CLAIRE, ESQ., Attorney for Defendant Network Solutions, Inc., Shari Claire, Esq., Rivkin Radler, Uniondale, New York.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION & ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Plaintiffs Stephen Weingrad and Weingrad & Weingrad, P.C. sue Telepathy, Inc., Network Solutions, Inc., Snapnames.com, Inc. and Namebay S.A.M. alleging trademark infringement, trade name infringement, unfair competition, and dilution under New York state law. Additionally, Plaintiffs allege false designation of origin and competition under § 43 of the Lanham Act, 15 U.S.C. § 1125(a) (2000), dilution under § 43 of the [*2] Lanham Act, 15 U.S.C. § 1125(c), violations of the Anti-cybersquatting and Consumer Protection Act, 15 U.S.C. § 1129, and fraud under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1343, 1961(1) and 1961(5) ("RICO"). Plaintiffs also sue defendant Network Solutions alleging deceptive business practices under New York General Business Law § 349. Network Solutions moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(3) and 12(b)(6) for improper venue and failure to state a claim upon which relief may be granted. Telepathy moves to dismiss the complaint under Fed. Civ. P. 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue and moves to transfer the action to the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1404. Snapnames.com moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) [*3] and 9(b) for failure to state a claim upon which relief may be granted and failure to plead with the required specificity. For the reasons set forth below, Network Solutions' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(3) for improper venue is granted, and the complaint is dismissed in its entirety against all defendants.

I.

Stephen Weingrad practices law under his own name and the partnership name Weingrad & Weingrad, P.C. (Compl. P10). He registered the domain name weingrad.com with Network Solutions on October 9, 1997, and used it as the location of a web site to advertise his legal practice from 1997 until 2004. (Compl. P10, 20, 23) Network Solutions is a domain name regis-

RFJN0299

2005 U.S. Dist. LEXIS 26952, *

trar, meaning it issues domain names to people and enti- ties; these names enable such registrants to create and maintain publicly accessible Internet web sites. (Compl. P20)

Network Solutions notified Weingrad that the regis- tration of weingrad.com would expire on October 5, 2004, and that Weingrad would lose his web site location on the Network Solutions registry unless he paid a re- newal fee of $ 35. (Compl. [*4] P23, Compl. Exs. 6, 8) Weingrad did not pay the required renewal fee nor did he contact Network Solutions in reference to his domain name before the October 5 deadline. (Compl. P23, 25) On October 12, 2004, Weingrad hired GoDaddy.com, a different domain name registrar, to transfer the registra- tion of the weingrad.com domain name from Network Solutions to GoDaddy.com. (Compl. P24) On November 9, 2004, Weingrad requested a status check on the trans- fer of weingrad.com from Network Solutions and was told that weingrad.com was still "pending renewal or deletion" even though the domain name's registration had expired more than a month prior. (Compl. P25) On No- vember 10, 2004, Weingrad placed a back order for weingrad.com with GoDaddy.com authorizing Go- Daddy.com to retrieve the domain name weingrad.com for registration once it was released by Network Solu- tions. (Compl. P26) On November 22, 2004, Weingrad contacted GoDaddy.com and he was informed that wein- grad.com was not retrievable on any domain name regis- try. (Compl. P28).

Network Solutions contacted Weingrad on Novem- ber 22, 2004, via email, stating that it would transfer weingrad.com to another registrar for $ 150, which is the standard [*5] fee Network Solutions charges to recap- ture and transfer a domain name from its registry during the 30 days after that domain name's registration has expired. (Compl. P32, Compl. Ex. 12) Weingrad chose not to pay Network Solutions' transfer fee. (Compl P32) On November 23, 2004, Weingrad received an email from Network Solutions stating that it declined to trans- fer weingrad.com and GoDaddy.com informed Weingrad that weingrad.com was not available for registration. (Compl. P29, 30) On December 17, 2004, Weingrad re- ceived an email from GoDaddy.com again stating that weingrad.com could not be retrieved. (Compl. P34) On December 18, 2004, Weingrad received an email from GoDaddy.com informing him that the registrar of wein- grad.com was now Namebay and it was on the Telepathy server. (Compl. P35) On December 28, 2004, in response to an inquiry by Weingrad, GoDaddy.com stated that weingrad.com was not available for registration. (Compl. P36)

On or about December 30, 2004, Weingrad inquired by email to Telepathy how it came to possess the wein- grad.com domain name. (Compl. P16) Nat Cohen, a Te-

lepathy officer, replied that Telepathy purchased wein- grad.com at a domain name auction to use in its [*6] service of offering email addresses at "last name do- mains" and weingrad.com was available for sale for $ 300. (Compl. P16, 17, 37) Weingrad believes Telepathy bought weingrad.com from Snapnames at a domain name auction. (Compl. P38) On January 19, 2005, Weingrad telephoned Telepathy and left a message for Cohen and also sent him a certified letter inquiring about the status of weingrad.com. (Compl. P17, 18) On Janu- ary 20, 2005, Cohen responded by email to Weingrad and stated that weingrad.com was no longer for sale. (Compl. P19) On January 20, 2005, Weingrad sent a letter to namebay.com stating that he was the rightful owner of weingrad.com. (Compl. P42) Namebay.com responded that weingrad.com was on "active" status and that Weingrad could transfer the domain name by con- tacting the "gaining registrar's website." (Compl. P42)

Weingrad believes that Network Solutions and Snapnames intentionally performed "some act upon the Web address" to defeat GoDaddy.com's efforts to regis- ter weingrad.com so that it could be registered by Te- lepathy and Namebay. (Compl. P68) Weingrad now uses the domain name weingradlaw.com to advertise his legal services on the Internet. (Compl. P75)

In 1997, Weingrad [*7] signed a Registration Agreement with Network Solutions in order to acquire weingrad.com, which stated:

> Governing Law: Registrant agrees that this Registration Agreement shall be gov- erned in all respects by and construed in accordance with the laws of the Com- monwealth of Virginia, United States of America. By submitting this Registration Agreement, Registrant consents to the ex- clusive jurisdiction of the venue of the United States District Court for the East- ern District of Virginia, Alexandria Divi- sion. If there is no jurisdiction in the United States District for the Eastern Dis- trict of Virginia, Alexandria Division, then jurisdiction shall be in the Civil Court of Fairfax County, Fairfax, Vir- ginia. (Compl. Ex. 4)

Additionally, the Network Solutions Service Agreement, which Weingrad assented to by selecting the accept but- ton on his computer screen in 2003, stated that "any dis- putes hereunder including disputes related to the services provided" will be governed by Virginia law and that the registrant agrees "to submit to exclusive subject matter jurisdiction, personal jurisdiction and venue of the

RFJN0300

2005 U.S. Dist. LEXIS 26952, *

United States District Court for the Eastern District of Virginia, Alexandria [*8] Division." (Network Solutions Ex. C)

II.

Weingrad's claims against Network Solutions fall within the forum selection clauses he consented to in the Registration Agreement and the Service Agreement. Therefore, the complaint must be dismissed for improper venue as it was not brought in the United States District Court for the Eastern District of Virginia or the Civil Court of Fairfax County, Virginia.

