# ORIGINAL

1

1    V I R G I N I A :

2         IN THE CIRCUIT COURT OF FAIRFAX COUNTY

3    - - - - - - - - - - - - - X

4    NETWORK SOLUTIONS, LLC,           :

5              Plaintiff,      : Civil Case No:

6         vs.                  : CL-2007-00011510

7    NEXUS HOLDINGS INC., et al,  :

8              Defendants.      :

9    - - - - - - - - - - - - - X

10                        January 10, 2008
                         Fairfax, Virginia

11

12        The above-entitled action came on to be

13   heard before THE HONORABLE JANE MARUM ROUSH, a Judge

14   in and for the Circuit Court of Fairfax County, in

15   Courtroom 5-B, Fairfax County Judicial Center, 4110

16   Chain Bridge Road, Fairfax, Virginia 22030,

17   beginning at approximately 10:05 o'clock, a.m.,

18   before Barbara S. Price, a Verbatim Reporter, when

19   there were present on behalf of the respective

20   parties:

21

22

23

2

1  **APPEARANCES:**

2      On behalf of the Plaintiff:

3          **Jack McKay, Esquire**
           PILLSBURY WINTHROP SHAW PITTMAN
4          2300 N Street, NW
           Washington, DC  20037-1122
5                    and
           **Alison B. Rousseau, Esquire**
6          PILLSBURY WINTHROP SHAW PITTMAN
           2300 N Street, NW
7          Washington DC  20037-1122

8      On behalf of the Defendant:

9          **Scott Surovell, Esquire**
           SUROVELL, MARKLE, ISAACS & LEVY
10         4010 University Drive, 2nd Floor
           Fairfax, Virginia  22030

11                     C O N T E N T S

12                          E X A M I N A T I O N

13  <u>WITNESSES</u>                    <u>DIRECT</u>      <u>CROSS</u>

14  Natalie Sterling                20, 66       51

15  Michael Vincent Cocozza         69, 85       79

16                     E X H I B I T S

17                              <u>IDENTIFIED</u>    <u>RECEIVED</u>

18  Defendant's Exhibit 1              18            18

19  Plaintiff's Exhibit 1              20            51

20  Plaintiff's Exhibit 2              20            51

21  Plaintiff's Exhibit 3              20            51

22  Plaintiff's Exhibit 4              20            51

23

3

<u>E X H I B I T S</u>

|  | <u>IDENTIFIED</u> | <u>RECEIVED</u> |
|---|---|---|
| Plaintiff's Exhibit 5 | 20 | 51 |
| Plaintiff's Exhibit 6 | 20 | 51 |
| Plaintiff's Exhibit 7 | 20 | 51 |
| Plaintiff's Exhibit 8 | 20 | 51 |

4

<u>P R O C E E D I N G S</u>

1

2          (Whereupon, the court reporter was duly

3    sworn by the clerk of court.)

4          THE COURT:  Good morning.  This is the

5    case of Network Solutions versus Nexus Holdings Inc,

6    et al.  Counsel and parties ready for trial?

7          MR. McKAY:  Ready for the hearing, Your

8    Honor.

9          THE COURT:  All right.

10          MR. McKAY:  My name is Jack McKay from

11   Pillsbury Winthrop on behalf of Network Solutions.

12   I have Alison Rousseau with me.

13          THE COURT:  All right.

14          MR. SUROVELL:  Good morning, Your Honor.

15   Scott Surovell on behalf of Brett Gottlieb,

16   appearing specially.  We are ready to proceed.

17          THE COURT:  There should be a big sign in

18   front of you saying this is a special appearance.

19   All right.  Opening statements?

20          MR. McKAY:  Do you want to go first since

21   it's your plea?

22          MR. SUROVELL:  Your Honor, I'll speak

23   really briefly.  These plea in bars on personal

5

1    jurisdiction, I think, create procedural confusion

2    in terms of how they proceed.  I'm not sure what

3    Your Honor's practice is on them.

4            THE COURT:  I don't think I've had enough

5    of them to actually develop a practice.  I would say

6    that you are the moving party.

7            MR. SUROVELL:  Right.  Well, I believe

8    what the cases say is that -- I think the burden is

9    on the plaintiff to establish personal jurisdiction

10   in their case.  The only evidence that I have today

11   -- I've already given it to the plaintiff's counsel

12   -- is an affidavit of nonresidence.  There's another

13   sentence in there that says, "I haven't done

14   anything to avail myself to the jurisdiction of

15   Virginia," pretty much.  There is a statute --

16   Virginia Code section that says an affidavit of

17   nonresidence is prima facie evidence of

18   nonresidence.  So I presume that affidavit is

19   permissible in this proceeding.  That's really the

20   only evidence that my client intends to present

21   today.

22           THE COURT:  Well, I can sort out the

23   burden.  But why don't you go ahead and make an

6

1   opening statement and introduce your affidavit.

2   Then I can hear from the plaintiff.

3          MR. SUROVELL:  Well, Your Honor, I think

4   the issues here today are -- You can divide them

5   into maybe three categories.  There might be a

6   forth.

7          The first one, the more nuclear one, is

8   whether or not there has been a general appearance

9   made, and whether or not that moots the

10  jurisdictional issues or not.

11         The second issue -- which is not really an

12  evidentiary question, I don't think.  I think Your

13  Honor can just look at the file and make the call on

14  that.  There might be some --

15         THE COURT:  You know, I lost that motion

16  when I was an attorney.  I filed a motion for the

17  extension of time -- a consent order for the

18  extension of time.  I thought it had to be a

19  pleading that actually went to the merits of the

20  case.  But Judge Middleton disagreed with me.

21         MR. SUROVELL:  Right.

22         THE COURT:  And I felt I had really gotten

23  stuck with that.  But I don't know that I've had to

7

1   rule on it since then.  That was a long time ago.

2       MR. SUROVELL:  Well, I'm glad you're

3   emotionally predisposed to favoring my position.

4       Your Honor, I would submit that in this

5   case, the only thing that my client would submit

6   would potentially get them to that, that you'll hear

7   about, is the consent.  I guess it was a joint

8   request, or something, to extend time to file a

9   response.

10      THE COURT:  Weren't there also deposition

11  notices, as well?

12      MR. SUROVELL:  Yes.  My client sent out a

13  deposition notice indicating intent to take our

14  client's deposition for purposes of the hearing

15  today.  And Judge Ney eventually quashed that, and

16  said that the rules didn't permit us to take our

17  client's -- to use a deposition in this hearing

18  today.  We had argued, among other things, that the

19  constitution couldn't possibly require somebody,

20  who's contesting a personal jurisdiction action, to

21  show up in the jurisdiction in person to contest it;

22  that there are some due process issues with that.

