60

1    A    Correct.

2    Q    And you would agree that there is nothing

3    contained in the Network Solutions system that would

4    indicate there was ever any discussions between Mr.

5    Gottlieb and Network Solutions about these services

6    or the nature of these services; correct?

7    A    Correct.

8    Q    Now, are you aware of whether there is a

9    reason Network Solutions has elected not to place

10   the actual text of the terms of service on the

11   screen for the person to see when they click on the

12   button to purchase?

13   A    I don't know.

14   Q    Wouldn't you agree that the customer would

15   be more likely to read it, if it was there on the

16   screen?

17        MR. McKAY:  Objection.  Lack of

18   foundation.

19        THE COURT:  I'll sustain the objection.

20        BY MR. SUROVELL:

21   Q    Could you turn to Exhibit 3?

22   A    Yes.

23   Q    Now, on Exhibit 3, this document indicates

61

1    that the account holder, which I think is an

2    organization called Nexus Holdings  -- What's the

3    account holder?

4        A    The account holder is the registrant or

5    the owner of the domain name.

6        Q    That's the owner of the account?

7        A    Correct.

8        Q    Okay.  And the primary user is not an

9    owner; correct?

10       A    Correct.

11       Q    And just so we're clear, you have no

12   knowledge about who put this information in the

13   system; correct?

14       A    Correct.

15       Q    All you know is that somebody on the

16   outside from somewhere registered an account for

17   Nexus Holdings and put the name Brett Gottlieb down

18   as a primary user; right?

19       A    Correct.

20       Q    And you have not gone through your payment

21   records, for example, and linked up exactly who has

22   been paying for this; have you?

23       A    I have actually seen our payment records.

62

1      Q    But you didn't bring any of the payment

2  records to court to match them up; right?

3      A    No, we did not.  No.

4      Q    Obviously, you've never met Brett

5  Gottlieb?

6      A    No, I have not.

7      Q    Okay.

8           MR. SUROVELL:  I don't think I have any

9  other questions, Your Honor.  Just give me a moment

10  to review my notes.  Let me just ask a few more

11  things.

12           BY MR. SUROVELL:

13      Q    Ma'am, you left the company in 2004?

14      A    Yes, in 2004.

15      Q    When was that?

16      A    It was the end of 2004.

17      Q    The time you were gone --

18      A    Yes.

19      Q    -- you never used Network Solutions domain

20  registration or renewal system; correct?

21      A    Actually from 2004 to 2005, I did register

22  a domain name with Network Solutions.

23      Q    Was it some personal thing?

63

1          A     It was a personal domain name that I

2     registered.

3          Q     In 2006, you never used the system; right?

4          A     No, I did not.

5          Q     So is it accurate to say that you're

6     making an assumption that their system has worked

7     the same from 2007 back to 2004?

8          A     Yes.

9          Q     Presumably there are people at the

10    company that would know exactly what system was in

11    place during that time frame because they built it;

12    correct?

13         A     Correct.

14         Q     Now, relative to the services that you've

15    described, the e-mail and the domain name services,

16    before a week ago, did you have any knowledge of

17    exactly where that information was stored?

18         A     No.

19         Q     So, in other words, you knew you were

20    going to come to court and testify today, so you

21    educated yourself to some extent about the way

22    Network Solutions is doing things today?

23         A     Correct.

64

1          THE COURT:  Let me say, that's to be

2    encouraged.

3          MR. SUROVELL:  Right.

4          THE COURT:  I can't tell you how many

5    times a witness gets on the stand and the lawyer,

6    who puts the witness on the stand, has no idea what

7    the witness is going to say.

8          MR. SUROVELL:  Hopefully, that's not --

9          THE COURT:  That's not every case.

10          MR. SUROVELL:  -- that's not the way I try

11   my cases.

12          BY MR. SUROVELL:

13     Q    Can you turn to Exhibit 3?  I have a

14   question concerning Exhibit 3, the last page, page

15   4.

16     A    Yes.

17     Q    It says on the right-hand side, something

18   about "fraud status accepted."  What is that about?

19     A    It's just a fraud screening that we do,

20   showing that the transaction was deemed to be non-

21   fraudulent.  It was an accepted transaction.

22     Q    What does "line item" represent?

23     A    The line item is the order ID that's

65

1    created at the time of that transaction.

2        Q    Is that like an invoice number?

3        A    No, it's not the invoice number.  It's the

4    order id.  There is a separate invoice number.

5        Q    Okay.  It's an internal tracking mechanism

6    for the company?

7        A    Correct.

8            MR. SUROVELL:  I don't have any further

9    questions.  Actually, no, I'm sorry.  I do.

10            BY MR. SUROVELL:

11        Q    Are you aware of the company's litigation

12    pending in California?

13        A    Briefly, yes, somewhat.

14        Q    Okay.  You're aware there's litigation

15    outstanding there regarding this matter?

16        A    Yes.

17        Q    It doesn't sound like you're in the

18    decision making process of that litigation; correct?

19        A    No, I'm not.

20        Q    Okay.

21            MR. SUROVELL:  That's all the questions I

22    have, Your Honor.

23            THE COURT:  Redirect?

66

1          MR. McKAY:  Yes, Your Honor, just a few.

2                    REDIRECT EXAMINATION

3          BY MR. McKAY:

4      Q    Ms. Sterling, there was a reference to

5   VeriSign during cross examination questions.  Would

6   you look at Exhibit 4?

7      A    Yes.

8      Q    Does that reflect any reference there to

9   VeriSign?

10     A    It does.  At the top of the page it

11  states, "Network Solutions a VeriSign Company."

12     Q    And at that point in 2003, was Network

13  Solutions owned by VeriSign?

14     A    Yes, they were.

15     Q    And did that situation later change?

16     A    Yes, it did.

17     Q    And was Network Solutions spun off from

18  VeriSign?

19     A    Yes, they were.

20     Q    You said in your response to Mr.

21  Surovell's questions that you had reviewed the

22  payment records for the account --

23     A    Yes, I had.

67

1    Q    -- of Nexus Holdings with the primary user

2    of Mr. Gottlieb?

3    A    Yes.

4    Q    What did you see when you reviewed the

5    payment records with respect to who was paying for

6    those services?

7    MR. SUROVELL:  Objection.  It's hearsay.

8    THE COURT:  I'm going to sustain the

9    objection to hearsay.

10    BY MR. McKAY:

11    Q    With respect to the registration process

12    -- just to make sure I understand your testimony --

13    from 2002 to 2004, you were familiar with what the

14    registration process was while you were an employee?

15    A    Yes.

16    Q    And that that required you to check the

17    box about having read and agreed to the service

18    agreement?

19    A    Yes.

20    Q    And then through your own personal

21    registration, you became familiar with the process

22    in 2005?