Although the proper procedural method for requesting a dismissal based on a forum selection clause remains an open question in the Second Circuit, prior cases have held that one proper method is to move under *Rule 12(b)(3), Fed. R. Civ. P.*, as was done here. *See New Moon Shipping Co., Ltd. v. Man B & W Diesel AG, 121 F.3d 24, 28-29 (2d Cir. 1997); Lurie v. Norwegian Cruise Lines, Ltd., 305 F. Supp. 2d 352, 356 (S.D.N.Y. 2004).* Furthermore, despite the Second Circuit's decision not to adopt a particular procedural device for seeking dismissal based on a forum selection clause, the Court has been clear that a district court has the authority to order such a dismissal. *New Moon Shipping Co., 121 F.3d at 28;* [*9] *Lurie, 305 F. Supp. at 356.*

The Second Circuit "gives substantial deference to [forum selection] clauses, particularly where 'the choice of forum was made in an arms length negotiation by experienced and sophisticated businessmen.'" *New Moon Shipping Co., 121 F.3d at 29* (quoting *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)).* On its face, the forum selection clause in both the Registration Agreement and the Service Agreement is mandatory rather than permissive; the language reflects "'the parties' intent to make jurisdiction exclusive.'" *John Boutari & Son v. Attiki Importers, 22 F.3d 51, 52-53 (2d Cir. 1994)* (quoting *Docksider, Ltd. v. Sea Tech., Ltd., 875 F.2d 762, 764 (9th Cir. 1989)).*

The contract between Network Solutions and Weingrad expired before Weingrad tried to transfer weingrad.com from Network Solutions to GoDaddy.com. However, contrary to Weingrad's assertions, parties to a contract are bound by that contract's forum selection clause even after the contract has expired, where, as here, the plaintiff's claims involve rights arising out of the contract and the [*10] entire business relationship between the parties stems from that contract. *AGR Fin., LLC v. Ready Staffing, Inc., 99 F. Supp. 2d 399, 402 (S.D.N.Y. 2000)* (holding forum selection clause in expired agreement governed claims arising out of that contract); *YWCA of the United States v. HMC Entertainment, 1992 U.S. Dist. LEXIS 14713, No. 91 Civ. 7943, 1992 WL*

*279361 (S.D.N.Y. Sept. 25, 1992)* (holding that a non-contractual claim was subject to a forum selection clause in an expired contract between plaintiff and defendant, because plaintiff's claims for unfair competition, trademark infringement, misappropriation and implied contract involved rights arising out of the contract and plaintiff and defendant would not have had dealings but for the contract between the two parties). Further, the Service Agreement states that the forum selection clause survives termination or expiration of the agreement. (Network Solutions Ex. C P29) The forum selection clause is valid and still applicable to claims brought by Weingrad.

If the clause is found to cover the claims in this action, those claims must be dismissed under *Rule 12(b)(3)* unless there [*11] is a clear showing from Weingrad that "enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud or overreaching." *M/S Bremen, 407 U.S. 1 at 15; see also New Moon Shipping Co., 121 F.3d at 29.* Any argument that the forum selection clause is invalid because it was the consequence of fraud, undue influence or overwhelming bargaining power is without merit. Weingrad, an experienced lawyer who set up a web site on behalf of his law partnership, chose to register a domain name with Network Solutions, agreed to the Retainer Agreement in 1997, and agreed to the Service Agreement in 2003. He is bound by the terms of the forum selection clause even if he did not take the time to read it because "a signatory to a contact is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents he or she signed." *Sun Forest Corp. v. Shvili, 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001)* (quoting *Orix Credit Alliance v. Brown, 1994 U.S. Dist. LEXIS 10206, No. 93 Civ. 1019, 1994 WL 392240, at *4 (S.D.N.Y. July 27, 1994).* The contract Weingrad formed [*12] with Network Solutions was not complicated and the one-page Registration Agreement was accompanied by a letter that stated in bold, underlined text that potential registrant's should "carefully review the agreement," which contained the forum selection clause. (Compl. Ex. 4)

Although Weingrad does not mention the Retainer and Service Agreements in his complaint, he relies necessarily on both as the source of his initial right to "own" the weingrad.com domain name and his belief that Network Solutions should have transferred the domain name to GoDaddy.com. A forum selection clause cannot "be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship." *Anselmo v. Univision Station Group, Inc., 1993 U.S. Dist. LEXIS 428, No. 92 Civ. 1471, 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15,*

RFJN0301

Case 3:07-cv-05115-JSW    Document 20-8    Filed 11/28/2007    Page 38 of 79

Page 4
2005 U.S. Dist. LEXIS 26952, *

*1993*) (quoting *Bense v. Interstate Battery Sys.*, 683 F.2d 718, 720 (2d Cir. 1982); see also *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) ("where the relationship between the parties is contractual, the pleading of alternative [*13] non-contractual theories of liability should not prevent enforcement of such a bargain [as to the appropriate forum for litigation].") (quoting *Coastal Steel Corp v. Tilghman Wheelabrator, Ltd.*, 709 F. 2d 190, 203 (3d Cir. 1983). The rule has been extended to tort and other claims that

> ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the [] claims involve the same operative facts as a parallel claim for breach of contract. Regardless of the differences in terminology, one common thread running through these various formulations is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship.

*Direct Mail Prod. Servs. v. MBNA Corp.*, 2000 U.S. Dist. LEXIS 12945, No. 99 Civ. 10550, 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000) (citations omitted); see also *Brennen v. Phyto-Riker Pharms., Ltd.*, 2002 U.S. Dist. LEXIS 10910, No. 01 Civ. 11815, 2002 WL 1349742, at *4 (S.D.N.Y. June 20, 2002).

Where a forum selection clause applied by its terms to "any suits or causes of action [*14] arising directly or indirectly from this agreement," it controlled a federal anti-trust claim premised on allegations that the defendant terminated the contract because the plaintiff refused to participate in a price-fixing plan. *Bense*, 683 F.2d at 720; see also *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993) (forum selection clause applicable to claims "arising out of" contractual relationship was "not restricted to pure breaches of the contracts containing the clauses" but also covered related securities and antitrust claims). Weingrad notes that a forum selection clause governing "litigation between the parties concerning the alleged breach of this Agreement or the meaning, effect and application and/or interpretation of its terms," did not cover plaintiff's tort claim of fraudulent inducement. *See Bon Jour Group v. Elan-Polo, Inc.*, 1997 U.S. Dist. LEXIS 10283, No. 96 Civ. 6705, 1997 WL 401814, at *2 (S.D.N.Y. July 16, 1997). However, the forum selection clauses in both the Registration and Service Agreements are broader then the forum selection clause in *Bon Jour*, and certainly broad enough to cover Weingrad's claims: the Registration [*15] Agreement places "exclusive jurisdiction" in Virginia and provides that the agreement is "governed in all respects by Virginia law" the Service Agreement likewise places "exclusive jurisdiction" in Virginia, and provides that "any and all disputes" will be governed by Virginia law. All of Weingrad's claims against Network Solutions "arise out of" the Registration Agreement and Service Agreement as his claims are grounded in his belief that (i) under the Registration Agreement, he owns weingrad.com, and, (ii) under the Service Agreement, Network Solutions was not permitted to release weingrad.com for auction after he failed to pay a renewal or transfer fee. Therefore, the forum selection clause controls and the claims must be dismissed under *Fed. R. Civ. P. 12(b)(3)*.

The forum selection clause also is enforceable by Telepathy, Snapnames.com and Namebay. "It is well established that 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'" *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 485-86 (W.D.N.Y. 1997) (quoting *Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1434 (N.D. Cal. 1997)). [*16] "In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, 2003 U.S. Dist. LEXIS 21858, No. 02 Civ. 0767, 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2003) (quoting *Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285, 1299 (11th Cir. 1998)). A non-party is "closely related" to a dispute if its interests are "completely derivative" of and "directly related to, if not predicated upon" the signatory party's interests or conduct. *Lipcon*, 148 F.3d at 1299 (quoting *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996)). Other Circuits have held that a contractually-based forum selection clause also covers tort claims against non-signatories if the tort claims "ultimately depend on the existence of a contractual relationship" between the signatory parties, *Coastal Steel Corp.*, 709 F.2d at 203, or if "resolution of the claims relates to interpretation of the contract," *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988), [*17] or if the tort claims "involve the same operative facts as a parallel claim for a breach of contract." *Lambert v. Kysar*, 983 F.2d 1110, 1121-22 (1st Cir. 1993).

Here, all defendants are closely related as Weingrad alleges they acted in concert to deprive him of the weingrad.com domain name he acquired through the Registration Agreement and subsequent Service Agreement with Network Solutions. Telepathy's, Snapnames.com's and Namebay's involvement in any scheme to cybersquat or otherwise infringe on Weingrad's common law trademark is derivative of and predicated on whether Network Solutions released weingrad.com from its registry in a

RFJN0302

2005 U.S. Dist. LEXIS 26952, *

lawful manner. Weingrad's claims are substantially identical with respect to each defendant, as he sues them together in all but one claim, which is asserted against only Network Solutions, and the claims all arise out of the defendants' relationships with each other. Thus, all of the claims alleged by Weingrad were brought in the wrong forum.