23  In addition, we didn't think the rules guided you

8

1  there.  But, in any event -- There was that.

2          And I think there was a scheduling

3  appearance to schedule this, to set some briefing

4  schedules and some dates.  From our point of view,

5  the extension of time thing is about the closest

6  they can get to a waiver.  We don't think it

7  constitutes a waiver.  We don't think simply asking

8  for more time to file your objection of personal

9  jurisdiction or file your plea in bar could be

10  construed as responding.  Making a general

11  appearance, or responding on the merits to a case,

12  exceeds what the Supreme Court has -- lines the

13  Supreme Court has drawn.  That, I think, is the

14  first issue.

15          The second issue, Your Honor, is whether

16  or not this contract provision in some way gets my

17  client into this court.  I think you're going to

18  hear evidence that there was three or four different

19  possible contracts entered into, based on click

20  boxes on a website.  That's going to be the evidence

21  I think the other side presents.  The contract

22  provision, Your Honor, you'll hear is not absolutely

23  definitive that the jurisdiction is in Fairfax.  It

9

1  talks about the Eastern District of Virginia and

2  other courts.  And there will be some arguments as

3  to that.

4         The third set of issues has to do with

5  whether or not, absent the contract, there's

6  sufficient personal jurisdiction due to minimum

7  contacts, both under the due process clause and the

8  Virginia long arm statute.  Again, my client's

9  evidence is going to be that there really aren't

10  any.  Their evidence is going to be that he was, I

11  guess, on their website clicking boxes and clicking

12  on things, and that gets them there.

13         And then the last set of issues has to do

14  with whether or not this litigation in California

15  has any bearing on the hearing today.  I'll submit,

16  Your Honor -- I've showed it to Mr. McKay.  But I

17  brought with me a stack of pleadings that have been

18  filed in California in the U.S. District Court out

19  there.  And one of the things that we felt we

20  clearly couldn't do was file a motion to stay the

21  proceedings, because of the jurisdictional issue.

22  But we wanted to make the court aware that there is

23  this litigation pending in California, which, in

10

1  part, is about which jurisdiction this case ought to

2  be litigated in, whether it ought to be litigated in

3  California or Virginia.

4      THE COURT:  Of course we're first in time,

5  both in the initiation of the lawsuit and in

6  conducting this hearing; correct?

7      MR. SUROVELL:  My understanding is -- I

8  think that's correct.  The class action suit, Your

9  Honor, was filed on October 4th, 2007.  I think this

10  action might have been filed --

11      MR. McKAY:  September 21st.

12      MR. SUROVELL:  Right.  And I think there

13  were some letters exchanged between counsel, which

14  is what prompted this suit to be filed.  So I think

15  there is a first in time issue relative to that.

16      I don't know if there's any really clear

17  Virginia Supreme Court authority on that issue

18  though, in terms of first in time or anything else.

19  I think there's some circuit court authority about

20  it.  But I don't think there's any Supreme Court

21  authority about comity vis a vis that issue.

22      THE COURT:  Well, I happen to know the

23  time in divorce cases.  If someone files for divorce

1    in Virginia and somebody else would rather be in

2    another state, generally we defer to the first in

3    time.

4        MR. SUROVELL:  Well, there are some UIFSA

5    issues in that.  And UCCJEA issues I think in those,

6    that sort of have ancillary application, depending

7    on what's at issue, I guess.  But that's definitely

8    a general rule about that.  I agree about that, at

9    least in divorces, Your Honor.

10        But there is a hearing I think set for the

11    25th of January --

12        MR. McKAY:  Yes, in California.

13        MR. SUROVELL:  -- where these issues about

14    jurisdiction are theoretically going to be argued.

15    And, again, I have a stack of pleadings, which I was

16    going to hand up to the court at the appropriate

17    time.

18        From our point of view, Your Honor, our

19    client hasn't had any contacts with Virginia

20    sufficient to render him subject to suit here.  He's

21    a California resident.  And this matter ought to be

22    resolved in California.

23        THE COURT:  All right.  Opening statement?

12

1          MR. McKAY:  Your Honor, Mr. Surovell has,

2   I think, laid out accurately the three issues that

3   are before the court today.

4          Just a bit of background:  Our evidence

5   will show that Mr. Gottlieb, from 2003 to 2007, on

6   each annual occasion, both registered with Network

7   Solutions and renewed that registration with Network

8   Solutions for a domain name registration and for e-

9   mail services on each of those occasions, 2003,

10  2004, 2005, 2006 and 2007.  And the one in 2007, he

11  actually renewed his service after this suit was

12  filed.

13         On each of those occasions, he was

14  required to go through steps, which we will show the

15  court.  He goes through steps and gets to a point at

16  the end where he's about to pay.  There's a box

17  that's there that says, "I click this.  I agree to

18  the terms and conditions of the Network Solutions

19  service agreement."  And it gives a hyperlink to

20  that agreement.

21         Our evidence will show that on each of

22  those occasion, the way the system is set up, that

23  one had to click on that box.  If you didn't click

1    on that box, then you got an error message.

2         THE COURT:  Nobody ever reads that stuff.

3         MR. McKAY:  I know, Your Honor.  But I

4    think we all, unfortunately, are probably bound by

5    it.

6         THE COURT:  Oh, I know.  But have you ever

7    analyzed how long people actually spend on that

8    site?  I mean, it must be a nanosecond.

9         MR. McKAY:  Not to my knowledge, Your

10   Honor.  I know what I do.  I can give you my

11   anecdotal information.

12        THE COURT:  I press agree, agree, agree,

13   agree, agree, to get down to where I have to give

14   them my credit card information.

15        MR. McKAY:  And move on.  But the

16   agreement was there.  The hyperlink was there to get

17   to the agreement.  And it includes, as Your Honor

18   will see, in each of those agreements that were

19   applicable in those years, a forum selection clause

20   that says suits will be brought in the State of

21   Virginia -- either in federal court, if there is

22   jurisdiction; or if not, in this court.

23        Your Honor, there are three bases for

14

1   jurisdiction here.  And I think that we make what in

2   some cases is called a prima facie case involving

3   jurisdiction quite easily.

4         The first is the general appearance.

5   And Your Honor highlighted what we think is

6   consistent.  Judge Ellis' ruling was consistent with

7   the Virginia law that's laid out in our opposition.

8   When you go beyond contesting jurisdiction, then

9   you've made a general appearance.

10        In this case we have three instances of

11  action:  We have a request for continuance.  And

12  there are Virginia cases directly on point that a

13  request for continuance is a general appearance.