23    A    Correct.

68

1        Q    At that time, did you have to go through

2    the same process that you've described today?

3        A    I did.

4        Q    And when you returned in 2007, did you

5    learn that the registration process included

6    requiring you to check the box?

7        A    Yes, I did.

8        Q    And did you in 2007 learn anything about

9    the process for renewing and what was required?

10        A    Yes, I did.

11        Q    Okay.  What did you learn?

12        A    It was the same process, that you would

13    need to check that box in order to proceed to renew.

14        MR. McKAY:  I don't have any other

15    questions, Your Honor.

16        THE COURT:  I thank you very much, Ms.

17    Sterling.  I appreciate your coming.

18        THE WITNESS:  Thank you.

19        MR. McKAY:  We have one other witness,

20    Your Honor.

21        THE COURT:  All right.

22        MR. McKAY:  Mike Cocozza.  He's just

23    outside.

69

1          THE COURT:  Let the deputy get him.

2          COURT CLERK:  Please raise your hand to be

3     sworn.

4          (Whereupon, the witness was sworn by the

5     court's clerk.)

6          MR. McKAY:  Your Honor, I'm going to hand

7     Mr. Cocozza a set of exhibits that he may need to

8     refer to.

9          THE COURT:  All right.

10    Whereupon,

11              MICHAEL VINCENT COCOZZA

12    the witness, was called for examination by counsel

13    on behalf of the plaintiff, and, after having been

14    duly sworn by the clerk of court, was examined and

15    testified as follows:

16              DIRECT EXAMINATION

17         BY MR. McKAY:

18    Q     Mr. Cocozza, would you state your full

19    name for the record?

20    A     Michael Vincent Cocozza.

21    Q     Would you spell your last name?

22    A     C-O-C-O-Z-Z-A.

23    Q     And where are you employed?

70

1      A      Network Solutions.

2      Q      What is your position?

3      A      My title is Senior Director of

4   Engineering.  I run what we call the fulfillment

5   system at Network Solutions.

6      Q      What do the words "fulfillment system"

7   mean?

8      A      The fulfillment system is the part of the

9   software system that actually goes out and fulfills

10  the requests of what we call the storefront.  The

11  front-end website that the users interact with is a

12  request based system.  It passes requests to my

13  system that actually goes out and, on behalf of the

14  customer, it purchases or does the things the

15  customer is asking it to do.

16     Q      Take a moment and look at what is marked

17  as Exhibit 1 in front of you.  Separate it from the

18  other exhibits so you can look at it.  Just take a

19  moment to look through this exhibit.  Tell me if

20  that's what you're referring to as the storefront?

21     A      This is the storefront, yes.

22     Q      And that's the storefront for a

23  registration; is that correct?

71

1      A     The storefront flow for a registration,

2   yes.  This is a flow for a registration.

3      Q     All right.  Look at Exhibit 2.  Tell me,

4   is Exhibit 2 a storefront flow?

5      A     This would be a renew services storefront

6   flow, yes.

7      Q     "Renew service," is that what you said?

8      A     Yes.

9      Q     Now, I think what you testified to was:

10  Your software that you supervise -- the process you

11  supervise takes the commands or directions from

12  those storefront entries and then executes them?

13     A     That's correct.

14     Q     Tell me, when did you come to Network

15  Solutions?

16     A     In June of 2001.

17     Q     June of 2001?

18     A     Correct.

19     Q     And what was your title when you came?

20     A     Senior Engineering Manager.

21     Q     And from June of 2001 to today, have you

22  been involved with what you call the fulfillment

23  process?

72

1     A     Yes, I have.

2     Q     And have you become familiar in those

3  duties with how the software works to fulfill the

4  requests that a customer makes in the storefront

5  process?

6     A     Yes, I have.

7     Q     You work with that software every day?

8     A     Yes, I do.

9     Q     All right.  Would you describe for the

10  court what the interaction is between a direction

11  that the customer gives in your --

12     A     Certainly.

13     Q     -- software that you supervise?

14     A     When a customer goes to what we call the

15  storefront flows, the customer goes through a

16  process of filling out the products that they want.

17  They identify themselves.  They put in information

18  regarding credit card data.  This is a purchase

19  order transaction or a retail transaction.  They

20  then compose all of that information into what we

21  call a request.

22          That request then gets submitted to the

23  fulfillment system, itself.  One of the first things

73

1   the fulfillment system does before it accepts an

2   order -- we call that an order -- the fulfillment

3   system will evaluate what it considers to be core

4   artifacts inside of that data request.

5          Core artifacts would be -- You have to

6   have a product that you actually want to do

7   something with.  There has to be a valid credit card

8   as part of the request.  And you also have to have

9   checked -- In this particular case, you have to

10  check a service agreement that says, "Yes, I have

11  read and I have validated the service agreement."

12         That admission, or that acceptance, has to

13  go past the core validation from the fulfillment

14  system before the fulfillment system will even say,

15  "Okay, I can take this and now do things on behalf

16  of the customer."

17         If for any reason one of those core

18  validation pieces of data are not in the request, we

19  will send that request back to the storefront to

20  then display the appropriate message to the user for

21  them to fix the data condition.  And then they move

22  on.

23      Q    This process of looking for certain

74

1    critical pieces of information, does your software

2    look for that both in the registration and the

3    renewal process?

4         A    Yes, it does.

5         Q    Now, look at Exhibit Number 1, at page 12.

6         A    Yes.

7         Q    Is that what you're describing with

8    respect to the service agreement box that you

9    described a moment ago?

10        A    Yes, it is.

11        Q    Now, what happens if a customer tries to

12   move to checkout?  How does your software operate

13   when he tries to move to checkout without clicking

14   on that box?

15        A    Again, the system will review the material

16   that the storefront sends back and simply indicate

17   that not all of the required data is there for us to

18   move forward on the fulfillment side.  And it will

19   turn back a response to storefront to message the

20   customer that they need to take action.

21        Q    Look at page 13.

22        A    Yes.

23        Q    Is that the kind of message that goes back

75

1  to the customer?

2      A    That is the kind of message that goes back

3  to the customer, yes.

4      Q    Exhibit 2, take a moment to look at it.

5  This a renewal -- you testified -- a renewal flow?

6  Look at page 8.

7      A    Yes.

8      Q    Once again, is that the same process where

9  there's a box there -- that that's the one you're

10 referring to -- that had to be checked as a critical

11 piece of information?

12     A    Yes, it is.

13     Q    And look at page 9.  Tell us what that is?

14     A    That would be the storefront's display

15 back to the customer that they need to correct these

16 fields on this submission form before the back-end

17 system will accept it.

18     Q    And given the way your software is

19 configured, either on a registration or renewal, is

20 it possible for a customer to bypass checking the

21 box, "I have read the Network Solutions service

22 agreement and agree to its terms"?