The remaining question is whether the forum selection clause, combined with other facts in this case, favors dismissal under *Fed. R. Civ. P. 12(b)(3)* or [*18] transfer to another federal district court under *28 U.S.C. § 1404(a)*. In determining whether to dismiss or transfer a case, the court must weigh whether a dismissal or a transfer is the more efficient and just means of enforcing the forum selection clause. *See Licensed Practical Nurses, Technicians & Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc., 131 F. Supp. 2d 393, 409 (S.D.N.Y. 2000)*. Courts in this district have dismissed cases involving clauses that permit suit in both federal and state courts of a foreign jurisdiction, as the Retainer Agreement and Service Agreement do. *See e.g., GMAC Commer. Credit v. Dillard Dep't Stores, 198 F.R.D. 402, 409 (S.D.N.Y. 2001); HNY Assocs., L.L.C. v. Summit Resort Props., 2001 U.S. Dist. LEXIS 5310, No.*

*01 Civ. 428, 2001 WL 456250, at *3 (S.D.N.Y. Apr. 30, 2001)*. Dismissal in these cases was warranted, because transfer to the federal district court would "deprive plaintiff of its right under the forum selection clause of [the] contract to bring suit in either state or federal court." *GMAC Commercial Credit, 198 F.R.D. at 409*. As both forum [*19] selection clauses allow plaintiff the choice of bringing suit in the United States District Court for the Eastern District of Virginia or the Civil Court of Fairfax County, the current action will be dismissed in its entirety for improper venue.

* * *

For the reasons set forth above, defendants' motion is granted and the complaint is dismissed.

SO ORDERED:

Dated: New York, New York

November 3, 2005

Michael B. Mukasey

U.S. District Judge

**EXHIBIT 14**

```
                                        FILED
                            CLERK, U.S. DISTRICT COURT

                                  SEP 1 4 2006

                            CENTRAL DISTRICT OF CALIFORNIA
                            BY                      DEPUTY
```

```
                                    Priority
                                    Send
                                    Enter
                                    Closed
                                    JS-5/JS-6
                                    JS-2/JS-3
                                    Scan Only
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FRANZ BADER, et al., | ) | CV 05-6958 SVW (RCx) |
| Plaintiffs, | ) | ORDER GRANTING DEFENDANT |
| | ) | NETWORK SOLUTIONS' MOTION TO |
| v. | ) | DISMISS FOR IMPROPER VENUE |
| | ) | [109] |
| INTERNATIONAL VACATIONS, LTD, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