14  We have the invocation of the court's discretionary

15  power to permit the defendant to exceed the page

16  limits when he was filing his motion to quash.

17  And then we have the defendant sending a notice of

18  his own deposition, which he wanted to set for San

19  Francisco, California.  And that, as Mr. Surovell

20  has correctly said, was quashed by Judge Ney.

21        But we think that when you take either one

22  of those three, and certainly when you take all

23  three, there was a general appearance entered here.

1    And, therefore, the other issues that we might have

2    to decide today, really don't have to be addressed.

3            The second prong on which jurisdiction is

4    available here to this court, is the forum selection

5    clause in the service agreements.  Those clauses

6    are, under the law, prima facie valid, unless there

7    is a showing by the defendant, the out of state

8    party, that for some reason, they are not valid.

9    And there is going to be no showing, apparently in

10   this case, of the fact that there is any reason for

11   invalidity.

12           And the forum selection clause that

13   Network Solutions has in its agreements has actually

14   been upheld in about half a dozen cases, which we've

15   cited in our briefs.  So it's a fairly established

16   agreement.  Network Solutions has two million

17   customers.  And these get litigated from time to

18   time.  It has been upheld on at least six reported

19   opinions.

20           And the last prong, Your Honor, if we had

21   to get to the constitutional question -- And I don't

22   think you have to, because I think consent, either

23   by general appearance or by the forum selection

16

1    clause, either of those is a basis for jurisdiction

2    without considering constitutional issues.

3         But if Your Honor felt the need to

4    consider constitutional issues, we have an out of

5    state resident here who entered into a business

6    contract with a company in Virginia.  And he agreed

7    to their forum selection clause and agreed to their

8    service agreement, in general.  He sends e-mails

9    every day over servers in Virginia.  And the

10   testimony will be today that Network Solutions has

11   servers only in Virginia.  And that it was a

12   necessity, both in the registration process, and the

13   renewal process.  And every e-mail he sends gets

14   transmitted over a server located in Virginia.

15        This is clearly an instance whereby using

16   those facilities for his own purposes, whether they

17   be personal or business, he has availed himself

18   consciously of the benefits of transacting business

19   in Virginia by using those facilities in Virginia.

20   That would fall under the general provisions of the

21   long arm statute.

22        And of course we have the specific

23   provisions in 8.01-328.1(B) about using computer

17

1    networks in Virginia, and that constitutes an act in

2    the Commonwealth.  And the cases that we cite will

3    be directly on point here to show that that is

4    sufficient in itself, even apart from the general

5    statute, to permit the court to exercise

6    jurisdiction.

7          I can address the California proceeding if

8    Your Honor wishes when we have closing statements.

9    So let me just say that what's at issue here today

10   is just a matter of jurisdiction.  It's not whether

11   this case should go forward or not go forward, or

12   whether it should be stayed or not be stayed, or

13   what's going on in California.  You have one

14   question before you today, and that's the plea in

15   bar to assert personal jurisdiction over Mr.

16   Gottlieb.  And those other issues, it seems to me,

17   about what's going on in California, are completely

18   irrelevant to today.

19          THE COURT:  All right.  Thank you.  Mr.

20   Surovell?

21          MR. SUROVELL:  I have an affidavit here,

22   Your Honor.  May I approach, Your Honor?

23          THE COURT:  Yes, sir.  All right.  Are

18

1    there any objections to this affidavit?

2            MR. McKAY:  Your Honor, I just discussed

3    with Mr. Surovell, while we took a moment here, that

4    I'm not going to object to the affidavit.  And the

5    exhibits that I'm presenting, he's not going to

6    object to them.  So we've agreed to that.  And,

7    therefore, we'll let the affidavit come in.

8            THE COURT:  All right.

9            MR. McKAY:  He'll ask questions about my

10   exhibits.  But he's going to let them come into

11   evidence, as well.

12           THE COURT:  All right.  This will be

13   admitted as Defendant's Exhibit Number 1.

14                   (The item referred to above was

15                   identified and received into

16                   evidence as Defendant's Exhibit

17                   No. 1.)

18           MR. SUROVELL:  You Honor, I have a copy of

19   the Code section if you want to see it.  It's an

20   affidavit about nonresidence being prima facie

21   evidence.

22           THE COURT:  Sure.  All right.  And with

23   that, the defendant rests?

19

1         MR. SUROVELL: Your Honor, I have these

2  pleadings from California. One of them was taken

3  on PACER this morning. My client's counsel e-mailed

4  me the others. I was going to ask the court to take

5  judicial notice of them.

6         THE COURT: All right. You can hand those

7  up.

8         MR. SUROVELL: I've given them a copy of

9  them. Actually, you know what, Your Honor -- you

10  know what?

11         THE COURT: No, what?

12         MR. SUROVELL: Your Honor, I'm not going

13  to do that.

14         THE COURT: Do you want them back?

15         MR. SUROVELL: Yes, I would appreciate

16  that.

17         THE COURT: That's fine.

18         MR. SUROVELL: I just thought about it

19  more carefully. And I'm going to hold off on that.

20         THE COURT: Okay. So the defendant rests?

21         MR. SUROVELL: Yes, ma'am.

22         THE COURT: All right. Mr. McKay?

23         MR. McKAY: Yes, Your Honor. We would

20

1    call Natalie Sterling.

2              THE COURT:  All right.

3              (Whereupon, the witness was sworn by the

4    court's clerk.)

5              MR. McKAY:  Your Honor, I have a copy of

6    the exhibits that we will go through with the

7    witness to provide to Your Honor.

8              THE COURT:  Yes, that's fine.

9              MR. McKAY:  Those actually are the

10   originals, Your Honor.

11             THE COURT:  Yes.  It would be best if I

12   have the originals.

13                      (The items referred to above

14                       were identified as Plaintiff's

15                       Exhibits Nos. 1 through 8.)

16   Whereupon,

17                   NATALIE STERLING

18   the witness, was called for examination by counsel

19   on behalf of the plaintiff, and, after having been

20   duly sworn by the court's clerk, was examined and

21   testified as follows:

22                   DIRECT EXAMINATION

23            BY MR. McKAY:

21

1    Q    Ms. Sterling, would you state your name

2    for the record?

3    A    Natalie Sterling.

4    Q    Where are you employed?

5    A    Network Solutions.

6    Q    And how long have you worked for Network

7    Solutions?

8    A    I've worked there for two years, back from

9    2002 to 2004.  And I've just started again in July

10   of 2007.

11   Q    Okay.  When you worked there in 2002 to

12   2004, what was your position?