23     A    No, it is not.

76

1    Q    And what will happen each time that he or

2    she tries to bypass?

3    A    The fulfillment system will reject the

4    request and send back the order to the storefront.

5    Q    Do you have a process in Network Solutions

6    where you learn if there are glitches or problems in

7    your software?

8    A    We do have a number of audit processes --

9    most of them that I own -- that go through all the

10   transactions that occur throughout our systems.  And

11   we evaluate basically all aberrations that are

12   demonstrated in the system.  And that is part of our

13   review process of the operations of the system.

14   Q    In the time that you've been working from

15   2001 to 2007, and 2008 now with this software, have

16   you ever had an aberration report that indicated

17   that customers were able to bypass clicking the box

18   about the service agreement?

19   A    No.

20   Q    Are you familiar with the process by which

21   e-mail is transferred across servers on a Network

22   Solutions e-mail account?

23   A    I am familiar with them, yes.

77

1    Q    And how does that work?  If I'm sitting in
2  California and type on my computer to send an e-mail
3  in my Network Solutions e-mail account, what
4  physically happens?

5    A    Well, the e-mail will go -- I'm going to
6  use a fairly nontechnical term, unfortunately -- it
7  will be routed, or it will bounce around, to a
8  number of different servers that end up at the
9  Network Solutions core mail servers, that then send
10  that material to the recipient.  Based on the nature
11  of the internet, there are what we call "hops" that
12  the data can go to.  But the target and the
13  responsible party for the negotiation of that e-
14  mail, is our e-mail servers.  And they take
15  responsibility for submission to the target
16  location.

17    Q    Is it possible for a Network Solutions e-
18  mail customer to send an e-mail from his computer
19  that does not cross the Network Solutions servers?

20    A    No.

21    Q    And where are those Network Solutions
22  servers located?

23    A    The Network Solutions servers for that are

78

1  located in our Savvis data center facility.

2      Q    And what state is that?

3      A    That's in Virginia.

4      Q    Okay.  And do you have knowledge of

5  whether the system you just described, of those

6  servers, where the servers have been located since

7  2001?

8      A    They have been primarily located in

9  Virginia.  When we made an acquisition of a company

10  called Inquet, Inquet had a mail platform, as well.

11  So there was a period of about six months in, I'm

12  going to say, '04 or '05, where there was a subset

13  of mail servers in the Boston area.  And they were

14  then moved back into the Savvis facility after the

15  purchase went through.

16      Q    So other than for that six month period,

17  during the time that you've been at Network

18  Solutions from 2001 to 2008, all e-mails from

19  Network Solutions e-mail accounts had to go over a

20  server in Virginia?

21      A    That's correct.

22          MR. McKAY:  No other questions, Your

23  Honor.

79

1        THE COURT:  Any cross examination?

2        MR. SUROVELL:  Yes, ma'am.

3                    CROSS EXAMINATION

4        BY MR. SUROVELL:

5    Q    Good morning, Mr. Cocozza.

6    A    Good morning.

7    Q    I tend to be more visual when it comes to

8    these things, as opposed to verbal.  I'll try my

9    best to be clear about exactly what your

10   responsibilities are, relative to others.

11   A    Sure.

12   Q    The customer fulfillment system, is it

13   accurate to say, is a separate system from the

14   storefront?

15   A    It is a separate code base from the

16   storefront; yes, that is correct.

17   Q    And the storefront code base is a

18   different person's responsibility?

19   A    That is correct.

20   Q    Just so we're clear:  We're talking about

21   right now, the way the system is set up right now.

22   When somebody enters information into the storefront

23   and clicks the button here on Exhibit Number 1, page

80

1    12, "secure checkout" --

2         A    Yes.

3         Q    -- the storefront sends -- I don't know

4    the software word, but -- a chunk of data to your

5    system.

6         A    That works.

7         Q    Okay.  What does that chunk of data

8    actually look like?

9         A    Are you asking for the binary

10   representation?  The requests come in, basically XML

11   packets.  And the target system, or the fulfillment

12   system, decomposes that XML data.  And then it does,

13   again, the validation step.  And then it takes that

14   data into its internal queues and databases.  Is

15   that answering your question on that?

16        Q    Yes.

17        A    Okay.

18        Q    Part of that XML data then would be, I

19   guess, whether or not a positive response was

20   indicated for the service agreement check box?

21        A    Yes.

22        Q    Exactly what does it say?  Check box

23   "yes," or check box "1" or "0," or something like

81

1    that?

2        A    We call this -- In XML there is name value

3    pairs, effectively, where you have a specific tag,

4    "Mike, John, Pete, and Mark."  And you're always

5    looking for those tags on the left.  And you have

6    values on the right.  And you know, based on having

7    written the code, whether you're looking for a "yes"

8    or a "no" response in Mike, or a "blue" or a "green"

9    response in Mark.  So that's the type of evaluation

10   on those core pieces that the fulfillment system

11   goes through.  It evaluates a series of name value

12   pairs.  All of those need to result to "true"

13   effectively in the software system before it moves

14   forward.

15       Q    In that piece of data that you're talking

16   about, the XML package that's sent, that indicates

17   that that checkbox was indicated, that's actually a

18   piece of data that the company could archive if they

19   chose to; correct?

20       A    If the company were to write software to

21   do that, yes, we certainly could.  We could always

22   archive more; I'm sure about that.

23       Q    The company does not archive that specific

82

1  piece of code that's generated to indicate the

2  positive is sent when the secured checkout button is

3  clicked?

4       A    That is correct.

5       Q    And you would agree that the company's

6  website, the storefront, has changed through the

7  years; correct?

8       A    Yes, it has.

9       Q    Okay.  And you've never been in charge of

10 that storefront?

11      A    That's correct.

12      Q    Would you agree, also, that it would be

13 possible for the company to determine whether or not

14 a specific person signing up for a domain or

15 renewing a domain had checked on the hyperlink for

16 the Network Solutions service agreement?

17      A    I'm sorry.  Can you ask the question

18 again?

19      Q    You would agree that it would be possible

20 for the company to determine whether or not a person

21 registering for a domain name or renewing it, had

22 checked on the Network Solutions service agreement

23 link, for example, shown on page 12?

83

1    A    There are absolutely techniques that you
2    can implement that would allow you to track any user
3    action, yes.
4        Q    Right.  Okay.  And that's not something
5    that the company tracks; is it?
6        A    That is not something that the company
7    tracks.
8        Q    Now, you said a second ago the company has
9    audit processes regarding, I guess, your fulfillment
10   functions; right?
11       A    That's correct.
12       Q    In order for something to come to your
13   attention, though, the system would have to indicate
14   some kind of a problem; correct?
15       A    That's correct.
16       Q    Computer systems sometimes have problems,
17   but don't make any noise about it -- for lack of a
18   better term -- right?
19       A    That is certainly possible, yes.
20       Q    Okay.  So all you're saying today is that
21   nobody has ever brought to your attention the fact
22   that people were getting through the system without
23   clicking the box; right?