```
                            ENTERED

                               SEP 1 8 2006

                            BY                145
```

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

I.    INTRODUCTION

     Plaintiffs allege twenty-one different causes of action against twenty-eight defendants. It is not necessary to repeat the summary of those events for purposes of resolving this motion.

     Network Solutions has filed this Rule 12(b)(3) motion to dismiss for improper venue. Plaintiffs allege three causes of action specifically against Network Solutions - 1) civil RICO fraud claim, 2) negligence, and 3) conversion of internet domain names. In early June, Plaintiffs made a last-minute request to continue a multitude of

1   motions, including this one, which the Court granted.  This Court's

2   order clearly stated that Plaintiffs' new counsel file oppositions to

3   the motions "no later than July 26, 2006." (Eisner Decl. Ex. A.)[1]

4        On July 26, 2006, Plaintiffs filed a notice of non-opposition to

5   this Rule 12(b)(3) motion. (Id. Ex. B.) Then, without any explanation,

6   Plaintiffs filed a notice of withdrawal of its earlier non-opposition,

7   and has attempted to substitute an opposition in its place. This

8   document was filed approximately three weeks late – on August 14,

9   2006.  This opposition only explicitly contests the forum selection

10  clause's applicability to one of the causes of action – conversion.

11       For the reasons discussed below, this Court GRANTS Defendant

12  Network Solutions' motion to dismiss for improper venue pursuant to

13  Rule 12(b)(3).

14

15  **II.   FACTS**

16       The Plaintiffs' allegations against Network Solutions are sparse.

17  Plaintiffs' first amended complaint ("FAC") never makes clear the

18  relationship between Network Solutions and the Plaintiffs, or the "LTD

19  Companies" (which Plaintiffs claim that numerous defendants have

20  seized and looted). Plaintiffs only vaguely allege that Network

21  Solutions "facilitated" the misappropriation of domain names and/or

22  converted domain names itself. (FAC at 5, 38.) Plaintiffs plead that

23  these domain names include: "ivacation.com,"

24  _____

25  [1] Concurrently, Defendant Network Solutions has filed a 12(b)(6) motion
    to dismiss Plaintiffs' RICO claim, and has asked this Court to decline
26  supplemental jurisdiction over the remaining state law claims asserted
    against it. Plaintiffs do not oppose that motion.  Because this Court
27  is granting Network Solutions' Rule 12(b)(3) motion to dismiss,
    Network Solutions' Rule 12(b)(6) motion is deemed moot.
28

                                    2

RFJN0305

1   "ivacationbedandbreakfast.com," "ivacationhomerentals.com,"

2   "ivacataionvillarentals.com," "ivacataionvillas.com," "numerouno.com,"

3   "timeshareforsales.com," "timesharestobuy.com," "utopial.com," and

4   "utopiaone.com." (Id. at 38.)

5     Network Solutions' motion explains the relationship in more

6   detail. Network Solutions is a domain name registrar - their business

7   is to associate numerical IP addresses to specific "names" that

8   customers wish to use as part of an internet website. (Whetzel Decl.

9   ¶¶ 5, 7.) Every internet domain name that is registered by Network

10   Solutions is governed by a commercial contract ("Service Agreements")

11   between it and its customers. (Id. ¶ 3.)

12     Plaintiffs, for the most part, claim to be shareholders of

13   International Vacations, Ltd. (FAC at 3-4.) Additionally, the FAC

14   states that International Vacation Homes, Inc. ("IVH"), is a wholly-

15   owned subsidiary of International Vacations, Ltd. (Id. at 4.) IVH was

16   the signatory of the various Service Agreements with Network

17   Solutions, which Network Solutions requires before any individual or

18   entity may assert ownership over a desired domain name.

19     One of the Service Agreements signed between IVH and Network

20   Solutions make clear that the parties "each agree to submit to

21   exclusive subject matter jurisdiction, personal jurisdiction, and

22   venue of the United States District Court for the Eastern District of

23   Virginia, Alexandria Division for any disputes between us under or

24   arising out of this Agreement." (Whetzel Decl. ¶ 16.) Each of the

25   other Service Agreements between IVH and Network Solutions contain

26   similarly broad language as to the forum selection clause's

27   applicability. (Id. ¶¶ 17-20.)

28

3

RFJN0306

III. DISCUSSION

    A.   Standard for 12(b)(3) Motion to Dismiss

    It is established that "[f]ederal law governs the validity of a forum selection clause" under Rule 12(b)(3) motions. Arqueta v. Banco Mexicano, 87 F.3d 320, 324 (9th Cir. 1996). This Court must "draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party," meaning Plaintiffs. Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1138 (9th Cir. 2004).

    However, any such inferences must be "enough to overcome the strong presumption in favor of enforcing forum selection clauses." Id. at 1141. Additionally, once a defendant objects to venue, "the plaintiff has the burden of showing that venue is proper." Bohara v. Backus Hosp. Med. Benefit Plan, 390 F. Supp. 2d 957, 960 (C.D. Cal. 2005) (citing Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491 (9th Cir. 1979)). Finally, as part of this analysis, this Court is empowered "to consider facts outside the pleadings." Murphy, 362 F.3d at 1137.

    B.   The Forum Selection Clause Applies to the Network Solutions
        Tort Claims

    It is undisputed that "forum selection clauses can be equally applicable to contractual and tort causes of action." Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 514 (9th Cir. 1988). A forum selection clause governs any tort claims which will require the interpretation of a contract signed by the parties. Id. As long as the tort cause of action relates "in some way to [the] rights and duties enumerated," the forum selection clause should apply. Id.

4

RFJN0307

1    Plaintiffs have alleged negligence, conversion, and a civil RICO

2    fraud claim. There is no claim for breach of contract, perhaps in an

3    effort to artfully avoid Network Solutions' forum selection clause.

4    However, a "plaintiff cannot avoid the application of a forum

5    selection clause by suing only in tort." Indemnity Ins. Co. v.

6    Schneider Freight USA, Inc., 2001 WL 1356247, *5 (C.D. Cal. 2001)

7    (citing Kelso Enters., Ltd. v. M/V Wisida Frost, 8 F. Supp. 2d 1197

8    (C.D. Cal. 1998)).

9    Plaintiffs argue that their claim for conversion does not "flow"

10    from the contracts with Network Solutions. Yet, Plaintiffs concede

11    that "Network Solutions would have no relationship with Plaintiffs

12    absent the Agreement." (Pls. Opp. at 3.) And to the extent that

13    Plaintiffs claim that Network Solutions was negligent because it

14    "facilitated" the conversion of these enumerated domain names, or to

15    the extent Network Solutions converted the domain names itself,

16    Plaintiffs can only maintain these causes of action because their

17    right to own these domain names flows directly from the Network

18    Solutions Service Agreement.

19    It is not surprising, therefore, that this would not be the first

20    court to hold that Network Solutions' forum selection clause

21    agreements are validly applied to tort claims. This is what the

22    Southern District of New York held in Weingrad v. Telepahty, Inc.,

23    2005 WL 2990645 (S.D.N.Y. 2005). That court held that where a

24    plaintiff relied "necessarily on [the Network Solutions Service

25    Agreement] as the source of his initial right to 'own' the . . .

26    domain name," the need to interpret or resolve rights under the

27    contract would be the same, whether the cause of action was for breach

28    of contract or in tort. See id. at *4-*5.

5

1    In addition to the claims for negligence and conversion,

2    Plaintiffs have alleged a civil RICO fraud claim against Network

3    Solutions.  The Ninth Circuit has indicated that a RICO claim may be

4    governed by a forum selection clause as well. See Argueta, 87 F.3d at

5    323-25.  Plaintiffs have not explained why the civil RICO fraud claim

6    should not be subject to the forum selection clause in this case.

7        Consequently, all of Plaintiffs' claims against Network Solutions

8    should be governed by the forum selection clause found in the multiple

9    Service Agreements.

10       C.    Plaintiffs' Purported Case Law Support is Inapplicable

11       Plaintiffs rely largely on two cases to distinguish the clear

12   case law against their position.  Plaintiffs cite to Gootnick v.

13   Lighter, 2005 WL 3079000 (N.D. Cal. 2005), to argue that the forum

14   selection clause should not apply.  However, that case did not involve

15   a Rule 12(b)(3) motion (which the court explicitly held was untimely),

16   but only a request to transfer venue.  Id. at *6.  When a district

17   court considers whether to exercise its discretion to transfer a case,

18   it examines many factors.  The presence of a forum selection clause in

19   such instances is, of course, "not determinative." Id. at *6.

20   However, this case furnishes no support for Plaintiffs.  The forum

21   selection clause is dispositive in the context of a timely raised Rule

22   12(b)(3) motion.

23       Second, Plaintiffs cite to Coalition for ICANN Transparency Inc.

24   v. Verisign, Inc., 2006 WL 2033375 (N.D. Cal. 2006), which is also

25   inapt.  In that case, plaintiff was a non-profit coalition of

26   registrars and registrants of internet domain names, which alleged

27   that Verisign had violated antitrust laws by engaging in anti-