13   A    I was a fraud analyst.

14   Q    And what is the job of a fraud analyst?

15   A    We investigate incoming credit card fraud.

16   Q    In your work as a fraud analyst from 2002

17   to 2004, what occasion did you have to learn how the

18   systems worked in the interrelation between Network

19   Solutions and its customers?

20   A    We go through a one month training process

21   where we learn all of the products and services that

22   Network Solutions provides, as well as the

23   registration, renewal, service agreement, and just

22

1   the ins and outs of the company.

2       Q    And beyond the training that you received,

3   in your work as a fraud investigator, what occasion

4   did you have to learn about how the company does

5   business, in terms of its relation with its

6   customers?

7       A    We would learn the different financial

8   transactions that took place, and also the customer

9   account histories.

10      Q    You came back to work when?

11      A    In July of 2007.

12      Q    What were you doing from 2004 to 2007?

13      A    From 2004 to 2007, I also worked as a

14  fraud investigator for a telecom company.

15      Q    When you came back in 2007, what was your

16  job title?

17      A    Subpoena compliance administrator, and

18  also investigator.

19      Q    And what are your duties as a subpoena

20  compliance investigator?

21      A    For subpoena compliance, I receive all of

22  our incoming subpoenas, review them for accuracy,

23  and then I also go through all of the customer

23

1    account histories and payment histories, and provide

2    requested documentation.

3              THE COURT:  So all those things I sign

4    from the Fairfax County Police, trying to get the

5    customer information, you're the one who receives

6    those?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.

9              MR. McKAY:  So there's a source of a lot

10   of your work.

11             THE COURT:  A lot apparently.  I've had

12   about three or four of them this week.  Although I

13   don't think any of them are for Network Solutions.

14             THE WITNESS:  I haven't seen any for them.

15             BY MR. McKAY:

16        Q    All right.  Tell the court generally what

17   Network Solutions does?

18        A    Generally, we're a domain name registrar.

19   And we also provide associated services, such as e-

20   mail and web hosting.

21        Q    And "domain name registrar" means what?

22        A    To register a domain name would be -- Like

23   Natalie.com, you would need to go to a registrar in

24

1    order to register that name.

2        Q    It could also be Natalie.net; couldn't it?

3        A    Correct.

4        Q    Or .org?

5        A    Yes.

6        Q    How many companies are there that actually

7    provide domain registration services today?

8        A    There are approximately nine hundred

9    companies.

10       Q    Now, you mentioned also that Network

11   Solutions provided e-mail accounts?

12       A    Yes, they do.

13       Q    That's similar to my AOL account?

14       A    No, it's different.  It's related to your

15   domain name.  So if you wanted to have an e-mail

16   associated with your domain name, you would have

17   Natalie@Natalie.com.  We wouldn't provide any other

18   type of e-mail.  It's just for that domain name.

19       Q    Now, does Network Solutions do its

20   business with respect to providing e-mail to

21   customers, over servers?

22       A    Yes, they do.

23       Q    And where does it have servers located?

25

1    A    The servers are in Sterling, Virginia.

2    Q    And does Network Solutions have servers

3  located outside of Virginia?

4    A    No, they do not.

5    Q    Approximately, how many customers does

6  Network Solutions have?

7    A    Approximately, two million customers.

8    Q    And are they in the United States only?

9    A    No.  They are international as well.

10    Q    To buy the services of Network Solutions,

11  to register a domain name and buy an associated

12  service such as the e-mail account, what generally

13  does the customer have to do?  We'll go through it

14  in more detail.  But, generally, what does the

15  customer have to do?

16    A    Generally, they would go to our website,

17  NetworkSolutions.com.  And there is a process that

18  they would go through to purchase the domain name

19  and the e-mail product.

20    Q    Now, let me ask you, if you would, to look

21  at Exhibit Number 1 that you have in front of you.

22    A    Yes.

23    Q    Would you tell the court, without going

26

1    into detail, about Exhibit Number 1?  Actually, let

2    me ask this question about 1, 2, and 3, all of which

3    look alike.

4        A    Okay.

5        Q    What are Exhibits 1, 2, and 3?

6        A    Exhibits 1, 2 and 3 -- Exhibit 1 is the

7    registration process for a new domain name.

8        Q    Are these screen shots?

9        A    These are screen shots that I took off of

10   our website that show the purchase flow.

11       Q    All right.  Plaintiff's Exhibit Number 1

12   are screen shots related to what?

13       A    The purchase of a domain name and e-mail.

14       Q    All right.  And Exhibit Number 2, those

15   screen shots relate to what process?

16       A    This is for the renewal of e-mail and

17   domain name services.

18       Q    And the third set of screen shots, Exhibit

19   Number 3, what are they?

20       A    This is the customer account history from

21   our internal system.

22       Q    And that's the customer account history

23   for Mr. Gottlieb?

27

1     A     Yes, it is.

2           MR. SUROVELL:  Objection.  My objection is

3     to leading, in terms of who it's for.  The document

4     speaks for itself.

5           THE COURT:  All right.  I'll overrule the

6     objection.  A certain amount of leading is permitted

7     to transition the witness into an area.

8           BY MR. McKAY:

9     Q     Ms. Sterling, let's move to Exhibit Number

10    1 --

11    A     Okay.

12    Q     -- the registration process.

13    A     Yes.

14    Q     And we can move through these, I think,

15    fairly quickly.  First of all, does this accurately

16    represent what a customer sees or would see, at

17    least as of today --

18    A     Yes, it does.

19    Q     -- as they began the registration process?

20    A     Yes.

21    Q     What's the first page?  Describe that to

22    the court.

23    A     The first page is the first screen that

28

1    you would see if you went to NetworkSolutions.com.

2         Q    And what are the options on that first

3    page?

4         A    On this first page, if you were looking to

5    purchase a domain name, you would go under the "Find

6    a domain name," type in the domain name that you're

7    checking to see if it's available for registration,

8    and then you would hit the green "search" button to

9    proceed to the next screen.

10        Q    And in this example, you typed in "Natalie

11   Sterling"?

12        A    Yes, I did.

13        Q    All right.  Turn to the second page of

14   Plaintiff's Exhibit 1, and tell the court what

15   functions go on on that page?

16        A    The second page is the results page.  It's

17   going to tell you if that domain name is available

18   for registration.  In this instance, it was

19   available.  The .com was taken.  But the .net was

20   available for registration.  So to purchase that

21   domain name, you would just click on the "Add

22   domains to order."

23        Q    The green button in the center of the

29

1    page?

2        A    Correct.

3        Q    And once you did that, would you be taken

4    to page 3?

5        A    Yes, you'll be taken to page 3.

6        Q    All right.  What is page 3?

7        A    Page 3 is just asking you if you would

8    like to keep your registration information public or

9    private.  And you could make that choice, and then

10   click "continue."