84

1   A    What I am saying is that through the

2   investigations that my team does, we have never seen

3   artifacts in the system that indicated that this

4   behavior was possible or ever occurring.  We also

5   have QA departments that constantly go through, in

6   preparation for every release, what they consider

7   not only new functional testing, but what we

8   classify as regression testing.  This ability, or an

9   enablement of this function, has never been

10  described or identified that it was ever possible.

11  Nor has there been through customer service, which

12  is also another feedback into engineering,

13  indicating that -- They have direct lines to the

14  customers that say, "Hey, we're noticing that this

15  is occurring."

16  Q    How many different iterations of your

17  fulfillment system have you been through since 2004?

18  A    That's a tough one to answer.  Let me try

19  to answer it this way:  We average about four what

20  we call major releases per year.  And that is

21  defined as material changes to logic inside of

22  somewhere in the fulfillment system.  And it's a

23  very large and distributed system.  The piece that

85

1    we're talking about specifically here, has been

2    quite static for quite a long time.  But the system

3    changes.

4        Q    Wouldn't you agree, though, that in your

5    experience as a software engineer, that lots of

6    times a major change can have an impact on a static

7    system that somebody didn't foresee?

8        A    Which is one of the primary reasons that

9    we have regression test sweeps in our QA

10   environment, to circumvent that type of thing.  The

11   answer is "yes."  But I believe from a software

12   engineering standpoint, Network Solutions has taken

13   appropriate steps to mitigate that risk.

14            MR. SUROVELL:  I don't have any further

15   questions, Your Honor.

16            MR. McKAY:  Any redirect?

17            MR. McKAY:  Just two, Your Honor.

18                    REDIRECT EXAMINATION

19            BY MR. McKAY:

20       Q    If Network Solutions maintained the kind

21   of data that Mr. Surovell was asking about, which is

22   data to show every customer who checked on the box

23   and whether every customer went to the hyperlink,

86

1   what would be the burden of maintaining that kind of

2   information?

3       A    There are a number of different impacts

4   that would need to be evaluated and likely would be

5   somewhat significant.  You have what we call

6   storefront load, the amount of resources consumed on

7   the servers that serve up these pages.  The more we

8   track -- The more data that we actually track on the

9   storefront servers, it effectively reduces the

10  number of users and the response time to the users

11  that we can actually give.  Because you only have a

12  certain amount of raw resource to use.

13          It also consumes much more of what we

14  would call disk space.  We would have to log that

15  event somewhere on the actual physical machines,

16  themselves.  So policies and procedures would need

17  to be modified to review the additional disk space

18  usage over time and adjust archival policies over

19  time for that.

20      Q    With respect to the releases that have

21  come into place over the time you've been at Network

22  Solutions, with respect to the fulfillment software,

23  during the time that you've been working between

87

1    2001 through 2008, now, with that fulfillment

2    software, has there always been in place a rule that

3    said that clicking the service agreement would

4    generate an error message, if someone tried to go

5    through without clicking that box?

6        A    Yes.

7            MR. McKAY:  No other questions, Your

8    Honor.

9            THE COURT:  All right.  Thank you very

10   much, sir.  I appreciate you coming.

11           THE WITNESS:  Thank you.

12           THE COURT:  Any further evidence for the

13   plaintiff?

14           MR. McKAY:  None, Your Honor.

15           THE COURT:  Any further evidence for the

16   defense?

17           MR. SUROVELL:  Could you just give me a

18   minute, Your Honor, to think about these pleadings.

19           THE COURT:  You can step down, sir.

20           THE WITNESS:  Thank you.

21           THE COURT:  In fact, you can leave the

22   courtroom, if you would like.

23           I'll tell you what:  What I'll do is I'll

88

1    take our morning recess now. You can ponder during

2    that time whether you want to put on any more

3    evidence. And if so, we'll take it. If not, when I

4    come back, we'll have closing arguments.

5              MR. SUROVELL: I don't have any more

6    evidence.

7              THE COURT: All right. We will,

8    nonetheless, take a fifteen minute recess.

9              MR. SUROVELL: Okay.

10             THE COURT: Once you announce that, it's

11   hard to retract it. We'll start back in fifteen

12   minutes with closing arguments.

13             MR. SUROVELL: Thank you, Your Honor.

14             MR. McKAY: Thank you.

15             (Whereupon, there was a brief break in the

16   proceedings.)

17             THE COURT: Closing argument, Mr.

18   Surovell?

19             MR. SUROVELL: I'm happy to report to Your

20   Honor that at least with most of the counsel, there

21   is a record presence in this room during the

22   proceedings today, everybody is from UVA Law,

23   including Your Honor.

89

1       THE COURT:  Absolutely everybody here is

2   from UVA Law?

3       MR. SUROVELL:  Everyone except --

4       MR. McKAY:  We have some lawyers here who

5   are not, but --

6       THE COURT:  Well, I was going to make a

7   snooty statement about UVA Law, but now I won't.

8       MR. SUROVELL:  And I hope this hearing

9   doesn't keep you up, like my last one we had.

10      THE COURT:  Good.

11      MR. SUROVELL:  Actually, I've got more

12  depositions tomorrow about bed bugs.

13      THE COURT:  Mr. Surovell is referring to a

14  trial I had with him about a year ago, which he was

15  representing the plaintiff in a case.  She was

16  alleging she was injured by a bed bug infestation at

17  the hotel where she had been staying for a long

18  period of time.  And I have never been able to enjoy

19  a good night sleep in a hotel since then.

20      MR. McKAY:  Particularly in a hotel.

21      THE COURT:  Yes, that's right.  In my own

22  home, I'm fairly confident; but not in a hotel.

23      MR. SUROVELL:  I've got more depositions

90

1    about bed bugs tomorrow.

2         Your Honor, I'm not sure exactly in what

3    order to handle these.  But I guess I'll start off

4    with:  To some extent, at least legally, there is

5    some interrelationship between the contract

6    provisions and the constitutional due process

7    issues.  I guess I'll start with the constitutional

8    due process issues, because that sort of trumps

9    everything, I think.

10        Your Honor, I know, is familiar with the

11   minimum contacts International Shoe analyses that

12   overrides all of our concerns here today.  I hope

13   the court is familiar with the Burger King versus --

14   I don't know how to pronounce it -- Rudzewicz case,

15   something like that.  In that opinion, the U.S.