28   competitive and monopolistic behavior.  Id. at *1, *5.  It is true, in

6

RFJN0309

1    that case, that plaintiff's constituents would have lacked any

2    "relationship" to Verisign in the absence of the signed contractual

3    agreements. Id. at *5.

4        However, a claim for antitrust violations is far less likely to

5    require the interpretation of a contract than Plaintiffs' current

6    conversion cause of action.  The district court decision was correct,

7    in the antitrust context, because the elements for an antitrust

8    violation could be established wholly independent of any reference to

9    the contractual agreement in that case.  See id.  However, this

10   argument cannot be applied to a claim for conversion.  California law

11   requires that Plaintiffs prove "ownership" to establish a conversion

12   claim.  In re Emery, 317 F.3d 1064, 1069 (9th Cir. 2003).  The only

13   way that Plaintiffs can prove ownership is by interpreting the Service

14   Agreements between IVH and Network Solutions.

15       As a result, Plaintiffs' case law citations do not support its

16   opposition to this motion.

17       D.   The Forum Selection Clause Applies to Plaintiffs Even Though

18            IVH was the Signatory to the Service Agreements

19       Plaintiffs have also tried to argue that they are not bound by

20   the forum selection clause because each of the individual plaintiffs

21   to this case did not sign the Service Agreements themselves. This

22   argument should fail.  First, Plaintiffs have specifically alleged

23   that this case is a "derivative action."  (FAC at 10.)  By bringing a

24   derivative action, Plaintiffs are stepping into the shoes of

25   International Vacations, Ltd., and its subsidiary, IVH.  Thus, all

26   Plaintiffs are bound by the Service Agreement in their derivative

27   capacity.

28

                                       7

RFJN0310

1    Second, the Ninth Circuit has clearly stated that "a range of

2  transaction participants, parties and non-parties, should benefit from

3  and be subject to forum selection clauses." Manetti-Farrow, Inc., 858

4  F.2d at 514 n.5 (internal quotation marks and citation omitted). With

5  this ruling in mind, it has been further held that a

6  successor/assignee of rights to a corporation is bound by a forum

7  selection clause. Graham Tech. Solutions, Inc. v. Thinking Pictures,

8  Inc., 9494 F. Supp. 1427, 1434 (N.D. Cal. 1997).  Plaintiff

9  Ivacation.Com Investor Association, LLC claims to be such an assignee,

10  and is certainly subject to the forum selection clause.

11    Additionally, the shareholder Plaintiffs have a close enough

12  relationship to IVH to be bound by the agreement. In Comerica Bank v.

13  Whitehall Specialties, Inc., 352 F. Supp. 2d 1077 (C.D. Cal. 2004),

14  owners and directors of a company were held to be covered by a

15  company's forum selection clause agreement.  Id. at 1082 n.6.  In the

16  current litigation, IVH is apparently a wholly-owned subsidiary of

17  International Vacations, Ltd., and Plaintiffs are shareholders in the

18  latter.  As shareholders, the Plaintiffs are to be considered "owners"

19  of the International Vacations Ltd., and its subsidiary IVH, and thus

20  are closely related enough to be governed by the forum selection

21  clause agreement.

22    E. Plaintiffs Are Denied Leave to Amend

23    During oral argument, Plaintiffs requested that this Court grant

24  Plaintiffs the further opportunity to allege additional causes of

25  action against Network Solutions that would fall outside the scope of

26  the forum selection clause's applicability.  This request is denied.

27    As stated above, while factual conflicts are to be resolved in

28  Plaintiffs' favor, Plaintiffs still bear the burden of proving that

8

1  venue is proper.  <u>See</u> <u>Bohara</u>, 390 F. Supp.2d at 960.  Plaintiffs

2  cannot reasonably expect to escape this responsibility by merely

3  stating, "we'll do better next time."

4      Finally, Plaintiffs' opposition makes no effort to detail how the

5  allegation of additional facts will lead to a different result in

6  Plaintiffs' forthcoming "Second Amended Complaint."

7

8  IV.  CONCLUSION

9      For the foregoing reasons, this Court GRANTS Defendant Network

10 Solutions' Motion to Dismiss for Improper Venue pursuant to Rule

11 12(b)(3).  Plaintiffs' claims against Network Solutions for

12 conversion, negligence, and civil RICO fraud must be litigated in the

13 Eastern District of Virginia, Alexandria Division.

14

15 IT IS SO ORDERED.

16

17

18 DATED: ___9/13/06___                    _____

19                                          STEPHEN V. WILSON
                                            UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25

26

27

28

RFJN0312

**EXHIBIT  15**

2- 8-06:10:41AM:Prestige Toledo                    ;419+661+1991          # 2/ 8

*NSI - Forum Selection enforced.*

FILED

00 JUL 11 PM 3: 

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
TOLEDO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Steven Weber,                                        Case No. 3:99CV7790

       Plaintiff,

   -v-

National Football League, et al.,                        ORDER

       Defendants.

    This is a case in which plaintiff alleges that defendants violated provisions of the Lanham

Act, 15 U.S.C. § 1051, the Sherman Act, 15 U.S.C. §§ 1-2, the Federal Declaratory Judgment

Act, 28 U.S.C. §§ 2201-02, the common law, and Ohio statutory law. Specifically, plaintiff

claims that defendants conspired to abuse their rights as trademark holders and otherwise restrain

trade. Pending is defendant Network Solutions, Inc.'s ("NSI") motion to dismiss for improper

venue on the ground that plaintiff is bound by a contractual choice of forum clause in his

AO 72A
(Rev.8/82)

RFJN0313

2- 8-05;10:41AM;Prestige Toledo                    ;419+661+1991           # 3/ 8

agreements with NSI.[1]  For the following reasons, defendant NSI's motion to dismiss shall be granted.

## BACKGROUND

Plaintiff Steven Weber is a resident of Pennsylvania.  He is in the business of buying and selling internet domain names.  In May 1997, plaintiff registered and paid for the rights to the domain names "jets.com" and "dolphins.com" through NSI, a District of Columbia corporation. Shortly thereafter, plaintiff listed these domain names for sale on his website at "domainsale.com."  This prompted a letter from counsel for the football defendants to plaintiff, claiming that he had violated their respective trademark rights.  (See Doc. 1, Ex. 3).

The football defendants also contacted NSI, seeking to have the rights to the domain names transferred to the New York Jets Football Club, Inc. and the Miami Dolphins, Ltd., respectively.  (See Doc.1 Ex. 4).  NSI, pursuant to its policies, placed the domain names on hold and barred their sale or use pending the outcome of the dispute.  "Jets.com" and "dolphins.com" have remained on hold by NSI since 1997.  (See Doc. 1 at 12).

In the interim, plaintiff re-registered the aforementioned domain names with NSI in May 1999.  (See Doc. 28 at 4).

Plaintiff filed the instant action claiming that defendants violated federal antitrust and trademark law and Ohio statutory and common law by: 1) wrongfully exercising control over his property, 2) unlawfully restraining trade in Ohio and elsewhere, 3) tortiously interfering with

---

[1] Defendants National Football League, NFL Properties, New York Jets Football Club, Inc., and Miami Dolphins, Ltd. (collectively the "football defendants") were not parties to this motion to dismiss and therefore will not be addressed in this opinion.

- 2 -

AO 72A
(Rev.8/82)

RFJN0314

2- 8-05;10:41AM;Prestige Toledo                              ;419+661+1901            # 4/ 8

plaintiff's business relationships, and 4) abusing their rights as trademark holders. (See Doc. 37 ¶ 8).

## PROCEDURAL HISTORY

Defendant NSI moved to dismiss plaintiff's complaint under Fed. R. Civ. P. 12(b)(3), claiming improper venue on the basis of a forum selection clause in the agreements between NSI and plaintiff. (See Doc. 9 at 1). The pertinent language states: "By submitting this Registration Agreement, registrant [plaintiff] consents to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Virginia, Alexandria Division." (Doc. 9 at 5). NSI attached copies of the two registration or re-registration agreements executed between the parties for the two domain names to it's original motion to dismiss. (See Doc. 9, Ex. A & B).

Plaintiff responded by claiming that the clause is void and unenforceable, was not in effect when any of the relevant events occurred, and should fail for vagueness. Plaintiff also argued that Fed. Rule Civ. P. 12(b)(3) is not the proper method by which to enforce a forum selection clause.

Plaintiff then filed a first amended complaint in which he reasserted his original claims and alleged additional claims including violations of the Sherman Act, 15 U.S.C. §§ 1-2, and the Federal Declaratory Judgment act, 28 U.S.C. §§ 2201-02. (See Doc 37 ¶ 8). Plaintiff argues that venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, which states that any suit brought under antitrust laws against a corporation "may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business..." 15 U.S.C. § 22.

- 3 -

AO 72A
(Rev.8/82)

RFJN0315

NSI responded to the first amended complaint by filing a motion to dismiss in which it reasserted its original motion and added claims that 1) Weber failed to plead an antitrust injury, which nullifies application of the antitrust venue provision of 15 U.S.C. § 22; 2) NSI is immune from the antitrust claims; 3) section 12 of the Clayton Act does not supercede enforcement of the forum selection clause; and 4) allowing Weber to bring suit in the Northern District of Ohio is not in keeping with the Congressional intent of the antitrust venue provision.