11       Q    And that takes you to page 4?

12       A    That takes you to page 4.  This is asking

13   you if you would like to add additional hosting

14   packages.  If you do not, then you would just click

15   "continue" without adding hosting.

16       Q    Okay.  Then you would be taken to page 5.

17   What are your options there?

18       A    Page 5 is asking if you would like to add

19   additional services to your order.  For instance, at

20   the bottom of that page you could select to add e-

21   mail to your order at that time.  And you could

22   select the number of e-mail boxes from the drop-

23   down.

30

1    Q    All right.  Page 6?

2    A    Page 6 is just additional services that

3 you could select, as well as page 7.  And at the

4 bottom of page 7 is the "continue" button that would

5 take you to the next process in the purchase flow.

6    Q    All right.  So by the time you get to page

7 7, you have made what choices you want with respect

8 to products that you are purchasing?

9    A    Yes, you have.

10    Q    So you get to page 8.  And what's page 8?

11 What is its relationship to the customer

12 transaction?

13    A    Page 8 is the shopping cart.  It's telling

14 you what you've selected for purchase.  In this

15 instance, it's selecting the domain name and the e-

16 mail.  And it also gives you the choice of the term

17 that you wish to register those products for.

18    Q    And is the default five years?

19    A    The default is five years.  On the next

20 page I had selected it down to one year.

21    Q    So on page 9 of Exhibit 1 you selected one

22 year?

23    A    Yes, I did.

31

1    Q    And did that then generate a price for the

2    services?

3    A    Yes, it does.

4    Q    And are those the prices of the services

5    that are in effect at Network Solutions today for

6    the services that you've checked?

7    A    Yes, they are.

8    Q    So what's the price for the domain name

9    registration?

10    A    For the domain name, it's $34.99.  And for

11    the e-mail box, it's $20.00.  And those are annual.

12    Q    Okay.  Back when you were with Network

13    Solutions in 2002 to 2004, were those the charges at

14    that time?

15    A    Yes, they were.

16    Q    All right.  So on page 9, if you proceed

17    to purchase, what happens next?

18    A    When you proceed to purchase, it takes you

19    to a "log-in" or "create account" screen.

20    Q    Is that page 10?

21    A    Yes, it is page 10.  And if you were a

22    previous customer, you would add your user ID and

23    password for your current account.  If you are a new

32

1    customer, then you would just fill out the new

2    customer information, your name, address.  And then

3    the continuation is on page 11.  It's going to ask

4    you for your phone number, e-mail, to select a user

5    ID and password, and also answer a security

6    question.

7        Q    So that's all part of, sort of, giving

8    information into the system?

9        A    Correct.  You are setting up your account.

10        Q    All right.  So once you've done that, you

11    get to page 12?

12        A    Yes.

13        Q    What happens on page 12?

14        A    On page 12 you will enter the credit card

15    information, the billing address information.  And

16    there's also a section where you would read and

17    agree to the terms of the service agreement.

18        Q    All right.  Now, that appears at the

19    bottom of page 12?

20        A    Yes, it does.

21        Q    Would you tell me what happens, first of

22    all, if you click that box?

23        A    When you click that box and hit "secure

33

1    checkout," you would proceed through the checkout

2    process to purchase the domain name and e-mail.

3              MR. SUROVELL:  Your Honor, I just want to

4    assert an objection -- this might be more

5    appropriate for cross examination -- as to

6    foundation, her ability to be able say exactly what

7    this button is programmed to do, its function.  I

8    mean, she might have looked at a screen, but that

9    doesn't necessarily mean she has got personal

10   knowledge to be able to testify as to exactly what

11   that will do.  I believe there's a foundational

12   issue.

13             THE COURT:  I'll overrule the objection.

14   I do think it's an issue for cross examination.

15             MR. SUROVELL:  Okay.

16             BY MR. McKAY:

17   Q    Ms. Sterling, at the time you produced the

18   screen shots that are a part of Exhibit Number 1,

19   did you attempt to proceed from the screen that is

20   on page 12, without checking the box that's called

21   "service agreement"?

22   A    Yes, I did.

23   Q    And what happened?

34

1            MR. SUROVELL:  Objection.  It's hearsay.

2            THE COURT:  I'll overrule the objection.

3            THE WITNESS:  When I clicked on that

4    button and proceeded, I received an error that the

5    service agreement terms must be selected in the box

6    below to proceed.

7            BY MR. McKAY:

8       Q    And there's another opportunity then on

9    page 13 to click on the service agreement?

10      A    Yes.

11      Q    In your work preparing these screen shots,

12   did you click on the link to Network Solutions

13   service agreement?

14      A    Yes, I did.

15      Q    And where did it take you?

16      A    It took me to a dynamic service agreement,

17   showing me the service agreement for the products I

18   had purchased.

19           MR. SUROVELL:  Same objection.

20           THE COURT:  I'll overrule the objection.

21           BY MR. McKAY:

22      Q    Would you look at page 14 of Exhibit 1?

23      A    Yes.

35

Q    And what is that?

A    That is the service agreement that would come up when I clicked on the link.

Q    Is that the one that did come up?

A    Yes, it is.

Q    And is that the whole agreement or only part of it?

A    This is just a snapshot of the agreement. But, yes, the whole agreement would come up for the products I purchased.

Q    Did they come up?

A    Yes, they did.

Q    And this is just the first page that we put in as an exhibit?

A    Correct.

Q    Now, when you were at Network Solutions in 2002 to 2004 --

A    Yes.

Q    -- was the customer registration process, as you described it now, in place in 2002 to 2004?

A    Yes, it was.

Q    And did that include the fact that in 2002 to 2004, if the customer failed to click that he had

36

1    read and agreed to the service agreement, that he

2    would get an error message?

3         A    Yes.

4              MR. SUROVELL:  Objection.  Foundation and

5    hearsay.

6              THE COURT:  I'll overrule the objection.

7              MR. SUROVELL:  The answer is "yes"?  I'm

8    sorry I was talking when you answered.

9              THE WITNESS:  Yes.

10              MR. SUROVELL:  All right.  I just wanted

11    to make sure.

12              BY MR. McKAY:

13         Q    All right.  Let's turn now to Exhibit

14    Number 2, which you described as being the screen

15    shots for the renewal process?

16         A    Correct.

17         Q    Tell the court what appears on page 1 of

18    Exhibit 2?

19         A    Page 1 is the log-in screen where the

20    customer would log-in to their account.  They would

21    just enter their user ID and password and click

22    "log-in."

23         Q    All right.  And once that has been done by

37

1    the customer, what happens?