16   Supreme Court made clear that simply having a

17   contract with somebody is not sufficient to confer

18   constitutional due process minimum contacts upon a

19   transaction.  You still have to look beyond that.

20   You have to look at the substance and nature of the

21   relationship, not just the contract to get through

22   to the constitutional due process part of this.

23        The case that we submit, that probably has

91

1   the tightest bearing on this, is the -- I don't know

2   if Your Honor -- There are a lot of cases cited by

3   both sides -- America On-Line versus ICQ case, which

4   was the Judge Ellis opinion, Eastern District in

5   2000.

6           That case involved a situation where -- it

7   involved actually I believe the same company,

8   Network Solutions -- where Judge Ellis found that

9   simply maintaining a domain name through Network

10  Solutions does not create personal jurisdiction over

11  a company.  That company registers their domain with

12  Network Solutions.  That does not create personal

13  jurisdiction.  That's not enough.

14          The forum selection clause, I don't

15  believe is mentioned in the opinion.  But they did

16  talk a lot about the nature of contacts, which is a

17  little bit different in that case.  In that case,

18  all they were doing was domain hosting.  They

19  weren't doing the e-mail service.

20          But in that opinion, Judge Ellis noted

21  that Network Solutions wasn't acting as an ISP with

22  the amount of interaction between Network Solutions

23  and the litigant in that case.  It was pretty

92

1    minimal.  There was a small annual fee, which was

2    paid regularly in that case.  And it also pointed

3    out, in that opinion, that -- And I have a copy of

4    it, if you want me to hand it up.

5            THE COURT:  Yes, that would be good.

6    Thank you.

7            MR. SUROVELL:  Judge Ellis also pointed

8    out that --

9            THE COURT:  Wasn't the case about a third

10   party that was trying to glom onto the forum

11   selection policy?

12           MR. SUROVELL:  Exactly.  Right.  And he

13   also talked about the fact that Network Solutions'

14   location being in Virginia, did not appear to be a

15   material term or of any significance to that

16   litigant.  In terms of they weren't looking for

17   somebody in Virginia or something like that.

18           And, also, there isn't any indication of

19   any negotiations or discussions between the person

20   prior to the domain name being registered, which is

21   also pretty similar to this case.  The record you

22   have before you shows that they're not aware of any

23   discussions, any negotiations, or any contact.

93

1    In fact, I think if you look carefully at

2  the record that you have before you, Your Honor, the

3  only evidence that Your Honor has is that somebody,

4  a person, put into their computer network, a name of

5  "Nexus Holdings" as an account owner of a domain

6  name, and registered an e-mail account in the name

7  of Brett@NexusHoldings.com. And that somebody put

8  into that system that Brett Gottlieb is a primary

9  user for that account. That is, more specifically,

10  exactly, what record Your Honor has before you

11  today. And that, plus an affidavit of Mr. Gottlieb

12  saying that he has never been to Virginia --

13    THE COURT: Well, don't I have -- Isn't it

14  in the pleadings in the admissions that Nexus

15  Holdings is simply a trade name, not a separate

16  corporation; correct?

17    MR. SUROVELL: I believe the complaint is

18  directed to Nexus Holdings, LLC.

19    MR. McKAY: It's footnote 1 to the opening

20  brief that the judge is referring to.

21    THE COURT: I thought I read that Nexus

22  Holdings is simply a trade name.

23    MR. SUROVELL: In our brief?

94

1           MR. McKAY:  Yes, it's footnote 1.

2           MR. SUROVELL:  Okay.

3           MR. McKAY:  There exists no such entity.

4           MR. SUROVELL:  Yes.  I don't think anybody

5    thinks there's actually an entity anywhere that's

6    named Nexus Holdings.  What's the page, Your Honor?

7           MR. McKAY:  Page 1, footnote 1.

8           MR. SUROVELL:  Got it.  I guess that's not

9    actually in evidence.  But I guess Your Honor could

10   take notice of it.  I mean it's filed in connection

11   with this specific part of the proceedings, so I

12   guess Your Honor could take judicial notice of it,

13   technically.  But, in any event, Your Honor, that's,

14   I guess, part of the record.

15          Now, relative to the forum selection

16   clause, Your Honor, I think you have to look at the

17   clause carefully.  In some ways, I think, it's a

18   little bit inartfully worded, in that it says that

19   the parties are subjecting themselves to the

20   jurisdiction of the Eastern District of Virginia.

21   And then it says, "Or, if there is no jurisdiction,

22   under Fairfax," which I think would require the

23   plaintiff to put on some showing that there's no

95

1  jurisdiction in federal court, before they're

2  entitled to be in this court.

3          It's kind of a fuzzy situation, because

4  both courts are in Virginia.  And that might also be

5  something for a subsequent motion to this hearing,

6  in terms of whether this is the right court, or

7  federal court is the right court.  Obviously, both

8  courts are in Virginia.  But, to some extent, Your

9  Honor, the exact contract provision is a little

10  fuzzy in that it doesn't clearly state "Virginia."

11  It talks about different parts of Virginia.  I would

12  just submit that there hasn't been any showing from

13  the plaintiff as to whether or not there's --

14          THE COURT:  Network Solutions has said

15  they would rather be in federal court.  But barring

16  that, they'll reluctantly agree to be in the Fairfax

17  Circuit Court.  But they don't want to be in

18  California or anywhere else.

19          MR. SUROVELL:  Right.  The only evidence

20  right now you have about that, is that there is some

21  litigation pending in federal court in California,

22  which I believe their employee testified that she

23  knew about.  She didn't get much more specific than

96

1   that, which, to some extent, suggests that there's

2   at least a potential for jurisdiction in the Eastern

3   District of Virginia.  But, again, I think that's

4   their burden, because it's their contract.  In order

5   to get under their provision, that they have to --

6   They haven't presented, I don't think, any evidence

7   about federal jurisdiction or whether or not they're

8   out of federal jurisdiction.

9          If anything, Your Honor, I think the terms

10  of the minimum contacts, transacting business

11  provisions, I think what you have here is -- you

12  know, the evidence they've presented shows that

13  somebody put this information into the system.  It's

14  not clear who paid for it or how it was paid for,

15  because there wasn't any record of that today.  All

16  you have in front of you is that somebody put Brett

17  Gottlieb's information into this system.  And, I

18  guess, that it has been used.  They don't know by

19  who; but it has been used.

20         And, Your Honor, we would submit that

21  that's insufficient to confer personal jurisdiction

22  over our client, Brett Gottlieb, based on the record

23  you have in front of you at this time.