### DISCUSSION

It is well established that forum-selection clauses are "prima facie valid and should be enforced unless enforcement is shown to be 'unreasonable' under the circumstances." International Software Systems, Inc. v. Amplicon, Inc., 77 F.3d 112, 114 (1996) (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). Therefore, courts generally enforce forum-selection clauses unless the non-moving party clearly shows that "enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." Bremen, 407 U.S. at 15. See also Security Watch Inc. v. Sentinel Systems, Inc., 176 F.3d 369, 374 (6th Cir. 1999) (holding that forum selection clauses are generally enforced in the Sixth Circuit unless enforcement would be unfair or unreasonable); Moses v. Business Card Express, Inc., 929 F.2d 1131, 1136 (6th Cir.), cert. denied, 502 U.S. 821 (1991) (same).

In Security Watch, the Sixth Circuit outlined three situations in which a forum selection clause may be held unenforceable. Those situations are: 1) if the clause was obtained by fraud, duress, abuse of economic power, or other unconscionable means, 2) if the forum would be closed to the suit or not able to handle it effectively, or 3) if the forum would be so inconvenient that requiring the plaintiff to bring suit there would be unjust. Security Watch, 176 F. 3d at 375,

-4-

AO 72A
(Rev.8/82)

RFJN0316

2- 8-05;10:41AM;Prestige Toledo                    ;419#891+1991                    # 5/ 8

(citing Restatement (Second) of Conflict of Laws § 80 (1988 revision)).  The forum selection clause contained in the Domain Registration Agreement (Doc. 9 at Ex. A & B) does not fit any of those categories, and is therefore sufficiently reasonable and just so as not to preclude enforcement.

Plaintiff argues in the alternative that the forum selection clause is ambiguous with respect to its intended scope, and presumably was meant to refer only to breach of contract claims.  This argument is without merit.  The agreement reads that "By submitting to this registration agreement, [r]egistrant consents to the exclusive jurisdiction and venue of the United States District Court for the Eastern District of Virginia, Alexandria Division." (Doc. 28 at 10).  NSI argues, and I agree, that "exclusive" is sufficient to mean that any and all claims arising out of the agreement will be subject to its parameters.

Plaintiff claims that the choice of forum provision was not in effect at the time the relevant events took place.  But NSI has proffered evidence to the contrary to establish that the agreement between the parties did include the forum selection clause.  Specifically, plaintiff re-registered "jets.com" and "dolphins.com" in May 1999, and NSI has shown that the clause was in effect at that time and covered the re-registration period. (Doc. 29).

Plaintiff also contends that the motion is improper because Fed. Rule Civ. P. 12(b)(3) is not the appropriate method to assert a forum selection clause.  I disagree.  There is support for this conclusion in Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29-32 (1988), in which the Supreme Court held that motions to dismiss based upon forum selection clauses are cognizable as motions to dismiss for improper venue.  See also 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (2d ed. 1986 & Supp. 1998)

- 5 -

RFJN0317

Z- 8-06;10:41AM;Prestige Toledo                    ;419+881+1991        # 7/ 8

(discussing forum-selection clauses as "Contractual Modification" of venue). Therefore, plaintiff's contention that defendants chose an improper procedural mechanism to assert the forum selection clause is not well taken.

Finally, plaintiff claims that venue is proper in this Court pursuant to section 12 of the Clayton Act, 15 U.S.C. §22. (See Doc. 37 ¶ 12). NSI argues that is entitled to an implied immunity from antitrust liability pursuant to its cooperative agreement with the National Science Foundation, a federal agency. (See Doc. 43 at 7). The issue of NSI's immunity does not need to be considered because there is clear precedent in this district that a plaintiff's characterization of a dispute as an antitrust matter shall not override a forum selection clause in an agreement into which it freely entered. Rini Wine Co. v. Guild Wineries and Distilleries, 604 F.Supp. 1055, 1059 (N.D. Ohio 1985). Accordingly, a determination of whether or not Weber's claim of an antitrust injury is well founded will not be made here.

Plaintiff also claims that Congressional intent of 15 U.S.C. § 22, as well as public policy considerations behind its enforcement, should preclude enforcement of the forum selection clause in its agreements with NSI. I do not agree. In addition to the Court in Rini Wine, other courts have enforced forum selection clauses in cases involving alleged antitrust violations. Full-Sight Contact Lens Corp. v. Soft Lenses, Inc., 466 F.Supp. 71 (S.D.N.Y. 1978)(granting transfer of antitrust claims when suit was brought in a court not stipulated in forum selection clauses); A.C. Miller Concrete Products Corp. v. Quickset Vault Sales Corp., 309 F.Supp. 1094 (E.D. Pa. 1970)(same).

Judicial interpretation of Section 12 of the Clayton Act has been that Congress intended to protect individuals injured by corporate violations of antitrust laws from the "often

- 6 -

AO 72A
(Rev.8/82)

RFJN0318

2- 8-05;10:41AM;Prestige Toledo                    ;419+661+1991            # 8/ 8

insuperable obstacle" of having to redress the wrong in a distant forum where the corporation

may be headquartered.  United States v. Scophony Corporation, 333 U.S. 795, 808, 92 Law Ed.

1091, 1101 (1947).  It is not clear how bringing this suit in the Northern District of Ohio,

contrary to the forum selection clause in the contract between the parties, would protect Weber's

interest in redressing the alleged injury in a manner that would justify disregarding his agreement

with NSI.

## CONCLUSION

It is, therefore,

ORDERED THAT defendant NSI's motions to dismiss shall be granted.

So ordered.


James G. Carr
United States District Judge

AO 72A
(Rev.8/82)

RFJN0319

**EXHIBIT 16**

Short Form Order

NEW YORK SUPREME COURT - QUEENS COUNTY

Present:  HONORABLE __ALLAN B. WEISS__       IA Part _2_
                           Justice

-------------------------------------x
BRIAN VOLPE,                                  Index
                                              Number __2838____ 2005
                          Plaintiff,          Motion
                                              Date __November 2,_ 2005
           -against-
                                              Motion
HENRY SUN, individually, Henry                Cal. Number __33__
Sun d/b/a HENRY SUN, HENRY SUN,
under the assumed name, "NATALIE
COHEN", HOWARD SUN, individually,
HOWARD SUN d/b/a HENRY SUN,
HOWARD SUN, under the assumed name
"NATALIE COHEN", "JOHN DOE", being
and intended to be any individual or
business entity, unnamed, but utilized
by defendants; and NETWORK SOLUTIONS,
a duly formed Virginia Corporation,
duly authorized to conduct business
in New York, and BREANNA WYATT, as an
agent, servant, and or employee of
the Defendant, NETWORK SOLUTIONS, and
LEGAL MEDICAL WEB, INC.,

                          Defendants.

-------------------------------------x

The following papers numbered 1 to _6_ read on this motion by
defendant  Network  Solutions,  LLC  ("NSL")  and  defendant
Breanna Wyatt for an order dismissing the complaint against them
pursuant to CPLR 3211(a)(1), (2), (7), and (8).

                                                Papers
                                                Numbered

     Notice of Motion - Affidavits - Exhibits ......... 1
     Answering Affidavits - Exhibits ................. 2
     Reply Affidavits ................................ 3
     Other (Memoranda of Law) ........................ 4-6

     Upon the foregoing papers it is ordered that:

RFJN0320

That branch of the motion by defendant NSL which is for an order pursuant to CPLR 3211(a)(1) dismissing the complaint against it is granted. Those branches of the motion which are for an order pursuant to CPLR 3211(a)(1) and (8) dismissing the complaint against defendant Breanna Wyatt are granted. (See the accompanying memorandum.)

Dated: 1/13/06

_____

J.S.C.

2

RFJN0321

MEMORANDUM

SUPREME COURT  :  QUEENS COUNTY
IA PART 2

---------------------------------------------x

BRIAN VOLPE,                                        INDEX NO. 2838/05

                    Plaintiff,                      BY: WEISS, J.

        -against-                                   DATED: 1/13/06

HENRY SUN, individually, Henry
Sun d/b/a HENRY SUN, HENRY SUN,
under the assumed name, "NATALIE
COHEN", HOWARD SUN, individually,
HOWARD SUN d/b/a HENRY SUN,
HOWARD SUN, under the assumed name
"NATALIE COHEN", "JOHN DOE", being
and intended to be any individual or
business entity, unnamed, but utilized
by defendants; and NETWORK SOLUTIONS,
a duly formed Virginia Corporation,
duly authorized to conduct business
in New York, and BREANNA WYATT, as an
agent, servant, and or employee of
the Defendant, NETWORK SOLUTIONS, and
LEGAL MEDICAL WEB, INC.,

                    Defendants.

---------------------------------------------x

        Defendant Network Solutions, LLC ("NSL") and defendant

Breanna Wyatt have moved for an order dismissing the complaint

against them pursuant to CPLR 3211(a)(1), (2), (7), and (8).

        NSL, an accredited domain name registrar, provides domain

name registration and other Internet related services.    A

registrant chooses a unique domain name and enters into a

commercial contract with a registrar to associate that domain name

with an Internet Protocol address, the method by which one computer