2        A    It will take them to an account screen

3    that shows the products in their account.  They

4    would place a check mark in the boxes that they wish

5    to renew those products.  And then click the "renew"

6    button.

7        Q    And did you go through this process

8    recently to produce these screen shots?

9        A    Yes, I did.

10        Q    All right.  So tell the judge what

11    happened when you got to page 3?

12        A    On page 3, it's just asking you again if

13    you would like to add at this time any additional

14    hosting to your products.  You can add the hosting,

15    or you can take it without.

16        Q    All right.  And are there more pages

17    offering additional services?

18        A    Yes.  The next page 4 is additional

19    services.  Page 5 is additional services.  And page

20    6 is additional services.

21        THE COURT:  You folks are like Jiffy Lube.

22    You know, it advertises a $29.95 oil change.  But by

23    the time I got out of there, I spent $250.  They

38

1   bring out that dirty air filter, and I fall for it

2   every time.

3          BY MR. McKAY:

4      Q    All right.  Ms. Sterling, if we simply

5   move beyond the offer of these services, let's turn

6   to page 7.  Tell the court what that is?

7      A    Page 7 is the shopping cart.  It's

8   summarizing the products that you are renewing at

9   that time.

10     Q    All right.  In this case, there were

11  actually three products the way you set this one up;

12  correct?

13     A    Correct.  In the account that I was in,

14  yes, there were three products that were renewed.

15     Q    All right.  And to get out of page 7 of

16  Exhibit 2, do you click on "proceed to purchase"?

17     A    Correct.

18     Q    What happened when you clicked on "proceed

19  to purchase"?

20     A    When you click on "proceed to purchase,"

21  it's going to take you to the payment information

22  screen.  This screen again is asking you for the

23  credit card information and the credit card billing

39

1  address.  And there's also a section where you need

2  to check the box to agree to the terms of the

3  service agreement to proceed.

4       Q    And is that all on page 8 of Exhibit 2?

5       A    Yes, it is.

6       Q    Now, when you went through this process to

7  run these screen shots recently, did you attempt to

8  proceed beyond page 8 by clicking on "secure

9  checkout" without clicking the box about the service

10  agreement?

11       A    Yes, I did.

12       Q    And what happened?

13            MR. SUROVELL:  Your Honor, so I don't have

14  to go over this and assert the same objection as I

15  did before, if Your Honor can just note a continuing

16  objection to anything she testifies to about

17  clicking on links or boxes.  It's so I don't have to

18  keep standing up and interrupting.

19            THE COURT:  All right.  I'll overrule the

20  objection as to hearsay.

21            MR. SUROVELL:  Okay.  Thank you, Your

22  Honor.

23            THE COURT:  Go ahead.

40

1      BY MR. McKAY:

2      Q    When you went through this process

3  recently to produce the screen shots that are

4  Plaintiff's Exhibit Number 2, did you attempt to

5  move beyond page 8 without clicking on the "I agree

6  to the service agreement"?

7      A    Yes, I did.

8      Q    What happened?

9      A    You receive the error on page 9 that says,

10  "You must agree to the terms of the service

11  agreement by selecting the box below."

12      Q    Did you, as part of this renewal process,

13  click on the hyperlink that's on page 8 and also on

14  page 9 to the service agreement?

15      A    Yes, I did.

16      Q    And where were you led?

17      A    I was led to the service agreement for the

18  products that I was attempting to renew.

19      Q    And, once again, on page 10, what you have

20  included is the first page of that service

21  agreement?

22      A    Correct, it's the first page.

23      Q    When did you return to Network Solutions

41

1    in 2007?

2        A    In July.

3        Q    And since you've been at Network Solutions

4    on this return visit -- you said in July 2007 -- do

5    you have knowledge of whether the renewal process

6    that you've just described to the court has been in

7    place when a customer was attempting to renew

8    services with Network Solutions?

9        A    Yes, it was in place.

10       Q    You know it?

11       A    Yes.

12       Q    And was that process that you've just

13   described to the court in place since you returned

14   to Network Solutions in July of 2007?

15       A    Yes.

16           MR. SUROVELL:  Objection.  I think I'm

17   objecting to foundation.

18           THE COURT:  I think they've laid the

19   foundation that she's familiar with how all of this

20   works during the time that she has been at the

21   company.

22           MR. SUROVELL:  While she was there, okay.

23   I wasn't sure --

42

1          THE COURT:  Well, the question was:  Since

2     she returned in July 2007, has this renewal process

3     been in place?

4          MR. SUROVELL:  Okay.  I was looking at

5     something else.  And I wasn't sure I heard the

6     complete question.  I was going to object if it was

7     anything outside of when she was employed.

8          THE COURT:  No, I think it was limited to

9     when she was employed there.  And I think the

10    foundation has been laid that she is familiar with

11    this process.

12         MR. SUROVELL:  Okay.

13         BY MR. McKAY:

14    Q     And the process that has been in place

15    since July of 2007, to your knowledge, with respect

16    to renewal processing, included the requirement to

17    check the box regarding the service agreement in

18    order to be able to complete a renewal?

19    A     Yes.

20    Q     The agreements that you brought up when

21    you clicked on the hyperlink, were agreements that

22    are available to the customer to read; is that

23    correct?

43

1      A    Yes, it is.

2      Q    Are those agreements changed from time to

3  time?

4      A    Yes, they are.

5      Q    And how do you, as a subpoena compliance

6  officer, when you get a request or an agreement for

7  a particular time, how do you know that you're

8  pulling the agreement that relates to the particular

9  time period of the subpoena?

10     A    When the service agreements are updated,

11  the legal department prints out a copy of that

12  service agreement and places it in a binder by date,

13  so that we know which service agreement applies

14  during a specific time period.

15     Q    So when you go back in the normal course

16  of your duties as a subpoena compliance

17  administrator, what is the process by which you

18  would then find the correct agreement for the right

19  period?

20     A    Based on the date.  If the person is

21  requesting to have a service agreement for a

22  specific time frame, I would just then go to those

23  binders and pull that service agreement.

44

1    Q    And to your personal knowledge, do the

2    service agreements in the period of 2003 to 2007,

3    all contain a forum selection clause?

4    A    Yes, they do.

5    Q    Now, let's turn to Exhibit Number 3.  You

6    told the court in response to an earlier question of

7    mine, a general question, these are the account

8    records for Mr. Gottlieb's account?

9    A    Yes, they are.

10    Q    Tell the court the process by which you

11    produced these screen shots that are marked as

12    Plaintiff's Exhibit 3?

13    A    I searched our database and was able to

14    find an account under the name of Nexus Holdings

15    with Brett Gottlieb as the primary user.  And I took

16    screen shots of each of the screens in that account

17    history.