97

1          Now, the general appearance issue, Your

2    Honor:  It would be a lot nicer if the rules of

3    court were a lot clearer, or if the Supreme Court

4    would help give us some guidance on this, better

5    than what they've done, instead of fuzzy cases over

6    two hundred years.  In once sense the Supreme Court

7    talks about "If you do anything besides contest

8    personal jurisdiction, you're potentially creating a

9    general appearance."  On the other hand, it's

10   virtually impossible to schedule this hearing

11   without doing something else.  So there has to be a

12   line somewhere that relates, you know, at some point

13   -- If you're trying to contest personal

14   jurisdiction, I mean, you have to be able to do

15   something to contest it.  I'm sure this court

16   wouldn't want us filing ten page memos and showing

17   up for a three hour hearing on a Friday.  I'm sure

18   the court would prefer that we call calendar control

19   instead of not.

20         And so doing those kinds of things

21   couldn't possibly be inconsistent with contesting

22   personal jurisdiction, because they are sort of done

23   in furtherance of it.  Likewise, getting the

98

1    response date extended so that a frivolous pleading

2    isn't filed, or that the correct pleading is filed,

3    shouldn't be construed as the kind of substantive

4    response which gets you into a general appearance.

5            Obviously, my client didn't file a grounds

6    of defense or a demurrer, which I think my client

7    would submit would be clearly waivers of personal

8    jurisdiction.

9            I believe Network Solutions counsel cited

10   a moment ago to a case which involved a continuance.

11   I think it was a 1902 case. I'm not sure exactly

12   what that court's procedures or docket methods or

13   whatever were, back in those days. I would submit

14   that whatever the procedures were back in those

15   days, they were probably quite different from what

16   they are today. So you might need to continue a

17   hearing before you file any kind of a pleading. But

18   I would submit that asking for whatever kind of

19   continuance that was, is not the same thing as

20   asking for an extension of time to file your

21   objection to personal jurisdiction.

22           So I would submit that whatever was done

23   in this case, was done solely in furtherance of

99

1    objecting to personal jurisdiction, including the

2    deposition notice, Your Honor, which, as I pointed

3    out earlier, was simply done in furtherance of

4    putting together evidence to present today.  It was

5    not a discovery deposition.  It was solely an

6    attempt to do a de bene esse deposition for Your

7    Honor's benefit.  So I would submit that none of

8    those actions constitute the entry of a general

9    appearance.

10           And the last thing I'll just say, Your

11   Honor, before reserving for response, is clearly

12   there is this other litigation going on in federal

13   court in California.  And I think the court needs to

14   take notice of that.  The last thing we want is

15   different courts arriving at different results; one

16   court saying they have jurisdiction, and the other

17   court saying they also have jurisdiction.  Then

18   we're in a mess.

19           I know that technically -- state courts, I

20   think, stand at parity relative to each other.  Your

21   Honor, in a federal court, to some extent -- I know

22   my father has a lot of funny federal judge jokes

23   about how the federal judges think they have --

100

1    especially relative to state court judges -- how

2    they can overrule a state supreme court with a

3    strike of the pen, et cetera.  But, I think to some

4    extent, the federal court sits -- to some extent --

5    sits over a state court, in terms of its ability to

6    stay a proceeding or move it along or whatever.  I

7    think that's something this court needs to take into

8    account, in terms of whether or not to proceed on

9    this.

10           But, again, I can't file a motion or do

11   anything about it, other than to point it out and

12   say something here in court today, because of my

13   concern that we may enter a general appearance by

14   asking you to do something about it.

15           THE COURT:  I think your purpose here

16   today is to contest the jurisdiction of this court.

17           MR. SUROVELL:  Right.

18           THE COURT:  I think you don't need to

19   mince words.

20           MR. SUROVELL:  Right.  So that's all I

21   have for now, Your Honor.  I would reserve for

22   argument, based on whatever Network Solutions

23   argues.

101

1          THE COURT:  All right.  Let me hear from

2     Network Solutions.

3          MR. McKAY:  Your Honor, let me deal with

4     really the last thing first, which is this

5     California issue.  If Your Honor looks at the last

6     page that's attached to the reply that was filed by

7     the defendant, they've attached one page of the

8     California proceeding.  And you'll see that that's a

9     Doe case.  And I'm not sure how the court is

10    supposed to extrapolate from that that anything is

11    going on with respect to Mr. Gottlieb, because Doe

12    is the plaintiff in that reported class action.

13         And as I said in beginning remarks this

14    morning, the issue for this court is really today

15    just one of jurisdiction.  You're not in a position

16    where you have to face issues about which court has

17    precedence on this case, or on whose case should go

18    forward.  There is no stay motion, as Mr. Surovell

19    has said he could not file.  And that's because you

20    have only one preliminary issue to decide, which is

21    jurisdiction; and that's the only issue before you.

22         Your Honor, taking the points -- I'm going

23    to take them in a little different order than Mr.

102

1    Surovell did.  I'm taking them in the order that's

2    in our brief.

3           The general appearance:  You know, I would

4    admit that it is a harsh rule sometime.  But we all

5    have to play by what the rules are.  And if you look

6    at The City of Portsmouth case, which is a Circuit

7    case, 69 Va. Cir. 397, Judge Sword said, in 2005, he

8    had done a survey of Virginia law on this issue, and

9    found that basically any pleading, other than

10   pleading necessary to contest jurisdiction, was a

11   general appearance.  And he cited, in his litany of

12   cases that he had reviewed, the Kaiser case, which

13   is a Virginia Supreme Court case that, Your Honor,

14   we did not cite in our pleadings.  We cited a 1902

15   case.

16           This actually brings us several decades

17   later.  This is a 1938 case.  It's 169 Va. 574.  And

18   the pertinent part is 591.  And back then, the

19   Virginia Supreme Court said, again, as they had in

20   1902, that requesting or conceding to a continuance,

21   was a general appearance.

22           And in this case, the request for a

23   continuance, or a resetting of the date for a

103

1    pleading, I do not believe made any reference to the

2    fact that more time is needed to contest

3    jurisdiction.   I think there was simply a statement

4    that a continuance was needed.   We agreed to it.   It

5    came in as a praecipe with the court.

6         And, of course, beyond that, that invokes

7    the court's processes to some extent, because the

8    court had to agree to that.

9         But, then, they went specifically to the

10   court and asked the court to give him more pages.

11   Once again, this was invoking the processes of the

12   court and the discretion of the court.   And we

13   actually had to have a little hearing on that before

14   the judge in chambers on the telephone to do that.

15        And then the last thing was the deposition

16   notice.   There was no need for that deposition

17   notice.   All that had to occur was that Mr. Gottlieb

18   had to come here to testify.

19        So all those acts were voluntary.   And I

20   think when you take any one of those, and certainly

21   when you take all three of them, there was a general

22   appearance.