or network connected to the Internet can identify and exchange information with another.

On or about October 23, 2003, Legal Medical Web, Inc., acting through its agent, plaintiff Brian Volpe, entered into a contract with VeriSign, Inc., a domain name registrar, renewing the registration for the domain name "<legalmedicalweb.com>." Volpe renewed the registration online by clicking on the appropriate icon. Paragraph 1 of the contract made the agreement binding upon the agents of Legal Medical Web, Inc. Paragraph 21(a) of the contract provided in relevant part: "You and we each agree to submit to exclusive subject matter jurisdiction, personal jurisdiction, and venue of the United States District Court for the Eastern District of Virginia, Alexandria Division for any disputes between us under or arising out of this Agreement. If there is no jurisdiction in the United States District Court for the Eastern District of Virginia, Alexandria Division, for any disputes between us or arising out of this Agreement you and we agree that jurisdiction shall be in the courts of Fairfax County, Fairfax, Virginia."

NSL, an affiliate of VeriSign, Inc., acquired the contract and performed Internet services for Volpe. NSL provided registrants with a domain name account that could be accessed by means of a password, and the password could also be used to make modifications to the registration. On June 7, 2004, the

2

RFJN0323

registration for the domain name "<legalmedicalweb.com>" was transferred to Henry Sun after someone gained password authenticated access online to the account. Volpe alleges that someone made the transfer fraudulently, and he brought the matter to the attention of NSL. Defendant Breanna Wyatt, a "dispute specialist" with NSL, decided that the registrar could not determine if the transfer had been made fraudulently since someone had used the correct password to gain access to the account. NSL "locked" the domain name to prevent it from being further transferred and advised Volpe that legal action would be necessary to resolve his dispute with Henry Sun. After six months of inaction by Volpe, the registrar removed the "lock" and deleted the domain name for non-payment of a renewal notice.

On February 4, 2005, Brian Volpe, acting pro se, brought this action against NSL and its agent, Breanna Wyatt, among others, alleging against the defendant registrar causes of action for, inter alia, breach of contract and tortious interference with business relationships.

That branch of the motion by defendant NSL which is for an order pursuant to CPLR 3211(a)(1) dismissing the complaint against it is granted. In order to prevail on a CPLR 3211(a)(1) motion, the documentary evidence submitted "must be such that it resolves all the factual issues as a matter of law and conclusively and definitively disposes of the plaintiff's claim***." (Fernandez

3

RFJN0324

v Cigna Property and Casualty Insurance Company, 188 AD2d 700, 702;

Vanderminden v Vanderminden, 226 AD2d 1037; Bronxville Knolls, Inc.

v Webster Town Center Partnership, 221 AD2d 248.)  The documentary

evidence relied upon by defendant NSL is dispositive of plaintiff

Volpe's action brought in this court.  Paragraph 1 of the relevant

contract   made   the   agreement   binding   upon   the   agents   of

Legal Medical Web, Inc.  Paragraph 21(a) of the contract provides

that disputes arising under the agreement shall be resolved in the

federal or state courts situated in Virginia.  "It is the policy of

the courts of this State to enforce contractual provisions for

choice of law and selection of a forum for litigation***."  (Koob

v IDS Financial Services, Inc., 213 AD2d 26, 33; see, Matter of

Smith Barney, Harris Upham & Co. v. Luckie, 85 NY2d 193; Boss v

American Exp. Financial Advisors, Inc., 15 AD3d 306.)  Forum

selection clauses in domain name contracts have been enforced by

courts of other jurisdictions.  (See, e.g., DeJohn v The .TV Corp.

Intern., 245 F Supp 2d 913; Kilgallen v Network Solutions, Inc.,

99 F Supp 2d 125.)  The court notes that defendant NSL has

registered millions of domain names for a small fee for registrants

located throughout the world, and the registrar would be prejudiced

if the forum selection clause in its contract is not enforced.

Those  branches  of  the  motion  which  are  for  an  order

pursuant  to  CPLR  3211(a)(1)  and  (8)  dismissing  the  complaint

against defendant Breanna Wyatt are granted.  Although defendant

4

Wyatt was a nonsignatory to the agreement, it was reasonably foreseeable that she would seek to enforce the forum selection clause given the close relationship between herself and her employer.    (See, Dogmoch Intern. Corp. v Dresdner Bank AG, 304 AD2d 396.)    American courts will enforce forum selection clauses in favor of non-parties "closely related" to a signatory. (See, Frietsch v Refco, Inc., 56 F3d 825.)    In any event, the plaintiff did not properly serve Wyatt with the summons and complaint.    (See, CPLR 308.)    Even a pro se litigant must comply with jurisdictional requirements.    (See, Goldmark v Keystone & Grading Corp., 226 AD2d 143.)

Short form order signed herewith.

_____
J.S.C.

1—13—06

RFJN0326

**EXHIBIT 17**

1    ARNOLD & PORTER LLP
     SUZANNE V. WILSON (State Bar No. 152399)
2    TRICIA A. CROSS (State Bar No. 210838)
     777 South Figueroa Street, 44th Floor
3    Los Angeles, California 90017-5844
     Telephone: (213) 243-4000
4    Facsimile: (213) 243-4199

5    Attorneys for Defendants
     VERISIGN, INC. and
6    NETWORK SOLUTIONS, INC.

ORIGINAL FILED

DEC 1 5 2004

LOS ANGELES
SUPERIOR COURT

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11   MICHAEL LANCASTER, an individual; and      )   Case No. BC 321199
     RELOCATION DIRECTOR, INC., a California     )
12   corporation,                               )   **NOTICE OF ORDER GRANTING**
                                                )   **MOTION OF DEFENDANTS**
13                   Plaintiffs,                )   **VERISIGN, INC. AND NETWORK**
                                                )   **SOLUTIONS, INC. TO DISMISS THE**
14           v.                                 )   **ACTION ON THE BASIS OF FORUM**
                                                )   **NON CONVENIENS**
15   VERISIGN, INC., a Delaware Corporation;    )
     NETWORK SOLUTIONS, INC., a Delaware        )   Date:       December 7, 2004
16   Corporation; and DOES 1-50, inclusive;     )   Time:       9:00 a.m.
                                                )   Department:  51
17                   Defendants.                )   Judge:      The Hon. Irving Feffer
                                                )
18                                              )
                                                )
19                                              )
                                                )
20                                              )
                                                )
21                                              )

22

23

24

25

26

27

28

343340_2.DOC

─────────────────────────────────────────────────────────
NOTICE OF ORDER GRANTING MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS

RFJN0327

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that, on December 7, 2004, the Court granted defendants

3    VeriSign, Inc.'s and Network Solutions, Inc.'s (collectively "Defendants") Motion to Dismiss the

4    Action on the Basis of Forum Non Conveniens and, accordingly, dismissed the above-captioned

5    action.  A true and correct copy of the Court's December 7, 2004 Minute Orders reflecting this

6    ruling are attached hereto as Exhibit A and are incorporated herein by reference.

7         In addition, as reflected in Exhibit A, on December 7, 2004, the Court took the Defendants'

8    pending Demurrers and Motion to Strike off calendar because they are moot.

9

10   DATED:  December 1, 2004.                    ARNOLD & PORTER LLP
                                                  Suzanne V. Wilson
11                                                Tricia A. Cross

12

13                                    By:  _____

14                                         TRICIA A. CROSS
                                           Attorneys for Defendants VeriSign,
15                                         Inc. and Network Solutions, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

NOTICE OF ORDER GRANTING MOTION TO DISMISS ON THE BASIS OF FORUM NON CONVENIENS

RFJN0328

EXHIBIT A

RFJN0329

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 01/27/04 | **DEPT.** 51 |
| HONORABLE IRVING S. FEFFER    JUDGE | K. MASON    DEPUTY CLERK |
| HONORABLE    JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| #4 | |
| G. MACK  CRT. ASST.  Deputy Sheriff | S PRICE    Reporter |

| | | |
|---|---|---|
| 9:00 am BC321199 | Plaintiff Counsel | HOWARD MILLER (x) |
| MICHAEL E LANCASTER ET AL VS VERISIGN INC ET AL | Defendant Counsel | TRICIA CROSS (x) |

**NATURE OF PROCEEDINGS:**

DEFENDANTS VERISIGN, INC. AND NETWORK SOLUTIONS INC'S DEMURRER;

ABOVE DEFENDANTS MOTION TO DISMISS THE ACTION ON THE BASIS OF FORUM NON CONVENIENS;

ABOVE DEFENDANTS MOTION TO STRIKE;

Case called for hearing.

Above motion to dismiss is argued and submitted.

Motion is GRANTED (case deemed dismissed).

Court finds that the forum selection clauses in the parties' agreements are enforceable and applicable to this action and that the exception in the Network Solutions Servive Agreement for disputes concerning or arising from (Plaintiffs') use of a domain name registered with (Defendants) is inapplicable.

Above Demurrer and Motion to Strike OFF-CALENDAR as moot.

Defendant to give notice.

All hearing dates are ADVANCED & VACATED.

Page   1 of   1   DEPT. 51

| MINUTES ENTERED |
|---|