18    Q    So tell the court, please, when you took

19    the screen shot of what's marked now as page 1 of

20    Plaintiff's Exhibit 3, what does that show?

21    A    This is showing the customer account

22    information, the account holder, and the primary

23    user.

45

1      Q    All right.  Did you move beyond that first

2  page?

3      A    Yes, I did.

4      Q    And what did you find, initially, about

5  this account?

6      A    The next page, on page 2, is showing the

7  products that were available that he had purchased.

8      Q    That he had purchased?

9      A    Yes, that he had purchased.  And that

10  shows the domain name of Nexus Holdings.

11          MR. SUROVELL:  Your Honor, I would object

12  to her testimony that Mr. Gottlieb did anything, on

13  the grounds of foundation.  I think she can testify

14  that her system contains information shown on these

15  screens.  But I think for her to say that my client

16  did anything, exceeds her foundation.  She has never

17  seen him.  And she wasn't sitting next to him.  So

18  it's to foundation.

19          THE COURT:  Well, I think it's understood

20  that her testimony is that this is Nexus Holding's

21  account, and that Mr. Gottlieb is the primary user.

22          BY MR. McKAY:

23      Q    So page 2 of Exhibit 3 shows the services

46

1  that had been purchased; is that correct?

2      A    Yes.

3      Q    What does page 3 of Plaintiff's Exhibit 3

4  show?

5      A    Page 3 is showing the order history for

6  NexusHoldings.com, for the domain name.

7      Q    What does that tell you, with the

8  knowledge that you have of how the company's records

9  are maintained?

10     A    It's showing the creation date for the

11 domain name and also the renewal dates.

12     Q    It shows a creation date of what?

13     A    10/31 of 2003.

14     Q    And how many renewals does it show?

15     A    There are four renewals.  One on 10/25 of

16 2004, on 10/12 of 2005, 9/18 of 2006, and 10/4 of

17 2007.

18     Q    All right.  Did you move beyond this

19 screen that is marked as page 3 of Exhibit 3?

20     A    I did.  Page 4 is showing the order

21 history for the e-mail address

22 Brett@NexusHoldings.com.

23     Q    So page 3 was the domain name?

47

1      A    Page 3 was the domain name order history.

2      Q    And page 4 is the e-mail history?

3      A    Correct.

4      Q    What does page 4 tell you, as you

5  understand the records of Nexus?

6      A    Page 4 is showing the creation date and

7  also the renewal dates for the e-mail address.

8      Q    For NexusHoldings.com?

9      A    For Brett@NexusHoldings.com.

10      Q    And does it show registration and renewal

11  dates that are comparable to the registration and

12  renewal dates of the domain name?

13      A    Yes, it does.

14      Q    All right.  I would like for you to turn

15  to the exhibits that are marked 4 through 8.  And

16  let's start with Exhibit Number 4.  Could you tell

17  the court what that is?

18      A    Exhibit 4 is the service agreement that

19  was in place in 2003.

20      Q    And does that agreement contain a forum

21  selection clause?

22      A    Yes, it does.

23      Q    What paragraph is that?

48

1    A    It's paragraph 21, section A.

2    Q    All right.  Turn, if you would, to Exhibit

3 5.  Tell the court what that is?

4    A    Exhibit 5 is the service agreement that

5 would have been in place in 2004.

6    Q    And that would have been in place at the

7 time of the first renewal by Mr. Gottlieb; is that

8 right?

9    A    Yes, that was the first renewal.

10    Q    And does it contain a forum selection

11 clause?

12    A    It does.  It is also paragraph 21, section

13 A.

14    Q    Okay.  What is Exhibit 6?

15    A    Exhibit 6 is showing the service agreement

16 that was in place in 2005.

17    Q    And that would have been in place at the

18 that time Mr. Gottlieb went through the renewal

19 process for both the domain name and e-mail account

20 in October of 2005?

21    A    Correct.

22    Q    Does it have a forum selection clause?

23    A    Yes, it does.

49

Q    And what paragraph is that?

A    That's also paragraph 21, section A.

Q    All right.  Would you tell the court what Exhibit 7 is?

A    Exhibit 7 is the service agreement that was in place in 2006.

Q    And that would have been in place at the time of the renewal that you showed us in Exhibit 3, in October of 2006; correct?

A    Yes.  I believe it was September of 2006.

Q    And does Exhibit Number 7, the 2006 agreement, have a forum selection clause?

A    Yes.  It is paragraph 21, section A, as well.

Q    Okay.  Would you tell the court what Exhibit Number 8 is?

A    Exhibit 8 is showing the service agreement that was in place in 2007.

Q    And that was the agreement that was in place on October 4th, 2007, when Mr. Gottlieb renewed both the domain name and the e-mail account?

A    Correct.

Q    And does Plaintiff's Exhibit Number 8 have

50

1  a forum selection clause?

2      A    Yes, it does.  And it's also paragraph 21,

3  section A.

4      Q    Ms. Sterling, you talked about Mr.

5  Gottlieb having access to an e-mail system that has

6  been in place from October 2003 --

7      A    Yes.

8      Q    -- to date.  If one sends e-mail across an

9  e-mail account at Network Solutions, does it have to

10  cross a server?

11      A    Yes, it does.

12      Q    And where are those servers located?

13      A    They're located in Sterling, Virginia.

14      Q    And do all e-mails that go through an e-

15  mail account maintained in Network Solutions, cross

16  those Virginia servers?

17      A    Yes, they do.

18          MR. McKAY:  Court's indulgence for one

19  moment, Your Honor?

20          THE COURT:  Yes.

21          MR. McKAY:  Your Honor, I don't have any

22  other questions.  I don't think there are any

23  objections to my exhibits, so I move my exhibits

1  into evidence.

2          THE COURT:  All right.  Is that correct,

3  that there are no objections to the exhibits?

4          MR. SUROVELL:  Correct.

5          THE COURT:  All right.  All of the

6  Plaintiff's exhibits are moved into evidence.

7                  (The items referred to above were

8                  received into evidence as Plaintiff's

9                  Exhibits Nos. 1 through 8.)

10         THE COURT:  Any cross examination?

11         MR. SUROVELL:  Yes, ma'am.

12                  CROSS EXAMINATION

13         BY MR. SUROVELL:

14    Q    Good morning, Ms. Sterling.  On Exhibits

15  Numbers 1 and 2 --

16    A    Yes.

17    Q    -- these screen shots were taken in just

18  the last few days?

19    A    They were taken within the last few weeks,

20  yes.

21    Q    Okay.  And you don't have any screen shots

22  -- Isn't it true that these screens we're looking

23  at, have changed since 2004?