23        And that leads me to one point, Your

104

1    Honor:   I took several notes while Mr. Surovell was

2    talking about this notion that we hadn't proved this

3    or we hadn't proved that, that the record was

4    inadequate, and for all that you could see, this man

5    might have done a whole bunch of things.  If he

6    didn't sign that agreement, click on it, he needed

7    to come here and tell you that.  And he chose not to

8    do that.

9          And, in fact, in his pleadings, he

10   indicated to the court that he did enter into this

11   contract with Network Solutions.  He said on page 5

12   of his opening memorandum that "The execution of the

13   forum contract took place on defendant's computer in

14   San Francisco when he checked a box."

15         On page 3 of that same pleading, he says

16   that "The defendant registered a private domain name

17   and e-mail account in October 2003, and renewed the

18   registration each year until this year."  To do the

19   registration and the re-registration, the defendant

20   used his computer in California to access the

21   internet, where he filled out a form with his

22   contact and credit card information.

23         So I really don't know why we're

105

1    speculating about whether there needs to be proof of

2    what this man did.  He either should have come and

3    said it, or maybe he knew he couldn't say anything

4    because of what he said in his pleadings, which was

5    to the contrary.

6          So I think what you have before you is a

7    record that Mr. Gottlieb has had services from

8    Network Solutions.  He has had them since October

9    2003.  He not only registered in 2003, but instead

10   of taking a five year registration, he took a one

11   year registration every year.  So every year he has

12   come back and reregistered.

13         And there is undisputed proof that to get

14   to the point where he actually bought those

15   services, he had to click on that box.  And that was

16   true at the time of the registration.  And it was

17   true at the time of the renewal.

18         Whether he read the contract or not -- And

19   there were questions, "Did we have information in

20   our records to show that he did read it?"  Because

21   of the burden, we don't keep that kind of

22   information.  Whether he read it or not is his

23   business.  But to get the services --

106

1    THE COURT:  Well, there are old Virginia

2   cases, which an illiterate person signed a contract

3   with an "X."  And the Supreme Court said that if he

4   was unable to read the contract, it was his

5   obligation to get someone who could read it to him.

6    MR. McKAY:  Yes, Your Honor.  And in the

7   electronic age, the Weingrad case that we cited from

8   the Southern District of New York, which actually

9   was this very clause, in this very contract with

10   Network Solutions, said that the fact that you

11   didn't read it, that was your problem.  If you

12   didn't read it, you took the risk.  And that's

13   exactly in conformance with the cases that you're

14   citing from the Virginia Supreme Court.  In the case

15   of Weingrad, the court said that the signatory is

16   presumed to have read, understood and agreed to be

17   bound by the terms, including the forum selection

18   clause.  They cited several cases to that effect.

19    So I think what you have in front of you

20   is the undisputed fact that he bought the services,

21   he bought them at a relatively nominal charge.  And

22   in part, that charge is kept low because it is a

23   forum selection clause.  He bought the services.  He

107

1   repurchase them every year under an agreement where

2   there has been no attack today, no showing,

3   whatsoever, not even in argument, that the clause is

4   somehow unenforceable.

5          So on that basis alone, in addition to a

6   general appearance -- You can find on either the

7   general appearance grounds or the forum selection

8   clause, which is basically a consent to

9   jurisdiction, that there was jurisdiction here.

10  And, certainly, we've made the prima facie showing

11  that a number of the cases talk about.

12          Now, Mr. Surovell, I think is saying that

13  it's not enough that you can consent.  But we cited

14  cases to Your Honor, in particular the Frontline

15  case at 10 F.Supp. 2d 583, that says that personal

16  jurisdiction is waivable.  And it doesn't become a

17  constitutional issue if you waive and agree to

18  appear.

19          I, for example, Your Honor, could agree to

20  appear in Alaska, and have no contacts whatsoever

21  with Alaska.  But if I agree to go there, I think

22  constitutionally there's no issue, because I've

23  agreed to go there.  And that's what happened in

1    this case when he clicked on the agreement in order

2    to be able to buy the services.

3          And weighing -- As Your Honor pointed out,

4    there are several distinctions.  First of all, it

5    didn't involve Network Solutions' attempt to enforce

6    its forum selection clause.  It involved a third

7    party, I think AOL, trying to say, "Well, because

8    they signed a contract in Virginia with some other

9    company and signed a forum selection clause, that

10   somehow that's no contact with Virginia."  That

11   troubled Judge Ellis.  As did the fact that nothing

12   happened in that case, other than the one time

13   registration, I think it was, of two different

14   domain names.

15         And that's very different than this case.

16   Because the testimony you've heard is that every

17   time Mr. Gottlieb has sent e-mails for the past five

18   years -- four and a half years -- he has sent them

19   over servers that were always in Virginia, except

20   for one six month period when there might have been

21   servers in Boston.

22         And, Your Honor, in the service agreement

23   that he agreed to, if Your Honor looks in each of

109

1    the Exhibits 4 through 8, every one of them talks,

2    in the first paragraph introduction, about

3    "Performance of services will occur at our offices

4    in Herndon, Virginia." It's near the very bottom of

5    Exhibit 4. It appears roughly in the same place in

6    every one of those clauses. So if this man read --

7    if he didn't read, he should have read this

8    contract, seeing that he was dealing with a Virginia

9    company that was going to provide services in

10   Virginia. And he chose to purchase those services

11   and take advantage of them.

12            So I don't believe that due process

13   considerations come into play where you've got

14   consent. But even if they did, there's more than an

15   ample basis here to find the minimum contacts,

16   because of the repeated use of services of a company

17   that he knew was in Virginia, over a long period of

18   time, and sending his e-mails across servers that

19   were located in Virginia.

20            That federal court question, seems to me

21   to be just irrelevant. If you look at our

22   complaint, we're trying simply to get Mr. Gottlieb

23   to honor his contract. And in our declaration, he

110

1    has to bring whatever complaint he wants to bring in

2    Virginia.   It was not possible to find the $75,000

3    jurisdictional amount, so we were in a position

4    where the case could not be brought in federal

5    court.  And so we brought it in this court.  And if

6    they want to remove it to federal court, or if they

7    want to sue us in federal court and maintain that

8    they have federal court jurisdiction, that's their

9    prerogative.  But where we stood, under the clause,

10   there was no option except to bring it in this

11   court.  And we believe that the court --

12            THE COURT:  So you're asking for

13   declaratory judgment that Virginia, wherever in

14   Virginia, is the proper forum, as opposed to this

15   court is the proper forum?

16            MR. McKAY:  Well, Your Honor, we believe

17   that this court is the proper forum, because of the

18   circumstances.  But our declaration, taking those

19   circumstances into effect, says it is this court.

20            But if they have a case that can be

21   brought in federal court in Virginia, they can bring

22   that case in federal court.  And we'll deal with

23   whether it's properly there or properly here.