| 12/07/04 |
| COUNTY CLERK |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 12/07/04                                                                    DEPT. 51

HONORABLE IRVING S. FEFFER    JUDGE  K. MASON           DEPUTY CLERK

HONORABLE                     JUDGE PRO TEM            ELECTRONIC RECORDING MONITOR
#13
       G. MACK  CRT. ASST.   Deputy Sheriff  NONE           Reporter

9:00 am BC321199                      Plaintiff
                                      Counsel
MICHAEL E LANCASTER ET AL                      NO APPEARANCES
                                      Defendant
          VS                          Counsel
VERISIGN INC ET AL

**NATURE OF PROCEEDINGS:**

NUNC PRO TUNC

Due to inadvertance and clerical error,
the minute order of 12-7-04 (incorrectly reflected as
1/27/04) does not accurately reflect the order of
the Court for Department 51
Said minute order is hereby corrected
nunc pro tunc as of
as follows:

By indicating that the correct date of the entry
of the minutes as "12-7-04" and NOT "1/27/04" as
indicated on face of said order.

Balance of said minute order shall remain as entered.

                     Page   1 of   1   DEPT. 51        ┌─────────────────┐
                                                       │ MINUTES ENTERED │
                                                       │ 12/07/04        │
                                                       │ COUNTY CLERK    │
                                                       └─────────────────┘

1

**PROOF OF SERVICE**

2      STATE OF CALIFORNIA          )
                                    )  ss
3      COUNTY OF LOS ANGELES        )

4          I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 777 South Figueroa Street, 44th Floor,
5      Los Angeles, California 90017-5844.

6          On December 15, 2004, I served the foregoing document described as:

7      NOTICE OF ORDER GRANTING MOTION OF DEFENDANTS VERISIGN, INC. AND NETWORK SOLUTIONS, INC. TO DISMISS THE ACTION ON THE BASIS OF
8      FORUM NON CONVENIENS

9      ☐   by placing true copies thereof enclosed in sealed envelopes addressed as stated on the
10         attached mailing list.

       ☒   by placing ☐ the original and ☒ a true copy thereof enclosed in sealed envelope(s)
11         addressed as follows:

12                    Howard B. Smith/Graham B. Smith
                      GIRARDI KEESE
13                    1126 Wilshire Boulevard
                      Los Angeles CA 90017
14

15     ☒   **BY MAIL**  I placed such envelope with postage thereon prepaid in the United States Mail
           at 777 South Figueroa Street, 44th Floor, Los Angeles, California 90017-5844.  Executed
16         on December 15, 2004 at Los Angeles, California.

17     ☐   **BY PERSONAL SERVICE**  I caused such envelope to be delivered by hand to the office
           of the addressee.  Executed on          at Los Angeles, California.
18

19     ☐   **BY FACSIMILE**  The above-referenced document (together with all exhibits and
           attachments thereto) was transmitted via facsimile transmission to the addressee(s) as
20         indicated on the attached mailing list on the date thereof.  The transmission was reported as
           completed and without error.  Executed on          at Los Angeles, California.

21     ☒   **STATE**  I declare under penalty of perjury under the laws of the State of California that the
22         foregoing is true and correct.

23

24     _____          _____
       Jacqui Tollefson                      Signature
25

26

27

28

_____
REPLY IN SUPPORT OF MOTION TO DISMISS OR STAY ON THE BASIS OF FORUM NON-CONVENIENS

RFJN0332

**EXHIBIT 18**

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 22 2003

ALAN SLATER, Clerk of the Court

BY: _____A. KNOX_____, DEPUTY

1  ARNOLD & PORTER
   Suzanne V. Wilson (State Bar No. 152399)
2  Victoria C. Shapiro (State Bar No. 202197)
   Cheryl A. Williams (State Bar No. 193532)
3  1900 Avenue of the Stars, 17th Floor
   Los Angeles, CA 90067-4408
4  Telephone: (310) 552-2500
   Facsimile: (310) 552-1191
5
6  Attorneys for Defendant Network Solutions, Inc.
7
8                    SUPERIOR COURT OF CALIFORNIA
9                         COUNTY OF ORANGE
10
11 OPTIMA TECHNOLOGY CORPORATION,)   Case No. 03CC10743
   INC., a California corporation,        )
12                                        )   NOTICE OF ORDER GRANTING
                    Plaintiff,            )   DEFENDANT NETWORK SOLUTIONS,
13                                        )   INC.'S MOTION TO DISMISS
         v.                               )   PLAINTIFF OPTIMA TECHNOLOGY
14                                        )   CORPORATION, INC.'S COMPLAINT
   NETWORK SOLUTIONS, INC., a Delaware )   PURSUANT TO CAL. CIV. PROC.
15 corporation, and DOES 1 through 50,    )   CODE § 410.30 FOR *FORUM NON*
   inclusive,                             )   *CONVENIENS*
16                                        )
                    Defendant.            )   Judge: The Honorable Clay M. Smith
17                                        )
                                          )
18
19
20
21
22
23
24
25
26
27
28

LA 307214_1.DOC

RFJN0333

1   TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE of the Court's Minute Order, entered on December 12, 2003,

3   granting Defendant Network Solutions, Inc.'s Motion to Dismiss Optima Technology Corporation,

4   Inc.'s Complaint Pursuant to Cal. Civ. Proc. § 410.30 for *Forum Non Conveniens*.  A true and

5   correct copy of the Court's Order is attached hereto as Exhibit 1.

6

7   Dated:  December 22, 2003              ARNOLD & PORTER
                                          SUZANNE V. WILSON
8                                         VICTORIA C. SHAPIRO
                                          CHERYL A. WILLIAMS
9

10

11                                 By: _____
                                        Victoria C. Shapiro
12                                      Attorneys for Defendant Network
                                        Solutions, Inc.
13  307214v1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

NOTICE OF ORDER GRANTING MOTION TO DISMISS COMPLAINT PURSUANT TO
CAL. CIV. PROC. § 410.30 FOR *FORUM NON CONVENIENS*

RFJN0334

# EXHIBIT 1

RFJN0335

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
MINUTE ORDER
12-DEC-2003

Dept:   C17     CENTRAL JUSTICE CENTER              Convened at:   10:00:00

Judge/Comm:    CLAY M. SMITH        Clerk:      HELEN BURNS
Bailiff:       GORDON ANDERSON      Reporter:   K HOFFMAN   CSR#5787

Court Type:        CIVIL
Court Category:    CONVERSION
Case Number:       03CC10743
Case Title:        OPTIMA TECHNOLOGY CORP VS NETWORK SOLUTIONS
                   INC

Doct Seq No:       21

Event:    213          MTN TO DISMISS
          Filing Party:    NETWORK SOLUTIONS INC
          105          DEMURRER TO COMPLAINT
          Filing Party:    NETWORK SOLUTIONS INC
          264          MTN TO STRIKE
          Filing Party:    NETWORK SOLUTIONS INC

                                                   PAGE 1 OF 2

Appearances:
PLAINTIFF ATTORNEY         GREEN & ADAMS LLP - Scott R. Albrecht
DEFENDANT ATTORNEY         ARNOLD & PORTER - Victoria C. Shapiro

Arguments heard.  Tentative ruling posted on the Internet becomes the Court's order as follows:

Defendant's motion to dismiss on the basis of forum non conveniens:

After a careful review of the moving and opposing papers, including the evidentiary material, the

Court finds that (i) Plaintiff executed one or more contracts (the Domain Name Registration

Agreements) containing a forum-selection provision designating Virginia at the forum state (¶¶

P), (ii) each Domain Name Registration Agreement clearly and unambiguously stated that it was

*ORIGINAL / FILE*

RFJN0336

MINUTE ORDER -  DECEMBER 12, 2003                     PAGE 2 OF 2

the entire agreement between the parties and that such agreement superceded all prior

agreements (¶¶ O), (iii) Plaintiff expressly acknowledged having read and agreed to the terms of

such agreement (¶¶ Q), and (iv) it would not be unfair or unreasonable to enforce the forum-

selection clause.

Accordingly, pursuant to CCP §§ 410.30, this case is dismissed.

Defendant's demurrer and motion to strike are off-calendar as moot.  Defendant to give notice.

ENTERED: 12/12/03

Converted to PDF: 12-DEC-2003 at 03:58:26

**ORIGINAL / FILE**

1

## PROOF OF SERVICE

2   STATE OF CALIFORNIA              )
                                     )   ss
3   COUNTY OF LOS ANGELES            )

4       I am employed in the County of Orange, State of California. I am over the age of 18 and not
    a party to the within action. My business address is 1001 N. Ross Street, Santa Ana, California
5   92701.

6       On December 22, 2003, I served the foregoing document described as: **NOTICE OF
    ORDER GRANTING DEFENDANT NETWORK SOLUTIONS, INC.'S MOTION TO**
7   **DISMISS PLAINTIFF OPTIMA TECHNOLOGY CORPORATION, INC.'S**
    **COMPLAINT PURSUANT TO CAL. CIV. PROC. CODE § 410.30 FOR** *FORUM NON*
8   *CONVENIENS*

9

10  ☒    by placing ☐ the original and ☒ a true copy thereof enclosed in sealed envelope(s)
          addressed as follows:
11

12       Mark S. Adams
         Scott R. Albrecht
13       Green & Adams, LLP
         8 Corporate Park, Suite 200
14       Irvine, California 92606

15

16  ☒    **BY PERSONAL SERVICE** I delivered such envelope by hand to the office of the
          addressee. Executed on December 22, 2003 at Santa Ana, California.
17

18  ☒    **STATE** I declare under penalty of perjury under the laws of the State of California that the
          foregoing is true and correct.
19

20

21  Omar Hernande                    Omar
    of Worldwide Attorney Services, Inc.       Signature
22  [Type or Print Name]

23

24

25

26

27

28

259845_1.DOC

PROOF OF SERVICE

RFJN0338