52

1     A    They have changed somewhat since 2004,

2  yes.

3     Q    All right.  We don't have any documents in

4  court today that show exactly how they've changed;

5  do we?

6     A    No, we don't.

7     Q    Now, regarding these screens shown in

8  Exhibit Number 1 and Number 2, you're not a software

9  engineer; correct?

10     A    Correct.

11     Q    You're not a web designer; right?

12     A    No.

13     Q    You didn't program or write the coding

14  that created these screens; did you?

15     A    No, I did not.

16     Q    Are you familiar with how website software

17  language works?

18     A    No, I'm not.

19     Q    So you haven't actually looked at the

20  coding behind these screens yourself, to see exactly

21  what instructions have been given to the computers

22  to tell them what to do; have you?

23     A    No, I have not.

53

1     Q     So basically all you're saying today is

2  that you went through the process shown on here,

3  clicked on the boxes, and this is what you saw

4  happen?

5     A     Correct.

6     Q     Now, are there any other ways to register

7  for domain names at Network Solutions, besides the

8  website?

9     A     They can call into customer service.

10    Q     So the individual can make a phone call

11 and register for a domain name?

12    A     Correct.  They would be walked through the

13 process.

14    Q     So they would still have to do it on a

15 computer?

16    A     They would need to be on their computer.

17 But customer service would be walking them through

18 the process.

19    Q     Okay.  So you're telling us, I guess from

20 your point of view, the only way to get a domain

21 name through Network Solutions is on this website?

22    A     Correct.

23    Q     Has that always been the case?

54

1      A    I'm not sure if that has always been the

2  case.

3      Q    Exhibit 3 doesn't really specifically tell

4  us exactly how the person registered for the domain

5  name; correct?

6      A    Correct.

7      Q    It just tells us that they did?

8      A    Correct.

9      Q    Now, you all are not an ISP; correct?

10      A    No.

11      Q    Just so the record is clear, an ISP would

12  be an Internet Service Provider; is that right?

13      A    Yes, it is.

14      Q    Okay.  Has Network Solutions ever out-

15  sourced its e-mail application?

16      A    Not that I'm aware of.

17      Q    You are aware that some of these documents

18  reference a company called VeriSign; right?

19      A    Yes.

20      Q    Is VeriSign a subsidiary of Network

21  Solutions, or a former parent company, or what

22  exactly was that relationship?

23      A    At one time VeriSign owned Network

55

1    Solutions.  We were a VeriSign company.

2        Q    And when did that change?

3        A    I'm not sure of the exact date that that

4    changed.

5        Q    It was during the time frame we're talking

6    about here today; right?

7        A    Yes, it was.

8        Q    Isn't it true that VeriSign has some

9    servers outside of Virginia?

10       A    If it did, I'm not sure.

11       Q    So it's possible that some of the activity

12   that you've discussed today may have occurred on

13   servers outside of Virginia?

14            MR. McKAY:  Objection.  Lack of

15   foundation, Your Honor.

16            THE COURT:  You would have to establish

17   that she would know that.

18            BY MR. SUROVELL:

19       Q    Ma'am, you were the fraud compliance

20   officer in 2004?

21       A    Yes, fraud investigator.

22       Q    Sorry, the fraud investigator.  As part of

23   that, wouldn't you be required to know where the

56

1    servers were?

2        A    No.  We dealt with credit card fraud.

3        Q    So how do you know where the servers are

4    today?

5        A    I've been to the location where the

6    servers are in Sterling.

7        Q    When was the first time you went?

8        A    That would have been I guess about a week

9    ago.

10       Q    All right.  So you don't know where the

11   servers were before a week ago?

12       A    No.

13       Q    So then your testimony for today is simply

14   that as of right now, the servers are located in

15   Sterling, Virginia.  But before that, you don't know

16   where they were.

17       A    As far as I know, they've always been in

18   Virginia.  But I've only been there once and that

19   was a week ago.

20       Q    Now, it's accurate to say that Exhibit

21   Number 3, which is the account history --

22       A    Yes.

23       Q    -- it's accurate to say that that document

57

1    does not contain any information which would allow

2    anyone to see whether or not a person has actually

3    read any of these service agreements; correct?

4        A    Correct.

5        Q    Have you ever signed up for internet

6    services for other companies?

7        A    Yes.

8        Q    And you're aware of the fact that for many

9    other companies, at least it's possible to create a

10   box with language that you can scroll through when

11   you click on the "agree" button; correct?

12       A    Yes.

13       Q    And to the best of your knowledge, Network

14   Solutions has never had that type of a system in

15   place during the time period we're talking about in

16   this case?

17       A    I don't know.

18       Q    Network Solutions does not have any

19   records that indicate that Mr. Gottlieb ever clicked

20   on the link for the terms of the service agreement;

21   correct?

22       A    For him to be able to purchase the domain

23   name, he would have had to have put a check in that

58

1   box, or he would have received an error.

2       Q    Okay.  Let me ask the question again.  I

3   think we're talking about apples and oranges.  You

4   understand that there's a --

5       THE COURT:  I think he's asking you:  You

6   can't tell whether he actually went to that site,

7   clicked on that link to the agreement, or just blew

8   by it?

9       THE WITNESS:  I can't tell that he

10   actually read it, no.

11       BY MR. SUROVELL:

12       Q    But it would be possible for Network

13   Solutions to actually maintain a record of whether

14   he clicked on that link, relative to his

15   transaction; right?

16       A    I'm not sure if there's a specific record

17   that shows that.

18       Q    But it would be possible for Network

19   Solutions to enable their system to capture that

20   information; correct?

21       MR. McKAY:  Objection.  Lack of

22   foundation.

23       THE COURT:  I'll overrule the objection.

59

1          THE WITNESS:  I don't know if that would

2    be possible.

3          MR. SUROVELL:  Okay.

4          BY MR. SUROVELL:

5      Q    Now, you're not aware of Network Solutions

6    ever placing anything on any of their websites

7    similar to Exhibits 1 or 2 in the last four years

8    that specifically states anything about someone

9    consenting to personal jurisdiction in Virginia; are

10   you?

11         MR. McKAY:  Objection.  Ambiguous, Your

12   Honor.

13         THE COURT:  I sustain the objection.

14         BY MR. SUROVELL:

15     Q    To the best of your knowledge, on any of

16   the registration and renewal screens, there has

17   never been information stating anything about forum

18   selection clauses; correct?

19     A    Nothing specific, no.

20     Q    You would agree that there's nothing

21   contained within Network Solutions records that

22   you've seen that would indicate that Mr. Gottlieb

23   had any negotiations over these services; correct?