111

1    But our declarations of the forum clause

2    is enforceable and binds him to follow its dictates.

3    If he can gin up federal court jurisdiction, then

4    the case can be brought in Alexandria.  If he can't,

5    then the case has to be brought here; that's what

6    the declaration seeks.

7        THE COURT:  I understand your position.

8    Mr. Surovell, is there anything further?

9        MR. SUROVELL:  Two quick points, Your

10   Honor.  In the Burger King case, which I cited a

11   minute ago, the U.S. Supreme Court case, I don't

12   believe that case says that a contractual consent

13   gets you around the due process position.  And I'm

14   not aware of any U.S. Supreme Court authority to the

15   contrary.  But I haven't carefully researched it

16   either.  I'm counting on co-counsel to point it out

17   if it has, on this specific point.

18       But in that case, Your Honor, they said in

19   that case -- and I'm quoting from it -- they're

20   talking about a choice of law provision.  They go on

21   to say that "Although such a provision standing

22   alone would be insufficient to confer jurisdiction,

23   we believe that when combined with the twenty year

JEANNIE M. LaCROIX ROLLANDINI
9079 EMMA ANN WAY, FAIRFAX STATION, VA 22039
(703) 690-3505

112

1  independent relationship of Rudzewicz with Burger

2  King's Miami headquarters, it reinforces its

3  deliberate affiliation with the forum state and

4  reasonable foreseeability of a possible litigation."

5  And I think they're just saying in that case that

6  you have to have -- the minimum contacts analysis

7  really relates to the purposeful activity directed

8  at the forum.  I don't think a contractual provision

9  gets you to home plate.  It certainly helps.  But I

10 don't think it gets you to home plate.

11       In any event, the last point I want to say

12 regarding the point that Mr. McKay just said:  This

13 forum selection clause they've got here, will

14 entitle it to governing law.  I guess it's combined

15 governing law and forum selection clause.

16       And I've seen -- A lot of these things, I

17 think, can be sort of deceptive.  You might think

18 they say one thing, when they really say another.

19 But the way this one is worded -- And it's their

20 contract.  They wrote it.  I think that they're

21 stuck with it.  It says that this is governed by the

22 laws of the Commonwealth of Virginia.  That's the

23 first sentence, which tests of governing law.  And I

113

1   believe all four of them are the same.  Although I

2   haven't gone through and compared them.

3           Then it says, "You and we each agree to

4   submit to the exclusive subject matter and

5   jurisdiction, personal jurisdiction, and venue of

6   the United States District Court for the Eastern

7   District of Virginia, Alexandria Division, for any

8   disputes between us, under or arising out of this

9   agreement."

10          And then it says, "If there is no

11  jurisdiction in the United States District Court for

12  the Eastern District of Virginia, Alexandria

13  Division, for any disputes between --"

14          THE COURT:  You need to slow down.  The

15  court reporter can't take down what you're saying

16  when you read so quickly.

17          MR. SUROVELL:  Yes.  She always tells me

18  that after court.

19          THE COURT:  It's a natural tendency when

20  people are reading, to read very quickly, forgetting

21  that the court reporter can only go so fast.

22          MR. SUROVELL:  All right.  But the second

23  sentence, Your Honor, says that basically if there

114

1    is no jurisdiction in federal court, you and we then

2    agree that jurisdiction shall be in Fairfax County

3    -- the courts in Fairfax County, Fairfax, Virginia.

4         And what I think that does, Your Honor, is

5    that, to some extent, sets what their burden of

6    proof is in the hearing today.  This is their

7    contract.  In order for them to meet the burden of

8    their contract, I think they have to disprove

9    federal jurisdiction as part of this case.  I'm not

10   confident that they've presented this court with

11   sufficient information.  In order to do that, I

12   guess to some extent they're arguing you should just

13   look at the file and figure that out from looking at

14   the file.

15        By the way, relative to some of the

16   assertions that were made in the pleadings, it's not

17   clear to me that those are necessarily -- simply

18   predicting what the record is going to be in a

19   proceeding, does not necessarily tie your hands as

20   to what your version of the evidence is.  So it's

21   not clear that those statements made in those

22   pleadings necessarily constitute the kinds of

23   judicial admissions that Network Solutions thinks

115

1   they are or asserts they are.

2          So, in any event, Your Honor, that's the

3   only rebuttal that I have.  I would just note that I

4   hope that if anybody is keeping score in terms of

5   the objections, that doesn't -- I went down pretty

6   hard there.  Hopefully, that doesn't predict the

7   outcome.  I would ask that Your Honor find that

8   there is no personal jurisdiction.

9          THE COURT:  All right.  I am going to

10  overrule the plea in bar.  I do think that there is

11  personal jurisdiction here.

12         As far as the general appearance -- I

13  might be in a minority on this -- but I think it

14  needs to be a pleading to the merits of the case,

15  which is the same argument that I made

16  unsuccessfully to Judge Middleton about twenty years

17  ago.  It needs to be pleadings of the merits of the

18  case.  For example, an answer that was filed, or

19  something along those lines that was filed, not

20  contesting jurisdiction.  And I don't think asking

21  for more time to file your response to pleadings is

22  a general appearance.  I know I'm in a minority on

23  that.  But barring further guidance from the Supreme

116

1    Court, that's ruling on that.

2              But I do think the forum selection clause

3    is valid and is enforceable.  And I believe that

4    Virginia has long arm jurisdiction over the

5    defendant under the long arm statute, both under the

6    doing business in Virginia clause and under the

7    subsection B about using the computer network

8    located in Virginia.

9              And I don't believe that the exercise of

10   personal jurisdiction under Virginia's long arm

11   statute violates any concepts of due process.  I

12   think there is sufficient memo contacts with the

13   state.

14             So for those reasons, I'm overruling the

15   plea in bar.

16             Could you submit an order before you leave

17   today?

18             MR. McKAY:  Yes, Your Honor.

19             THE COURT:  All right.  Thank you very

20   much.

21             MR. SUROVELL:  Thank you, Your Honor.

22             THE COURT:  Court is adjourned.

23             (Whereupon, the hearing in the above-

117

1    entitled matter was concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

JEANNIE M. LaCROIX ROLLANDINI
9079 EMMA ANN WAY, FAIRFAX STATION, VA 22039
(703) 690-3505

118

## CERTIFICATE OF REPORTER

I, **Barbara S. Price,** the stenographic reporter who was duly sworn to well and truly report the foregoing proceedings, do hereby certify that they are true and correct to the best of my knowledge and ability; and that I have no interest in said proceedings, financial or otherwise, nor through relationship with any of the parties in interest or their counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this ___14th___ day of ___January___, 2008.


_Barbara S. Price_
Barbara S. Price

Notary identification number:  7032782

Expires 12/31/10